# FY 2025 NEW YORK STATE EXECUTIVE BUDGET

# EDUCATION, LABOR AND FAMILY ASSISTANCE ARTICLE VII LEGISLATION

# FY 2025 NEW YORK STATE EXECUTIVE BUDGET

## EDUCATION, LABOR AND FAMILY ASSISTANCE
## ARTICLE VII LEGISLATION

### CONTENTS

| PART | DESCRIPTION | STARTING PAGE NUMBER |
|---|---|---|
| A | School Aid | 6 |
| B | Ensure Instructional Best Practices in the Teaching of Reading | 52 |
| C | FAFSA Completion for High School Students | 54 |
| D | Amend Requirements for Bundy Aid Apportionment | 56 |
| E | Ensuring Informational Coordination Between State Educational Agencies | 58 |
| F | Tuition Assistance Program Tuition Credit Extender | 59 |
| G | Continue the Current Financing Structure for Residential Placements of Children with Special Needs Outside of New York | 60 |
| H | Authorize the Pass-Through of any Federal Supplemental Security Income Cost of Living Adjustment | 60 |
| I | Implement Mandatory Federal Child Support Changes | 63 |
| J | Require Paid Breaks for Breast Milk Expression in the Workplace | 67 |
| K | Limit Liquidated Damages in Certain Frequency of Pay Violations | 68 |
| L | Expand Recovery Tools for Stolen Wages | 69 |
| M | Sunset the State's COVID-19 Sick Leave Law | 74 |
| N | Authorize Mortgage Insurance Fund (MIF) Utilization | 75 |

| PART | DESCRIPTION | STARTING PAGE NUMBER |
|---|---|---|
| O | Enhance Protections Against Deed Theft | 78 |
| P | Authorize the repurposing of real property owned by SUNY and DOT | 98 |
| Q | Authorize New York City and the New York State Urban Development Corporation to Allow for Denser Residential Development | 106 |
| R | Authorize Tax Incentive Benefits for Converting Commercial Property to Affordable Housing | 107 |
| S | Enable the City of New York to Create a Pathway to Legalize Pre-Existing Basement and Cellar Dwelling Units in New York City | 120 |
| T | Extend the Project Completion Deadline for Vested Projects in Real Property Tax Law 421-a | 123 |
| U | Create New Tax Abatement for Rental Housing Construction | 124 |

Legislative Bill Drafting Commission
12672-01-4


S.        --------
          Senate
          --------


IN SENATE--Introduced by Sen


--read twice and ordered printed,
and when printed to be committed
to the Committee on


          -------- A.
          Assembly
          --------

IN ASSEMBLY--Introduced by M. of A.


with M. of A. as co-sponsors


--read once and referred to the
Committee on


*BUDGBI*
(Enacts into law major components of
legislation necessary to implement
the state education, labor, housing
and family assistance budget for the
2024-2025 state fiscal year)


          --------

BUDGBI. ELFA (Governor)

          AN ACT

to  amend  the  education  law,  in
relation  to  contracts  for  excel-
lence;  to  amend  the education law,
in  relation  to  foundation  aid;  to
amend  the  education  law,  in relation
to     allowable     transportation
expenses;  to  amend  the  education
law,  in  relation to transportation
aid  and  the  Clean  Water,  Clean  Air,
and  Green  Jobs  Environmental  Bond
Act  of  2022;  to  amend  the  education

## IN SENATE_____

### Senate introducer's signature

The senators whose names are circled below wish to join me in the sponsorship
of this proposal:

| | | | | |
|---|---|---|---|---|
| s15 Addabbo | s34 Fernandez | s28 Krueger | s01 Palumbo | s42 Skoufis |
| s43 Ashby | s60 Gallivan | s24 Lanza | s21 Parker | s11 Stavisky |
| s36 Bailey | s12 Gianaris | s16 Liu | s19 Persaud | s45 Stec |
| s57 Borrello | s59 Gonzalez | s50 Mannion | s13 Ramos | s35 Stewart- |
| s46 Breslin | s26 Gounardes | s04 Martinez | s05 Rhoads | Cousins |
| s25 Brisport | s53 Griffo | s07 Martins | s33 Rivera | s44 Tedisco |
| s55 Brouk | s40 Harckham | s02 Mattera | s39 Rolison | s06 Thomas |
| s09 Canzoneri- | s54 Helming | s48 May | s61 Ryan | s49 Walczyk |
| Fitzpatrick | s41 Hinchey | s37 Mayer | s18 Salazar | s52 Webb |
| s17 Chu | s47 Hoylman- | s03 Murray | s10 Sanders | s38 Weber |
| s30 Cleare | Sigal | s20 Myrie | s23 Scarcella- | s08 Weik |
| s14 Comrie | s31 Jackson | s51 Oberacker | Spanton | |
| s56 Cooney | s27 Kavanagh | s58 O'Mara | s32 Sepulveda | |
| s22 Felder | s63 Kennedy | s62 Ortt | s29 Serrano | |


## IN ASSEMBLY_____

### Assembly introducer's signature

The Members of the Assembly whose names are circled below wish to join me in the
multi-sponsorship of this proposal:

| | | | | |
|---|---|---|---|---|
| a078 Alvarez | a047 Colton | a034 Gonzalez- | a137 Meeks | a016 Sillitti |
| a031 Anderson | a140 Conrad | Rojas | a017 Mikulin | a052 Simon |
| a121 Angelino | a032 Cook | a150 Goodell | a122 Miller | a075 Simone |
| a037 Ardila | a039 Cruz | a116 Gray | a051 Mitaynes | a114 Simpson |
| a035 Aubry | a043 Cunningham | a100 Gunther | a145 Morinello | a094 Slater |
| a120 Barclay | a021 Curran | a139 Hawley | a144 Norris | a005 Smith |
| a106 Barrett | a018 Darling | a083 Heastie | a045 Novakhov | a118 Smullen |
| a105 Beephan | a053 Davila | a028 Hevesi | a069 O'Donnell | a022 Solages |
| a107 Bendett | a072 De Los Santos | a128 Hunter | a091 Otis | a110 Steck |
| a082 Benedetto | a003 DeStefano | a029 Hyndman | a132 Palmesano | a010 Stern |
| a027 Berger | a070 Dickens | a079 Jackson | a088 Paulin | a127 Stirpe |
| a042 Bichotte | a054 Dilan | a104 Jacobson | a141 Peoples- | a102 Tague |
| Hermelyn | a081 Dinowitz | a011 Jean-Pierre | Stokes | a064 Tannousis |
| a117 Blankenbush | a147 DiPietro | a134 Jensen | a023 Pheffer | a086 Tapia |
| a015 Blumencranz | a009 Durso | a115 Jones | Amato | a071 Taylor |
| a073 Bores | a099 Eachus | a125 Kelles | a063 Pirozzolo | a001 Thiele |
| a098 Brabenec | a048 Eichenstein | a040 Kim | a089 Pretlow | a033 Vanel |
| a026 Braunstein | a074 Epstein | a013 Lavine | a019 Ra | a055 Walker |
| a138 Bronson | a109 Fahy | a065 Lee | a030 Raga | a143 Wallace |
| a046 Brook-Krasny | a061 Fall | a126 Lemondes | a038 Rajkumar | a112 Walsh |
| a020 Brown, E. | a008 Fitzpatrick | a095 Levenberg | a006 Ramos | a041 Weinstein |
| a012 Brown, K. | a004 Flood | a060 Lucas | a062 Reilly | a024 Weprin |
| a093 Burdick | a057 Forrest | a135 Lunsford | a087 Reyes | a059 Williams |
| a085 Burgos | a124 Friend | a123 Lupardo | a149 Rivera | a113 Woerner |
| a142 Burke | a050 Gallagher | a129 Magnarelli | a067 Rosenthal, L. | a080 Zaccaro |
| a119 Buttenschon | a011 Gallahan | a101 Maher | a025 Rozic | a096 Zebrowski |
| a133 Byrnes | a007 Gandolfo | a036 Mamdani | a111 Santabarbara | a056 Zinerman |
| a044 Carroll | a068 Gibbs | a130 Manktelow | a090 Sayegh | a077 |
| a058 Chandler- | a002 Giglio, J.A. | a108 McDonald | a076 Seawright | |
| Waterman | a148 Giglio, J.M. | a014 McDonough | a084 Septimo | |
| a049 Chang | a066 Glick | a097 McGowan | a092 Shimsky | |
| a136 Clark | | a146 McMahon | a103 Shrestha | |

1) Single House Bill (introduced and printed separately in either or
both houses). Uni-Bill (introduced simultaneously in both houses and printed
as one bill. Senate and Assembly introducer sign the same copy of the bill).

2) Circle names of co-sponsors and return to introduction clerk in 2
signed copies of bill and: in Assembly 2 copies of memorandum in support, in
Senate 4 copies of memorandum in support (single house); or 4 signed copies
of bill and 6 copies of memorandum in support (uni-bill).

law, in relation to academic
enhancement aid; to amend the educa-
tion law, in relation to high tax
aid; to amend the education law, in
relation to universal prekindergar-
ten and the Statewide universal
full-day pre-kindergarten program;
to amend the education law, in
relation to implementation of the
smart schools bond act of 2014; to
amend the education law, in relation
to special apportionments and
grants-in-aid to school districts;
to amend chapter 91 of the laws of
2002 amending the education law and
other laws relating to reorganiza-
tion of the New York city school
construction authority, board of
education and community boards, in
relation to extending the effective-
ness thereof; to amend chapter 345
of the laws of 2009, amending the
education law and other laws relat-
ing to the New York city board of
education, chancellor, community
councils, and community superinten-
dents, in relation to the effective-
ness thereof; to amend the education
law, in relation to state aid
adjustments; to amend the education
law, in relation to extending
certain provisions of the teachers
of tomorrow teacher recruitment and
retention program; to amend the
education law, in relation to maxi-
mum class sizes for special classes
for certain students with disabili-
ties; to amend chapter 82 of the
laws of 1995, amending the education
law and other laws relating to state
aid to school districts and the
appropriation of funds for the
support of government, in relation
to the effectiveness thereof; to
amend chapter 756 of the laws of
1992 relating to funding a program
for work force education conducted
by the consortium for worker educa-
tion in New York city, in relation
to reimbursement for the 2023-2024
school year withholding a portion of
employment preparation education aid
and in relation to the effectiveness
thereof; to amend the education law,
in relation to the financing of
charter schools; to amend part A of

chapter 56 of the laws of 2023
directing the education department
to conduct a comprehensive study of
alternative tuition rate-setting
methodologies for approved providers
operating school-age and preschool
programs receiving state funding, in
relation to extending the date for
the submission of such recommenda-
tions; to amend chapter 169 of the
laws of 1994, relating to certain
provisions related to the 1994-95
state operations, aid to localities,
capital projects and debt service
budgets, in relation to the effec-
tiveness thereof; to amend chapter
97 of the laws of 2011, amending the
education law relating to census
reporting, in relation to the effec-
tiveness thereof; providing for
special apportionment for salary
expenses; providing for special
apportionment for public pension
accruals; providing for set-asides
from the state funds which certain
districts are receiving from the
total foundation aid; and providing
for support of public libraries; to
repeal certain provisions of the
education law relating to phase-in
foundation increase; and to repeal
certain provisions of the education
law relating to foundation aid (Part
A); to amend the education law, in
relation to establishing evidence-
based reading instructional best
practices for students attending
prekindergarten through grade three
(Part B); to amend the education
law, in relation to directing the
commissioner of education to require
the completion of a FAFSA or a waiv-
er of such requirement and requires
school districts issue annual
reports on students completing the
FAFSA and the waiver (Part C); to
amend the education law, in relation
to eligibility for unrestricted aid
to independent colleges and univer-
sities (Part D); to amend the educa-
tion law, in relation to ensuring
informational coordination between
state educational agencies (Part E);
to amend chapter 260 of the laws of
2011 amending the education law and
the New York state urban development

corporation act relating to estab-
lishing components of the NY-SUNY
2020 challenge grant program, in
relation to the effectiveness there-
of (Part F); to amend part N of
chapter 56 of the laws of 2020,
amending the social services law
relating to restructuring financing
for residential school placements,
in relation to the effectiveness
thereof (Part G); to amend the
social services law, in relation to
increasing the standards of monthly
need for aged, blind and disabled
persons living in the community
(Part H); to amend the family court
act and the domestic relations law,
in relation to establishment and
modification of child support orders
(Part I); to amend the labor law, in
relation to nursing employees' right
to express breast milk (Part J); to
amend the labor law, in relation to
limiting liquidated damages in
certain frequency of pay violations
(Part K); to amend the labor law, in
relation to civil penalties for
violations of certain provisions for
the payment of wages (Part L); to
amend chapter 25 of the laws of
2020, relating to providing require-
ments for sick leave and the
provision of certain employee bene-
fits when such employee is subject
to a mandatory or precautionary
order of quarantine or isolation due
to COVID-19, in relation to provid-
ing for the expiration and repeal of
such provisions (Part M); to utilize
reserves in the mortgage insurance
fund for various housing purposes
(Part N); to amend the criminal
procedure law and the penal law, in
relation to the crime of deed theft;
to amend the real property actions
and proceedings law, in relation to
the partition of heirs' property;
and to amend the real property law,
in relation to allowing transfer on
death deeds (Part O); relating to
the conveyance and use of real prop-
erty owned and maintained by the
State University of New York at
Farmingdale (Subpart A); relating to
the conveyance and use of real prop-
erty owned and maintained by the

State University of New York at
Stony Brook (Subpart B); and relat-
ing to the conveyance and use of
real property owned and maintained
by the New York State Department of
Transportation (Subpart C) (Part P);
to amend the multiple dwelling law,
in relation to authorizing a city of
one million or more to remove the
cap on the floor area ratio of
certain dwellings (Part Q); to amend
the labor law and the real property
tax law, in relation to the
exemption from real property taxa-
tion of certain multiple dwellings
in a city having a population of one
million or more (Part R); to amend
the multiple dwelling law, in
relation to establishing a program
to address the legalization of
specified basement and cellar dwell-
ing units and the conversion of
other specified basement and cellar
dwelling units in a city with a
population of one million or more
(Part S); to amend the real property
tax law, in relation to eligible
multiple dwellings under the afford-
able New York housing program (Part
T); and to amend the real property
tax law and the labor law, in
relation to enacting the affordable
neighborhoods for New Yorkers tax
incentive (Part U)

  The People of the State of New
York, represented in Senate and
Assembly, do enact as follows:

1    Section  1.  This  act  enacts into law major components of legislation

2  necessary to implement the state education, labor,  housing  and  family

3  assistance budget for the 2024-2025 state fiscal year. Each component is

4  wholly  contained  within  a  Part  identified as Parts A through U. The

5  effective date for each particular provision contained within such  Part

6  is  set  forth  in  the  last section of such Part. Any provision in any

7  section contained within a Part, including the  effective  date  of  the

8  Part,  which  makes a reference to a section "of this act", when used in

9  connection with that particular component, shall be deemed to  mean  and

10  refer  to  the  corresponding  section of the Part in which it is found.

11  Section three of this act sets forth the general effective date of  this

12  act.


13                              PART A


14    Section 1. Paragraph e of subdivision 1 of section 211-d of the educa-

15  tion law, as amended by section 1 of part A of chapter 56 of the laws of

16  2023, is amended to read as follows:

17    e.  Notwithstanding  paragraphs  a and b of this subdivision, a school

18  district that submitted a contract for excellence for the  two  thousand

19  eight--two  thousand nine school year shall submit a contract for excel-

20  lence for the  two  thousand  nine--two  thousand  ten  school  year  in

21  conformity  with the requirements of subparagraph (vi) of paragraph a of

22  subdivision two of this section unless all schools in the  district  are

23  identified  as  in  good  standing  and  provided further that, a school

24  district that submitted a contract for excellence for the  two  thousand

25  nine--two  thousand  ten school year, unless all schools in the district

26  are identified as in good standing, shall submit a contract  for  excel-

1 lence for the two thousand eleven--two thousand twelve school year which

2 shall, notwithstanding the requirements of subparagraph (vi) of para-

3 graph a of subdivision two of this section, provide for the expenditure

4 of an amount which shall be not less than the product of the amount

5 approved by the commissioner in the contract for excellence for the two

6 thousand nine--two thousand ten school year, multiplied by the

7 district's gap elimination adjustment percentage and provided further

8 that, a school district that submitted a contract for excellence for the

9 two thousand eleven--two thousand twelve school year, unless all schools

10 in the district are identified as in good standing, shall submit a

11 contract for excellence for the two thousand twelve--two thousand thir-

12 teen school year which shall, notwithstanding the requirements of

13 subparagraph (vi) of paragraph a of subdivision two of this section,

14 provide for the expenditure of an amount which shall be not less than

15 the amount approved by the commissioner in the contract for excellence

16 for the two thousand eleven--two thousand twelve school year and

17 provided further that, a school district that submitted a contract for

18 excellence for the two thousand twelve--two thousand thirteen school

19 year, unless all schools in the district are identified as in good

20 standing, shall submit a contract for excellence for the two thousand

21 thirteen--two thousand fourteen school year which shall, notwithstanding

22 the requirements of subparagraph (vi) of paragraph a of subdivision two

23 of this section, provide for the expenditure of an amount which shall be

24 not less than the amount approved by the commissioner in the contract

25 for excellence for the two thousand twelve--two thousand thirteen school

26 year and provided further that, a school district that submitted a

27 contract for excellence for the two thousand thirteen--two thousand

28 fourteen school year, unless all schools in the district are identified

1  as  in good standing, shall submit a contract for excellence for the two

2  thousand  fourteen--two  thousand  fifteen  school  year  which   shall,

3  notwithstanding  the requirements of subparagraph (vi) of paragraph a of

4  subdivision  two  of  this  section,  provide  for the expenditure of an

5  amount which shall be not less than the amount approved by  the  commis-

6  sioner in the contract for excellence for the two thousand thirteen--two

7  thousand  fourteen  school  year;  and  provided  further that, a school

8  district that submitted a contract for excellence for the  two  thousand

9  fourteen--two  thousand  fifteen  school year, unless all schools in the

10  district are identified as in good standing, shall submit a contract for

11  excellence for the two thousand  fifteen--two  thousand  sixteen  school

12  year  which shall, notwithstanding the requirements of subparagraph (vi)

13  of paragraph a of subdivision two  of  this  section,  provide  for  the

14  expenditure  of  an  amount  which  shall  be  not  less than the amount

15  approved by the commissioner in the contract for excellence for the  two

16  thousand  fourteen--two  thousand  fifteen  school  year;  and  provided

17  further that a school district that submitted a contract for  excellence

18  for  the  two thousand fifteen--two thousand sixteen school year, unless

19  all schools in the district are identified as in  good  standing,  shall

20  submit a contract for excellence for the two thousand sixteen--two thou-

21  sand seventeen school year which shall, notwithstanding the requirements

22  of  subparagraph (vi) of paragraph a of subdivision two of this section,

23  provide for the expenditure of an amount which shall be  not  less  than

24  the  amount  approved by the commissioner in the contract for excellence

25  for the two thousand fifteen--two  thousand  sixteen  school  year;  and

26  provided  further  that,  a school district that submitted a contract for

27  excellence for the two thousand sixteen--two thousand  seventeen  school

28  year,  unless  all  schools  in  the  district are identified as in good

1  standing, shall submit a contract for excellence for  the  two  thousand
2  seventeen--two  thousand eighteen school year which shall, notwithstand-
3  ing the requirements of subparagraph (vi) of paragraph a of  subdivision
4  two  of  this  section,  provide  for the expenditure of an amount which
5  shall be not less than the amount approved by the  commissioner  in  the
6  contract  for  excellence  for  the  two  thousand sixteen--two thousand
7  seventeen school year; and provided further that a school district  that
8  submitted  a contract for excellence for the two thousand seventeen--two
9  thousand eighteen school year, unless all schools in  the  district  are
10  identified  as  in good standing, shall submit a contract for excellence
11  for the two thousand eighteen--two thousand nineteen school  year  which
12  shall,  notwithstanding  the  requirements of subparagraph (vi) of para-
13  graph a of subdivision two of this section, provide for the  expenditure
14  of  an  amount  which  shall be not less than the amount approved by the
15  commissioner in the contract for excellence for the two thousand  seven-
16  teen--two  thousand  eighteen  school year; and provided further that, a
17  school district that submitted a contract for  excellence  for  the  two
18  thousand eighteen--two thousand nineteen school year, unless all schools
19  in  the  district  are  identified  as  in good standing, shall submit a
20  contract for excellence for  the  two  thousand  nineteen--two  thousand
21  twenty  school  year  which  shall,  notwithstanding the requirements of
22  subparagraph (vi) of paragraph a of subdivision  two  of  this  section,
23  provide  for  the  expenditure of an amount which shall be not less than
24  the amount approved by the commissioner in the contract  for  excellence
25  for  the  two  thousand eighteen--two thousand nineteen school year; and
26  provided further that, a school district that submitted a  contract  for
27  excellence  for  the  two  thousand nineteen--two thousand twenty school
28  year, unless all schools in the  district  are  identified  as  in  good

1  standing, shall submit a contract for excellence for the two thousand

2  twenty--two thousand twenty-one school year which shall, notwithstanding

3  the requirements of subparagraph (vi) of paragraph a of subdivision  two

4  of this section, provide for the expenditure of an amount which shall be

5  not less than the amount approved by the commissioner in the contract

6  for excellence for the two thousand nineteen--two thousand twenty school

7  year; and provided further that, a school district that submitted a

8  contract for excellence for the two thousand twenty--two thousand twen-

9  ty-one school year, unless all schools in the district are identified as

10  in good standing, shall submit a contract for excellence for the two

11  thousand twenty-one--two thousand twenty-two school year which shall,

12  notwithstanding the requirements of subparagraph (vi) of paragraph a  of

13  subdivision two of this section, provide for the expenditure of an

14  amount which shall be not less than the amount approved by the commis-

15  sioner in the contract for excellence for the two thousand twenty--two

16  thousand twenty-one school year; and provided further that, a school

17  district that submitted a contract for excellence for the two thousand

18  twenty-one--two thousand twenty-two school year, unless all schools in

19  the district are identified as in good standing, shall submit a contract

20  for excellence for the two thousand twenty-two--two thousand twenty-

21  three school year which shall, notwithstanding the requirements of

22  subparagraph (vi) of paragraph a of subdivision two of this section,

23  provide for the expenditure of an amount which shall be not less than

24  the amount approved by the commissioner in the contract for excellence

25  for the two thousand twenty-one--two thousand twenty-two school year;

26  and provided further that, a school district that submitted a contract

27  for excellence for the two thousand twenty-two--two thousand twenty-

28  three school year, unless all schools in the district are identified as

1  in good standing, shall submit a contract for  excellence  for  the  two

2  thousand twenty-three--two thousand twenty-four school year which shall,

3  notwithstanding  the requirements of subparagraph (vi) of paragraph a of

4  subdivision  two  of  this  section,  provide  for the expenditure of an

5  amount which shall be not less than the amount approved by  the  commis-

6  sioner  in the contract for excellence for the two thousand twenty-two--

7  two thousand twenty-three school year; <u>and  provided  further  that,  a</u>

8  <u>school  district  that  submitted  a contract for excellence for the two</u>

9  <u>thousand twenty-three--two thousand twenty-four school year, unless  all</u>

10 <u>schools in the district are identified as in good standing, shall submit</u>

11 <u>a contract for excellence for the two thousand twenty-four--two thousand</u>

12 <u>twenty-five school year which shall, notwithstanding the requirements of</u>

13 <u>subparagraph  (vi)  of  paragraph  a of subdivision two of this section,</u>

14 <u>provide for the expenditure of an amount which shall be  not  less  than</u>

15 <u>the  amount  approved by the commissioner in the contract for excellence</u>

16 <u>for the two thousand twenty-three--two thousand twenty-four school year;</u>

17 provided, however, that, in a city school district in a  city  having  a

18 population  of  one million or more, notwithstanding the requirements of

19 subparagraph (vi) of paragraph a of subdivision two of this section, the

20 contract for excellence shall provide for the expenditure as  set  forth

21 in  subparagraph  (v) of paragraph a of subdivision two of this section.

22 For purposes of this paragraph, the "gap elimination adjustment percent-

23 age" shall be calculated as the sum of one minus the quotient of the sum

24 of the school district's net gap elimination adjustment for two thousand

25 ten--two thousand eleven computed pursuant to chapter fifty-three of the

26 laws of two thousand ten,  making  appropriations  for  the  support  of

27 government,  plus  the  school district's gap elimination adjustment for

28 two thousand eleven--two thousand twelve as computed pursuant to chapter

1  fifty-three of the laws of two thousand eleven, making appropriations

2  for the support of the local assistance budget, including support for

3  general support for public schools, divided by the total aid for adjust-

4  ment computed pursuant to chapter fifty-three of the laws of two thou-

5  sand eleven, making appropriations for the local assistance budget,

6  including support for general support for public schools. Provided,

7  further, that such amount shall be expended to support and maintain

8  allowable programs and activities approved in the two thousand nine--two

9  thousand ten school year or to support new or expanded allowable

10 programs and activities in the current year.

11   § 2. The opening paragraph of subdivision 4 of section 3602 of the

12 education law, as amended by section 9-b of part CCC of chapter 59 of

13 the laws of 2018, is amended to read as follows:

14   In addition to any other apportionment pursuant to this chapter, a

15 school district, other than a special act school district as defined in

16 subdivision eight of section four thousand one of this chapter, shall be

17 eligible for total foundation aid equal to the <u>sum of the transition</u>

18 <u>adjustment plus the</u> product of total aidable foundation pupil units

19 multiplied by the district's selected foundation aid, which shall be the

20 greater of five hundred dollars ($500) or foundation formula aid[,

21 provided, however that for the two thousand seven--two thousand eight

22 through two thousand eight--two thousand nine school years, no school

23 district shall receive total foundation aid in excess of the sum of the

24 total foundation aid base for aid payable in the two thousand seven--two

25 thousand eight school year computed pursuant to subparagraph (i) of

26 paragraph j of subdivision one of this section, plus the phase-in foun-

27 dation increase computed pursuant to paragraph b of this subdivision,

28 and provided further that for the two thousand twelve--two thousand

1  thirteen school year, no school district shall receive total  foundation

2  aid  in excess of the sum of the total foundation aid base for aid paya-

3  ble in the two thousand eleven--two thousand twelve school year computed

4  pursuant  to subparagraph (ii) of paragraph j of subdivision one of this

5  section, plus the phase-in  foundation  increase  computed  pursuant  to

6  paragraph  b  of this subdivision, and provided further that for the two

7  thousand thirteen--two thousand fourteen school year and thereafter,  no

8  school  district shall receive total foundation aid in excess of the sum

9  of the total foundation aid base computed pursuant to subparagraph  (ii)

10  of  paragraph  j  of  subdivision one of this section, plus the phase-in

11  foundation increase computed pursuant to paragraph b of  this  subdivi-

12  sion,  and provided further that for the two thousand sixteen--two thou-

13  sand seventeen school year, no eligible school districts  shall  receive

14  total  foundation  aid  in excess of the sum of the total foundation aid

15  base computed pursuant to subparagraph (ii) of paragraph j  of  subdivi-

16  sion  one  of  this  section plus the sum of (A) the phase-in foundation

17  increase, (B) the executive foundation increase with a minimum  increase

18  pursuant  to  paragraph b-2 of this subdivision, and (C) an amount equal

19  to "COMMUNITY SCHOOLS AID" in  the  computer  listing  produced  by  the

20  commissioner  in  support  of  the  executive budget request for the two

21  thousand sixteen--two thousand  seventeen  school  year  and  entitled

22  "BT161-7", where  (1)  "eligible school district" shall be defined as a

23  district with (a) an  unrestricted  aid  increase  of  less  than  seven

24  percent (0.07) and (b) a three year average free and reduced price lunch

25  percent  greater  than fifteen percent (0.15), and (2) "unrestricted aid

26  increase" shall mean the quotient arrived at when dividing (a)  the  sum

27  of  the  executive  foundation  aid  increase plus  the gap elimination

28  adjustment for the base year, by (b) the difference of  foundation  aid

1  for the base year less the gap elimination adjustment for the base year,

2  and (3) "executive foundation increase" shall mean the difference of (a)

3  the amounts set forth for each school district as "FOUNDATION AID" under

4  the  heading "2016-17 ESTIMATED AIDS" in the school aid computer listing

5  produced by the commissioner in support of the executive budget  request

6  for  the  two  thousand  sixteen--two thousand seventeen school year and

7  entitled "BT161-7" less (b)  the  amounts  set  forth  for  each  school

8  district  as "FOUNDATION AID" under the heading "2015-16 BASE YEAR AIDS"

9  in such computer listing and provided further that total foundation  aid

10  shall  not  be  less  than  the product of the total foundation aid base

11  computed pursuant to paragraph j of subdivision one of this section  and

12  the due-minimum percent which shall be, for the two thousand twelve--two

13  thousand  thirteen  school  year,  one  hundred  and  six-tenths percent

14  (1.006) and for the two thousand thirteen--two thousand fourteen  school

15  year  for  city  school  districts of those cities having populations in

16  excess of one hundred twenty-five thousand and  less  than  one  million

17  inhabitants  one  hundred  and one and one hundred and seventy-six thou-

18  sandths percent (1.01176), and for all other districts one  hundred  and

19  three-tenths  percent  (1.003),  and  for the two thousand fourteen--two

20  thousand fifteen school year  one  hundred  and  eighty-five  hundredths

21  percent (1.0085), and for the two thousand fifteen--two thousand sixteen

22  school  year,  one  hundred  thirty-seven  hundredths  percent (1.0037),

23  subject to allocation pursuant to the provisions of subdivision eighteen

24  of this section and any provisions of a chapter of the laws of New  York

25  as described therein, nor more than the product of such total foundation

26  aid  base and one hundred fifteen percent for any school year other than

27  the two thousand seventeen--two thousand eighteen school year, provided,

28  however, that for  the  two  thousand  sixteen--two  thousand  seventeen

1  school  year such maximum shall be no more than the sum of (i) the prod-

2  uct of such total foundation aid base and one  hundred  fifteen  percent

3  plus  (ii)  the  executive foundation increase and plus (iii) "COMMUNITY

4  SCHOOLS  AID"  in  the  computer listing produced by the commissioner in

5  support of the executive budget request for the two  thousand  sixteen--

6  two  thousand  seventeen school year and entitled "BT161-7" and provided

7  further that for the two thousand nine--two  thousand  ten  through  two

8  thousand  eleven--two thousand twelve school years, each school district

9  shall receive total foundation aid in an  amount  equal  to  the  amount

10  apportioned  to  such  school  district  for the two thousand eight--two

11  thousand nine school year pursuant to this subdivision].  Total  aidable

12  foundation  pupil  units  shall be calculated pursuant to paragraph g of

13  subdivision two of this section. For the  purposes  of  calculating  aid

14  pursuant  to  this  subdivision, aid for the city school district of the

15  city of New York shall be calculated on a citywide basis.

16    § 3. Subparagraphs 1 and 4 of paragraph a of subdivision 4 of  section

17  3602  of  the  education law,  as amended by section 9-b of part CCC of

18  chapter 59 of the laws of 2018,  are amended to read as follows:

19    (1) The foundation amount shall reflect the average per pupil cost  of

20  general  education instruction in successful school districts, as deter-

21  mined by a statistical analysis of the costs of  special  education  and

22  general  education  in  successful  school  districts, provided that the

23  foundation amount shall be adjusted annually to reflect  the  <u>eight-year</u>

24  <u>average of the</u> percentage  increase  in  the  consumer price index as

25  defined by paragraph hh of subdivision one of  this  section[,  provided

26  that  for the two thousand eight--two thousand nine school year, for the

27  purpose of such adjustment, the  percentage  increase  in  the  consumer

28  price  index  shall be deemed to be two and nine-tenths percent (0.029),

1  and provided further that the foundation amount  for  the  two  thousand

2  seven--two thousand eight school year shall be five thousand two hundred

3  fifty-eight  dollars,  and  provided  further  that for the two thousand

4  seven--two  thousand  eight through two thousand seventeen--two thousand

5  eighteen school years, the foundation amount shall be  further  adjusted

6  by  the  phase-in foundation percent established pursuant to paragraph b

7  of this subdivision] <u>for the ten most recent  calendar  years  excluding</u>

8  <u>the highest and lowest values</u>.

9   (4)  The expected minimum local contribution shall equal the lesser of

10  (i) the product of (A) the quotient arrived at when the selected  actual

11  valuation  is divided by total wealth foundation pupil units, multiplied

12  by (B) the product of the local tax factor,  multiplied  by  the  income

13  wealth  index,  or (ii) the product of (A) the product of the foundation

14  amount, the regional cost index, and the pupil need index, multiplied by

15  (B) the positive difference, if any, of  one  minus  the  state  sharing

16  ratio  for  total  foundation  aid. The local tax factor shall be estab-

17  lished by May first of each year by determining the product, computed to

18  four decimal places without rounding, of ninety  percent  multiplied  by

19  the quotient of the sum of the statewide average tax rate as computed by

20  the  commissioner for the current year in accordance with the provisions

21  of paragraph e of subdivision one of section thirty-six  hundred  nine-e

22  of this part plus the statewide average tax rate computed by the commis-

23  sioner  for  the  base  year in accordance with such provisions plus the

24  statewide average tax rate computed by the  commissioner  for  the  year

25  prior  to  the  base year in accordance with such provisions, divided by

26  three[, provided however that for the two thousand  seven--two  thousand

27  eight  school  year,  such local tax factor shall be sixteen thousandths

28  (0.016), and provided further that for the two thousand eight--two thou-

1  sand nine school year, such  local  tax  factor  shall  be  one  hundred

2  fifty-four  ten  thousandths (0.0154)]. The income wealth index shall be

3  calculated pursuant to paragraph d of subdivision three of this section,

4  provided, however, that for the purposes of computing the expected mini-

5  mum  local  contribution  the income wealth index shall not be less than

6  sixty-five percent (0.65) and shall not be more than two hundred percent

7  (2.0) [and provided however that such income wealth index shall  not  be

8  more  than  ninety-five  percent  (0.95) for the two thousand eight--two

9  thousand nine school year, and provided further that such income  wealth

10 index  shall  not  be  less than zero for the two thousand thirteen--two

11 thousand fourteen school year]. The selected actual valuation  shall  be

12 calculated  pursuant  to paragraph c of subdivision one of this section.

13 Total wealth foundation pupil units  shall  be  calculated  pursuant  to

14 paragraph h of subdivision two of this section.

15   § 4. Paragraph b of subdivision 4 of section 3602 of the education law

16 is REPEALED and a new paragraph b is added to read as follows:

17   b.  Transition  adjustment.  The transition adjustment shall equal the

18 product of (1) the state sharing ratio for total foundation aid for  the

19 two  thousand  twenty-four--two  thousand  twenty-five  school  year  as

20 defined in paragraph g of subdivision three of  this  section,  but  not

21 less  than five tenths (0.5), multiplied by (2) the positive difference,

22 if any, of (i) the total amount a district was eligible  to  receive  in

23 the  two  thousand  twenty-three--two  thousand  twenty-four school year

24 pursuant to this subdivision less (ii)  the  product  of  total  aidable

25 foundation  pupil units multiplied by the district's selected foundation

26 aid for the two thousand twenty-four--two  thousand  twenty-five  school

27 year computed pursuant to this subdivision, as set forth on the computer

28 listing  produced by the commissioner in support of the executive budget

1  request for  the  two  thousand  twenty-four--two  thousand  twenty-five

2  school year and entitled "BT242-5".

3    § 5.  Paragraph  d  of subdivision 4 of section 3602 of the education

4  law, as amended by section 6 of part YYY of chapter 59 of  the  laws  of

5  2019, is amended to read as follows:

6    d.  For  the  two  thousand fourteen--two thousand fifteen through two

7  thousand [twenty-three] twenty-eight--two thousand  [twenty-four]  twen-

8  ty-nine  school  years  a  city school district of a city having a popu-

9  lation of one million or more may use amounts  apportioned  pursuant  to

10  this subdivision for afterschool programs.

11    § 6.  Paragraphs  b-2, b-3, b-4, f, g, h, i and j of subdivision 4 of

12  section 3602 of the education law are REPEALED.

13    § 7. Paragraph k of subdivision 4 of section 3602 of the education law

14  is REPEALED.

15    § 8. The undesignated closing paragraph of subdivision  3  of  section

16  3602  of  the education law, as added by section 13 of part B of chapter

17  57 of the laws of 2007, is amended to read as follows:

18    Such result shall be expressed as a decimal carried  to  three  places

19  without  rounding,  but  shall not be greater than ninety hundredths nor

20  less than zero, provided, however, that for the purpose of computing the

21  state sharing ratio for total foundation aid in the two  thousand  twen-

22  ty-four--two  thousand  twenty-five  school  year  and  thereafter, such

23  result shall not be greater than ninety-one hundredths.

24    § 9. Intentionally omitted.

25    § 10. Paragraph j of subdivision 1 of section 3602  of  the  education

26  law is amended by adding a new subparagraph (iii) to read as follows:

27    (iii)  The  total foundation aid base for aid payable in the two thou-

28  sand seven--two thousand eight school year and thereafter, and  for  aid

1 calculations  for  subsequent  school years based on aid payable in such

2 school years, shall be deemed final and not  subject  to  change  on  or

3 after  July  first  of the school year following the last school year in

4 which the commissioner may last accept and certify for payment any addi-

5 tional claim for such school year pursuant to paragraph a of subdivision

6 five of section thirty-six hundred four of this part.

7 § 11.  Subparagraphs  2  and  3  of paragraph b of subdivision 6-f of

8 section 3602 of the education law, as added by section 19 of part  H  of

9 chapter 83 of the laws of 2002,  are amended to read as follows:

10 (2)  is  a construction emergency project to remediate emergency situ-

11 ations which arise in public school buildings and  threaten  the  health

12 and/or  safety  of  building occupants, as a result of the unanticipated

13 discovery of asbestos or other hazardous substances during  construction

14 work on a school or significant damage caused by a fire, snow storm, ice

15 storm, excessive rain, high winds, flood or a similar catastrophic event

16 which results in the necessity for immediate repair[; and/or

17 (3)  if  bonded  pursuant  to  paragraph  j of subdivision six of this

18 section, would cause a city school district in a  city  having  a  popu-

19 lation  of  less  than  one  hundred twenty-five thousand inhabitants to

20 exceed ninety-five percent of its constitutional  debt  limit  provided,

21 however,  that any debt issued pursuant to paragraph c of section 104.00

22 of the local finance law shall not be included in such calculation].

23 § 12. The opening paragraph of subdivision  2  of  section  3623-a  of

24 education  law,  as  added  by  section 86 of chapter 474 of the laws of

25 1996, is amended to read as follows:

26 Allowable transportation capital, debt service and lease expense shall

27 include base year expenditures [for:] as described in this  subdivision,

28 net of revenue received with the express purpose of funding such expend-

1  itures  as  prescribed  by the commissioner, except as provided in para-

2  graph d of subdivision three of this section.

3  § 13. Subdivision 3 of section 3623-a of the education law is amended

4  by adding added a new paragraph d to read as follows:

5  d. (1) For aid payable in the two thousand  twenty-four--two  thousand

6  twenty-five school year and thereafter, notwithstanding any provision of

7  law  to the contrary, approved transportation capital, debt service, and

8  lease expenses for apportionments to school districts under  subdivision

9  seven  of  section  thirty-six hundred two of this article shall include

10 the final value of any vouchers paid on behalf  of  a  school  district,

11 payments, and grants authorized pursuant to section 58-0701 of the envi-

12 ronmental  conservation law for costs associated with the purchase of or

13 conversion to zero-emission school buses and supporting infrastructure.

14  (2) In the case of allowable expenses for transportation capital, debt

15 service, or leases which  are  related  to  costs  associated  with  the

16 purchase  of  or conversion to zero-emission school buses and supporting

17 infrastructure and which are supported in whole or in part by  vouchers,

18 payments,  or  grants  authorized  under section 58-0701 of the environ-

19 mental conservation law, such allowable expenses at the  time  in  which

20 the expense is claimed for aid shall not exceed the sum of (i) the prod-

21 uct  of  the transportation aid ratio calculated pursuant to subdivision

22 seven of section thirty-six hundred two of this  article  multiplied  by

23 allowable  expenses, plus (ii) the final value of any such vouchers paid

24 on behalf of a school district, payments, and  grants  authorized  under

25 section 58-0701 of the environmental conservation law.

26  (3)  The  entity  authorized  to  provide state assistance payments or

27 grants pursuant to subdivision two of section 58-0703  of  the  environ-

28 mental  conservation  law  shall  provide  to the commissioner a list of

1  grants awarded and payments to each school district or vouchers paid  on

2  behalf  of  a school district for the purchase of or conversion to zero-

3  emission school buses and supporting infrastructure no  later  than  one

4  month prior to the end of each calendar year and each school year.  This

5  list  shall include the type and number of zero-emission school buses to

6  be funded by these payments or grants, the supporting infrastructure  to

7  be funded by these payments or grants, the award amounts of each payment

8  or  grant,  the  direct recipient of each payment or grant, the district

9  receiving such payment or grant or that benefitted from  such  voucher,

10 the  date  on  which  the  payment  or grant was received, and any other

11 information necessary for the calculation of aid pursuant to subdivision

12 seven of section thirty-six hundred two of this article.

13   § 14. Paragraph i of subdivision 12 of section 3602 of  the  education

14 law,  as  amended  by  section 10 of part A of chapter 56 of the laws of

15 2023, is amended to read as follows:

16   i. For the two thousand  twenty-one--two  thousand  twenty-two  school

17 year  through  the two thousand [twenty-three] twenty-four--two thousand

18 [twenty-four] twenty-five school year, each  school  district  shall  be

19 entitled  to  an  apportionment  equal  to the amount set forth for such

20 school district as "ACADEMIC ENHANCEMENT"  under  the  heading  "2020-21

21 ESTIMATED  AIDS"  in  the  school  aid  computer listing produced by the

22 commissioner in support of the budget for the two  thousand  twenty--two

23 thousand  twenty-one school year and entitled "SA202-1", and such appor-

24 tionment shall be deemed to satisfy the state obligation to  provide  an

25 apportionment  pursuant  to  subdivision  eight  of  section  thirty-six

26 hundred forty-one of this article.

1    § 15. The opening paragraph of subdivision 16 of section 3602  of  the

2   education  law,  as amended by section 11 of part A of chapter 56 of the

3   laws of 2023, is amended to read as follows:

4    Each  school  district  shall  be  eligible  to receive a high tax aid

5   apportionment in the two thousand eight--two thousand nine school  year,

6   which  shall equal the greater of (i) the sum of the tier 1 high tax aid

7   apportionment, the tier 2 high tax aid apportionment and the tier 3 high

8   tax aid apportionment or (ii) the product of the apportionment  received

9   by  the school district pursuant to this subdivision in the two thousand

10  seven--two thousand eight school year,  multiplied  by  the  due-minimum

11  factor,  which shall equal, for districts with an alternate pupil wealth

12  ratio computed pursuant to paragraph b  of  subdivision  three  of  this

13  section that is less than two, seventy percent (0.70), and for all other

14  districts,  fifty percent (0.50). Each school district shall be eligible

15  to receive a high tax aid apportionment in the  two  thousand  nine--two

16  thousand  ten  through two thousand twelve--two thousand thirteen school

17  years in the amount set forth for such school district as "HIGH TAX AID"

18  under the heading "2008-09 BASE YEAR AIDS" in the  school  aid  computer

19  listing  produced  by  the commissioner in support of the budget for the

20  two thousand nine--two thousand ten school year and  entitled  "SA0910".

21  Each  school district shall be eligible to receive a high tax aid appor-

22  tionment in the two thousand thirteen--two thousand fourteen through two

23  thousand [twenty-three] twenty-four--two thousand [twenty-four]  twenty-

24  five  school  year  equal to the greater of (1) the amount set forth for

25  such school district as "HIGH TAX AID" under the heading  "2008-09  BASE

26  YEAR  AIDS"  in  the school aid computer listing produced by the commis-

27  sioner in support of the budget for the two thousand nine--two  thousand

28  ten  school  year  and entitled "SA0910" or (2) the amount set forth for

1  such school district as "HIGH TAX AID" under the heading "2013-14  ESTI-

2  MATED  AIDS"  in the  school aid computer listing produced by the commis-

3  sioner in support of the executive budget for the  2013-14  fiscal  year

4  and entitled "BT131-4".

5   § 16. Paragraph d of subdivision 10 of section 3602-e of the education

6  law,  as  amended by section 23-c of part A of chapter 56 of the laws of

7  2021, is amended to read as follows:

8   d. Notwithstanding any other provision of this section, apportionments

9  under this section greater than the amounts provided in the two thousand

10  sixteen--two thousand seventeen  school  year  shall  only  be  used  to

11  supplement  and  not  supplant  current local expenditures of [state or]

12  local funds on prekindergarten programs and the number of eligible full-

13  day four-year-old prekindergarten pupils and  eligible  full-day  three-

14  year-old  prekindergarten  pupils  in  such  programs from such sources.

15  Current local expenditures  shall  include  any  local  expenditures  of

16  [state  or]  local  funds used to supplement or extend services provided

17  directly or via contract to eligible children enrolled  in  a  universal

18  prekindergarten program pursuant to this section.

19   § 17. Subdivision 13 of section 3602-ee of the education law, as added

20  by section 1 of part CC of chapter 56 of the laws of 2014, is amended to

21  read as follows:

22   13. Apportionments under this section shall only be used to supplement

23  and not supplant current local expenditures of federal[, state] or local

24  funds  on  pre-kindergarten  programs  and  the  number of slots in such

25  programs from such sources. Current local expenditures shall include any

26  local expenditures of federal[, state] or local funds used to supplement

27  or extend services provided directly or via contract to  eligible  chil-

1  dren enrolled in a universal pre-kindergarten program pursuant to

2  section thirty-six hundred two-e of this part.

3     § 18. Subdivision 16 of section 3602-ee of the education law, as

4  amended by section 16 of part A of chapter 56 of the laws of 2023, is

5  amended to read as follows:

6     16.  The authority of the department to administer the universal full-

7  day pre-kindergarten program shall expire June thirtieth, two thousand

8  [twenty-four] twenty-five; provided that the program shall continue and

9  remain in full effect.

10    § 19. Paragraphs a and b of subdivision 16 of section 3641 of the

11 education law, as added by section 2 of part C of chapter 56 of the laws

12 of 2014, subparagraph 3 of paragraph b as amended by section 3 of part

13 YYY of chapter 59 of the laws of 2017, are amended to read as follows:

14    a. Definitions. The following terms, whenever used or referred to in

15 this subdivision, unless the context indicates otherwise, shall have the

16 following meanings:

17    (1) "Bonds" shall mean general obligation bonds issued pursuant to the

18 "smart schools bond act of 2014" in accordance with article VII of the

19 New York state constitution and article five of the state finance law.

20    [(2) "Smart schools review board" shall mean a body comprised of the

21 chancellor of the state university of New York, the director of the

22 budget, and the commissioner, or their respective designees.

23    (3)] (2) "Smart schools investment plan" shall mean a document

24 prepared by a school district setting forth the smart schools project or

25 projects to be undertaken with such district's smart schools allocation.

26    [(4)] (3) "Smart schools project" shall mean a capital project as set

27 forth and defined in subparagraphs four, five, six[,] or seven [or

28 eight] of this paragraph.

1    [(5)]  (4)  "Pre-kindergarten  or  transportable  classroom unit (TCU)

2   replacement project" shall mean a capital project which,  as  a  primary

3   purpose,  expands  the availability of adequate and appropriate instruc-

4   tional space for pre-kindergarten  or  provides  for  the  expansion  or

5   construction  of adequate and appropriate instructional space to replace

6   TCUs.

7    [(6)]  (5)  "Community   connectivity  project"  shall  mean  a  capital

8   project  which,  as  a  primary purpose, expands high-speed broadband or

9   wireless internet connectivity in the local community, including  school

10  buildings  and  campuses,  for  enhanced  educational opportunity in the

11  state.

12   [(7)]  (6) "Classroom technology project" shall mean a capital  project

13  to  expand high-speed broadband or wireless internet connectivity solely

14  for school buildings and campuses, or  to  acquire  learning  technology

15  hardware  for  schools,  classrooms,  and student use, including but not

16  limited to whiteboards,  computer  servers,  desktop  computers,  laptop

17  computers, and tablet computers.

18   [(8)]  (7) "School safety and security technology project" shall mean a

19  capital  project to install high-tech security features in school build-

20  ings and on school campuses, including but not limited to video surveil-

21  lance, emergency notification systems and physical access controls,  for

22  enhanced educational opportunity in the state.

23   [(9)]  (8) "Selected school aid" shall mean the sum of the amounts set

24  forth as "FOUNDATION AID", "FULL DAY K  CONVERSION",  "BOCES",  "SPECIAL

25  SERVICES",  "HIGH  COST EXCESS COST", "PRIVATE EXCESS COST", "HARDWARE &

26  TECHNOLOGY", "SOFTWARE,  LIBRARY,  TEXTBOOK",  "TRANSPORTATION   INCL

27  SUMMER",  "OPERATING  REORG  INCENTIVE",  "CHARTER SCHOOL TRANSITIONAL",

28  "ACADEMIC ENHANCEMENT", "HIGH TAX AID",  and  "SUPPLEMENTAL  PUB  EXCESS

1  COST" under the heading "2013-14 BASE YEAR AIDS" in the school aid

2  computer listing produced by the commissioner in support of the execu-

3  tive budget proposal for the two thousand fourteen-fifteen school year.

4   [(10)] (9) "Smart schools allocation" shall mean, for each school

5  district, the product of (i) two billion dollars ($2,000,000,000) multi-

6  plied by (ii) the quotient of such school district's selected school aid

7  divided by the total selected school aid to all school districts.

8   b. Smart schools investment plans. (1) [The smart schools review

9  board] Subject to the approval of the director of the budget, the

10 commissioner shall issue guidelines setting forth required components

11 and eligibility criteria for smart schools investment plans to be

12 submitted by school districts. Such guidelines shall include but not be

13 limited to: (i) a timeline for school district submission of smart

14 schools investment plans; (ii) any requirements for the use of available

15 state procurement options where applicable; (iii) any limitations on the

16 amount of a district's smart schools allocation that may be used for

17 assets with a short probable life; and (iv) the loan of smart schools

18 classroom technology pursuant to section seven hundred fifty-five of

19 this chapter.

20  (2) No school district shall be entitled to a smart schools grant

21 until such district shall have submitted a smart schools investment plan

22 to the [smart schools review board] department and received [such

23 board's] the commissioner's approval of such investment plan. In devel-

24 oping such investment plan, school districts shall consult with parents,

25 teachers, students, community members and other stakeholders.

26  (3) The [smart schools review board] commissioner shall review all

27 smart schools investment plans for compliance with all eligibility

28 criteria and other requirements set forth in the guidelines. The [smart

1  schools  review board]  <u>commissioner</u> may approve or reject such plans, or

2  may return such plans to the school district for modifications; provided

3  that notwithstanding any  inconsistent  provision  of  law,  the  [smart

4  schools  review  board]  <u>commissioner</u>  shall  approve no such plan first

5  submitted to the department on or after April  fifteenth,  two  thousand

6  seventeen, unless such plan calculates the amount of classroom technolo-

7  gy  to  be  loaned  to  students attending nonpublic schools pursuant to

8  section seven hundred fifty-five  of  this  chapter  in  a  manner  that

9  includes  the  amount budgeted by the school district for servers, wire-

10  less access  points  and  other  portable  connectivity  devices  to  be

11  acquired  as  part  of a school connectivity project. Upon approval, the

12  smart schools project or projects described in the investment plan shall

13  be eligible for smart schools grants. A smart schools  project  included

14  in  a  school district's smart schools investment plan shall not require

15  separate approval of the commissioner unless it  is  part  of  a  school

16  construction  project  required  to  be  submitted  for  approval of the

17  commissioner pursuant to section four  hundred  eight  of  this  chapter

18  and/or  subdivision  six of section thirty-six hundred two of this arti-

19  cle. Any department, agency or public authority shall provide the [smart

20  schools review board] <u>department</u> with any  information  it  requires  to

21  fulfill its duties pursuant to this subdivision.

22    (4)  Any  amendments or supplements to a smart schools investment plan

23  shall be submitted to the [smart schools review  board]  <u>department</u>  for

24  approval, and shall not take effect until such approval is granted.

25    § 20. Section 34 of chapter 91 of the laws of 2002 amending the educa-

26  tion  law and other laws relating to reorganization of the New York city

27  school construction authority, board of education and community  boards,

1  as  amended  by  chapter  364 of the laws of 2022, is amended to read as

2  follows:

3    § 34. This act shall take effect July 1, 2002; provided, that sections

4  one  through  twenty, twenty-four, and twenty-six through thirty of this

5  act shall expire and be deemed repealed June 30, [2024]  2028  provided,

6  further,  that notwithstanding any provision of article 5 of the general

7  construction law, on June 30, [2024] 2028 the provisions of subdivisions

8  3, 5, and 8, paragraph b of subdivision 13, subdivision  14,  paragraphs

9  b,  d,  and  e of subdivision 15, and subdivisions 17 and 21 of section

10  2554 of the education law as repealed by  section  three  of  this  act,

11  subdivision  1  of  section  2590-b  of the education law as repealed by

12  section six of this act, paragraph  (a)  of  subdivision  2  of  section

13  2590-b  of  the  education law as repealed by section seven of this act,

14  section 2590-c of the education law as repealed by section eight of this

15  act, paragraph c of subdivision 2 of section 2590-d of the education law

16  as repealed by section twenty-six of this act, subdivision 1 of  section

17  2590-e  of the education law as repealed by section twenty-seven of this

18  act, subdivision 28 of section 2590-h of the education law  as  repealed

19  by section twenty-eight of this act, subdivision 30 of section 2590-h of

20  the education law as repealed by section twenty-nine of this act, subdi-

21  vision  30-a  of  section  2590-h  of  the  education law as repealed by

22  section thirty of this  act  shall  be  revived  and  be  read  as  such

23  provisions  existed  in law on the date immediately preceding the effec-

24  tive date of this act; provided, however, that sections seven and  eight

25  of  this  act  shall  take effect on November 30, 2003; provided further

26  that the amendments to subdivision 25 of section 2554 of  the  education

27  law  made  by section two of this act shall be subject to the expiration

28  and reversion of such subdivision pursuant to section 12 of chapter  147

1  of  the  laws of 2001, as amended, when upon such date the provisions of

2  section four of this act shall take effect.

3    § 21. Subdivision 12 of section 17 of chapter 345 of the laws of 2009

4  amending the education law and other laws relating to the New York  city

5  board  of education, chancellor, community councils and community super-

6  intendents, as amended by chapter 364 of the laws of 2022, is amended to

7  read as follows:

8    12. any provision in sections one, two, three, four, five, six, seven,

9  eight, nine, ten and eleven of this act  not  otherwise  set  to  expire

10  pursuant to section 34 of chapter 91 of the laws of 2002, as amended, or

11  section  17 of chapter 123 of the laws of 2003, as amended, shall expire

12  and be deemed repealed June 30, [2024] 2028.

13    § 22. Paragraph a of subdivision 5 of section 3604  of  the  education

14  law,  as  amended by chapter 161 of the laws of 2005, is amended to read

15  as follows:

16    a. State aid adjustments. All errors or omissions in the apportionment

17  shall be corrected by the commissioner. Whenever a school  district  has

18  been  apportioned  less  money  than  that  to which it is entitled, the

19  commissioner may allot to such district the balance to which it is enti-

20  tled. Whenever a school district has been apportioned  more  money  than

21  that  to which it is entitled, the commissioner may, by an order, direct

22  such moneys to be paid back to the state to be credited to  the  general

23  fund  local  assistance  account  for  state  aid to the schools, or may

24  deduct such amount from the next  apportionment  to  be  made  to  said

25  district,  provided, however, that, upon notification of excess payments

26  of aid for which a recovery must be made by the state through  deduction

27  of  future  aid payments, a school district may request that such excess

28  payments be  recovered  by  deducting  such  excess  payments  from  the

1 payments due to such school district and payable in the month of June in

2 (i) the school year in which such notification was received and (ii) the

3 two succeeding school years, provided further that there shall be no

4 interest penalty assessed against such district or collected by the

5 state. Such request shall be made to the commissioner in such form as

6 the commissioner shall prescribe, and shall be based on documentation

7 that the total amount to be recovered is in excess of one percent of the

8 district's total general fund expenditures for the preceding school

9 year. The amount to be deducted in the first year shall be the greater

10 of (i) the sum of the amount of such excess payments that is recognized

11 as a liability due to other governments by the district for the preced-

12 ing school year and the positive remainder of the district's unreserved

13 fund balance at the close of the preceding school year less the product

14 of the district's total general fund expenditures for the preceding

15 school year multiplied by five percent, or (ii) one-third of such excess

16 payments. The amount to be recovered in the second year shall equal the

17 lesser of the remaining amount of such excess payments to be recovered

18 or one-third of such excess payments, and the remaining amount of such

19 excess payments shall be recovered in the third year. Provided further

20 that, notwithstanding any other provisions of this subdivision, any

21 pending payment of moneys due to such district as a prior year adjust-

22 ment payable pursuant to paragraph c of this subdivision for aid claims

23 that had been previously paid as current year aid payments in excess of

24 the amount to which the district is entitled and for which recovery of

25 excess payments is to be made pursuant to this paragraph, shall be

26 reduced at the time of actual payment by any remaining unrecovered

27 balance of such excess payments, and the remaining scheduled deductions

28 of such excess payments pursuant to this paragraph shall be reduced by

1   the commissioner to reflect the amount so recovered.  [The  commissioner

2   shall certify no payment to a school district based on a claim submitted

3   later  than three years after the close of the school year in which such

4   payment  was first to be made.  For claims for which payment is first to

5   be made in the nineteen hundred  ninety-six--ninety-seven  school  year,

6   the  commissioner shall certify no payment to a school district based on

7   a claim submitted later than two years after the close  of  such  school

8   year.] For claims for which payment is first to be made [in the nineteen

9   hundred  ninety-seven--ninety-eight school year and thereafter] <u>prior to</u>

10  <u>the two thousand twenty-three--two thousand twenty-four school year</u>, the

11  commissioner shall certify no payment to a school district based  on  a

12  claim submitted later than one year after the close of such school year.

13  <u>For  claims  for  which  payment is first to be made in the two thousand</u>

14  <u>twenty-three--two thousand twenty-four school year and  thereafter,  the</u>

15  <u>commissioner  shall  certify  no payment to a school district based on a</u>

16  <u>claim submitted later than the first of November of  such  school  year.</u>

17  Provided,  however,  no  payments  shall be barred or reduced where such

18  payment is required as a result of a final audit of the  state.  [It  is

19  further  provided  that,  until June thirtieth, nineteen hundred ninety-

20  six, the commissioner may grant a waiver from  the  provisions  of  this

21  section  for any school district if it is in the best educational inter-

22  ests of the district pursuant to guidelines developed by the commission-

23  er and approved by the director of the budget.] <u>It is  further  provided</u>

24  <u>that  for any apportionments provided pursuant to sections seven hundred</u>

25  <u>one, seven  hundred  eleven,  seven  hundred  fifty-one,  seven  hundred</u>

26  <u>fifty-three,  nineteen hundred fifty, thirty-six hundred two, thirty-six</u>

27  <u>hundred two-b, thirty-six hundred two-c, thirty-six  hundred  two-e  and</u>

28  <u>forty-four  hundred  five  of  this chapter for the two thousand twenty-</u>

1    three--two thousand twenty-four and two thousand twenty-four--two  thou-

2    sand twenty-five school years, the commissioner shall certify no payment

3    to a school district, other than payments pursuant to subdivisions

4    six-a, eleven, thirteen and fifteen of section thirty-six hundred two of

5    this part, in excess of the payment computed based on an electronic data

6    file used to produce  the school aid computer listing produced by the

7    commissioner in support of the executive budget  request  submitted  for

8    the two thousand twenty-four--two thousand twenty-five state fiscal year

9    and entitled "BT242-5", and further provided that for any apportionments

10   provided  pursuant  to sections seven hundred one, seven hundred eleven,

11   seven hundred fifty-one, seven  hundred  fifty-three,  nineteen  hundred

12   fifty,   thirty-six  hundred  two, thirty-six hundred two-b, thirty-six

13   hundred two-c, thirty-six hundred two-e and forty-four hundred  five  of

14   this  chapter  for the two thousand twenty-five--two thousand twenty-six

15   school year and thereafter, the commissioner shall certify no payment to

16   a school district, other than payments pursuant to  subdivisions  six-a,

17   eleven,  thirteen  and fifteen of section thirty-six hundred two of this

18   part, in excess of the payment computed based on an electronic data file

19   used to produce the school aid computer listing produced by the  commis-

20   sioner  in  support  of  the  executive budget request submitted for the

21   state fiscal year in which the school year commences.

22     § 23. The opening paragraph of section 3609-a of the education law, as

23   amended by section 18 of part A of chapter 56 of the laws  of  2023,  is

24   amended to read as follows:

25     For  aid  payable in the two thousand seven--two thousand eight school

26   year through the two  thousand  twenty-three--two  thousand  twenty-four

27   school  year,  "moneys apportioned" shall mean the lesser of (i) the sum

28   of one hundred percent of the  respective  amount  set  forth  for  each

1  school  district  as  payable  pursuant  to  this  section  in  the  school  aid

2  computer  listing  for  the  current  year  produced  by  the  commissioner  in

3  support  of  the budget which includes the appropriation for the general

4  support  for  public  schools for the prescribed payments and individual-

5  ized payments due prior to April first for the  current  year  plus  the

6  apportionment  payable during the current school year pursuant to subdi-

7  vision six-a and subdivision fifteen of section thirty-six  hundred  two

8  of  this  part  minus  any  reductions  to current year aids pursuant to

9  subdivision seven of section thirty-six hundred four of this part or any

10  deduction from  apportionment  payable  pursuant  to  this  chapter  for

11  collection  of a school district basic contribution as defined in subdi-

12  vision eight of section forty-four hundred one of this chapter, less any

13  grants provided pursuant to subparagraph two-a of paragraph b of  subdi-

14  vision  four  of section ninety-two-c of the state finance law, less any

15  grants provided pursuant to subdivision five of  section  ninety-seven-

16  nnnn  of  the  state  finance  law, less any grants provided pursuant to

17  subdivision twelve of section thirty-six hundred forty-one of this arti-

18  cle, or (ii) the apportionment calculated by the commissioner  based  on

19  data  on  file  at  the time the payment is processed; provided however,

20  that for the purposes of any payments made  pursuant  to  this  section

21  prior  to  the  first  business  day of June of the current year, moneys

22  apportioned shall not include any aids payable pursuant to  subdivisions

23  six  and  fourteen,  if applicable, of section thirty-six hundred two of

24  this part as current year aid for  debt  service  on  bond  anticipation

25  notes  and/or bonds first issued in the current year or any aids payable

26  for full-day kindergarten for the current year pursuant  to  subdivision

27  nine  of section thirty-six hundred two of this part. The definitions of

28  "base year" and "current year"  as  set  forth  in  subdivision  one  of

1   section thirty-six hundred two of this part shall apply to this section.

2   [For  aid payable in the two thousand twenty-three--two thousand twenty-

3   four school year, reference to such "school aid computer listing for the

4   current  year"  shall  mean  the  printouts entitled "SA232-4".] For aid

5   payable in the two thousand twenty-four--two thousand twenty-five school

6   year and thereafter, "moneys apportioned" shall mean the lesser of:  (i)

7   the  sum  of  one hundred percent of the respective amount set forth for

8   each school district as payable pursuant to this section in  the  school

9   aid  computer  listing for the current year produced by the commissioner

10  in support of the executive budget request which includes the  appropri-

11  ation  for  the  general  support  for public schools for the prescribed

12  payments and individualized payments due prior to April  first  for  the

13  current  year  plus  the apportionment payable during the current school

14  year pursuant to subdivisions six-a and fifteen  of  section  thirty-six

15  hundred  two  of  this  part  minus  any reductions to current year aids

16  pursuant to subdivision seven of section thirty-six hundred four of this

17  part or any deduction from apportionment payable pursuant to this  chap-

18  ter for collection of a school district basic contribution as defined in

19  subdivision  eight  of  section  forty-four hundred one of this chapter,

20  less any grants provided pursuant to subparagraph two-a of  paragraph  b

21  of  subdivision  four  of section ninety-two-c of the state finance law,

22  less any grants provided pursuant to subdivisions six of  section  nine-

23  ty-seven-nnnn  of the state finance law, less any grants provided pursu-

24  ant to subdivision twelve of section  thirty-six  hundred  forty-one  of

25  this  article,  or (ii) the apportionment calculated by the commissioner

26  based on data on file at the time the  payment  is  processed;  provided

27  however,  that  for  the  purposes of any payments made pursuant to this

28  section prior to the first business day of June  of  the  current  year,

1   moneys apportioned shall not include any aids payable pursuant to subdi-

2   visions  six  and fourteen, if applicable, of section thirty-six hundred

3   two of this part as current year aid for debt  service  on  bond  antic-

4   ipation  notes and/or bonds first issued in the current year or any aids

5   payable for full-day kindergarten  for  the  current  year  pursuant  to

6   subdivision nine of section thirty-six hundred two of this part. For aid

7   payable in the two thousand twenty-four--two thousand twenty-five school

8   year,  reference  to  such  "school aid computer listing for the current

9   year" shall mean the printouts entitled "BT242-5".

10    § 24. Paragraph b of subdivision 2 of section 3612  of  the  education

11   law,  as  amended by section 22 of part YYY of chapter 59 of the laws of

12   2019, is amended to read as follows:

13    b. Such grants shall be awarded to school districts, within the limits

14   of funds appropriated therefor, through a competitive process that takes

15   into consideration the magnitude of any  shortage  of  teachers  in  the

16   school  district, the number of teachers employed in the school district

17   who hold temporary licenses to teach in the public schools of the state,

18   the number of provisionally certified teachers, the fiscal capacity  and

19   geographic  sparsity  of  the  district,  the number of new teachers the

20   school district intends to hire in the coming school year and the number

21   of summer in the city student internships proposed by an eligible school

22   district, if applicable. Grants provided pursuant to this section  shall

23   be used only for the purposes enumerated in this section.  Notwithstand-

24   ing  any  other provision of law to the contrary, a city school district

25   in a city having a population of one million or more inhabitants receiv-

26   ing a grant pursuant to this section may use no more than eighty percent

27   of such grant funds for any  recruitment,  retention  and  certification

28   costs  associated  with transitional certification of teacher candidates

1  for the school years two thousand one--two thousand two through two

2  thousand [twenty-three] <u>twenty-eight</u>--two thousand [twenty-four] <u>twen-</u>

3  <u>ty-nine</u>.

4     § 25. Subdivision 6 of section 4402 of the education law, as amended

5  by section 23 of part YYY of chapter 59 of the laws of 2019, is amended

6  to read as follows:

7     6. Notwithstanding any other law, rule or regulation to the contrary,

8  the board of education of a city school district with a population of

9  one hundred twenty-five thousand or more inhabitants shall be permitted

10 to establish maximum class sizes for special classes for certain

11 students with disabilities in accordance with the provisions of this

12 subdivision. For the purpose of obtaining relief from any adverse fiscal

13 impact from under-utilization of special education resources due to low

14 student attendance in special education classes at the middle and

15 secondary level as determined by the commissioner, such boards of educa-

16 tion shall, during the school years nineteen hundred ninety-five--nine-

17 ty-six through June thirtieth, two thousand [twenty-four] <u>twenty-nine</u>,

18 be authorized to increase class sizes in special classes containing

19 students with disabilities whose age ranges are equivalent to those of

20 students in middle and secondary schools as defined by the commissioner

21 for purposes of this section by up to but not to exceed one and two

22 tenths times the applicable maximum class size specified in regulations

23 of the commissioner rounded up to the nearest whole number, provided

24 that in a city school district having a population of one million or

25 more, classes that have a maximum class size of fifteen may be increased

26 by no more than one student and provided that the projected average

27 class size shall not exceed the maximum specified in the applicable

28 regulation, provided that such authorization shall terminate on June

1  thirtieth, two thousand. Such authorization shall be granted upon filing

2  of a notice by such a board of education with the  commissioner  stating

3  the  board's  intention to increase such class sizes and a certification

4  that  the  board  will  conduct  a  study  of attendance problems at the

5  secondary level and will implement a corrective action plan to  increase

6  the  rate of attendance of students in such classes to at least the rate

7  for students attending regular education classes in secondary schools of

8  the district.  Such  corrective  action  plan  shall  be  submitted  for

9  approval  by  the commissioner by a date during the school year in which

10  such board increases class sizes as provided pursuant to  this  subdivi-

11  sion  to  be  prescribed  by the commissioner. Upon at least thirty days

12  notice to the board of education, after conclusion of the school year in

13  which such board increases class sizes  as  provided  pursuant  to  this

14  subdivision,  the  commissioner  shall  be  authorized to terminate such

15  authorization upon a finding that the board has  failed  to  develop  or

16  implement an approved corrective action plan.

17   § 26. Subdivisions 22 and 24 of section 140 of chapter 82 of the laws

18  of 1995, amending the education law and other laws relating to state aid

19  to school districts and the appropriation of funds for  the  support  of

20  government,  as  amended  by section 38 of part YYY of chapter 59 of the

21  laws of 2019, are amended to read as follows:

22   (22) sections one hundred twelve, one hundred  thirteen,  one  hundred

23  fourteen,  one hundred fifteen and one hundred sixteen of this act shall

24  take effect on July 1, 1995; provided, however, that section one hundred

25  thirteen of this act shall remain in full force and effect until July 1,

26  [2024] 2029 at which time it shall be deemed repealed;

27   (24) sections one hundred eighteen through one hundred thirty of  this

28  act  shall  be deemed to have been in full force and effect on and after

1  July 1, 1995; provided further, however, that the amendments made pursu-

2  ant to section one hundred twenty-four of this act shall be deemed to be

3  repealed on and after July 1, [2024] 2029;

4    § 27.  Subdivision b of section 2 of chapter 756 of the laws of 1992,

5  relating to funding a program for work force education conducted by  the

6  consortium  for worker education in New York city, as amended by section

7  20 of part A of chapter 56 of the laws of 2023, is amended  to  read  as

8  follows:

9    b.  Reimbursement for programs approved in accordance with subdivision

10  a of this section for the reimbursement for the 2018--2019  school  year

11  shall not exceed 59.4 percent of the lesser of such approvable costs per

12  contact hour or fourteen dollars and ninety-five cents per contact hour,

13  reimbursement  for  the  2019--2020  school  year  shall not exceed 57.7

14  percent of the lesser of such  approvable  costs  per  contact  hour  or

15  fifteen  dollars  sixty  cents  per  contact hour, reimbursement for the

16  2020--2021 school year shall not exceed 56.9 percent of  the  lesser  of

17  such  approvable  costs  per contact hour or sixteen dollars and twenty-

18  five cents per contact hour, reimbursement  for  the  2021--2022  school

19  year  shall  not  exceed  56.0  percent of the lesser of such approvable

20  costs per contact hour or sixteen dollars and forty  cents  per  contact

21  hour, reimbursement for the 2022--2023 school year shall not exceed 55.7

22  percent  of  the  lesser  of  such  approvable costs per contact hour or

23  sixteen dollars and sixty cents per contact  hour,  [and]  reimbursement

24  for  the  2023--2024  school  year  shall not exceed 54.7 percent of the

25  lesser of such approvable costs per contact hour  or  seventeen  dollars

26  and seventy cents per contact hour, and reimbursement for the 2024--2025

27  school year shall not exceed 56.6 percent of the lesser of such approva-

28  ble costs per contact hour or nineteen dollars and ten cents per contact

1  <u>hour,</u> and  where a contact hour represents sixty minutes of instruction

2  services provided to an  eligible  adult.    Notwithstanding  any  other

3  provision  of  law  to the contrary, for the 2018--2019 school year such

4  contact  hours  shall  not  exceed  one million four hundred sixty-three

5  thousand nine hundred sixty-three (1,463,963); for the 2019--2020 school

6  year such contact hours  shall  not  exceed  one  million  four  hundred

7  forty-four  thousand  four  hundred  forty-four  (1,444,444);  for  the

8  2020--2021 school year such contact hours shall not exceed  one  million

9  four  hundred  six thousand nine hundred twenty-six (1,406,926); for the

10  2021--2022 school year such contact hours shall not exceed  one  million

11  four  hundred  sixteen  thousand one hundred twenty-two (1,416,122); for

12  the 2022--2023 school year such  contact  hours  shall  not  exceed  one

13  million  four  hundred six thousand nine hundred twenty-six (1,406,926);

14  [and] for the 2023--2024 school year such contact hours shall not exceed

15  one million three hundred forty-two thousand nine  hundred  seventy-five

16  (1,342,975)<u>; and for the 2024--2025 school year such contact hours shall</u>

17  <u>not  exceed  one  million sixty-three thousand eight hundred twenty-nine</u>

18  <u>(1,063,829)</u>. Notwithstanding any other provision of law to the contrary,

19  the apportionment calculated for the city school district of the city of

20  New York pursuant to subdivision 11 of section 3602 of the education law

21  shall be computed as if such contact hours provided  by  the  consortium

22  for  worker education, not to exceed the contact hours set forth herein,

23  were eligible for aid in accordance with the provisions of such subdivi-

24  sion 11 of section 3602 of the education law.

25   § 28. Section 4 of chapter 756 of the laws of 1992, relating to  fund-

26  ing  a  program for work force education conducted by the consortium for

27  worker education in New York city, is amended by adding a  new  subdivi-

28  sion cc to read as follows:

1    cc.  The  provisions  of  this  subdivision  shall not apply after the

2    completion of payments for the 2024-25 school year.  Notwithstanding any

3    inconsistent provisions of law,  the  commissioner  of  education  shall

4    withhold  a  portion  of employment preparation education aid due to the

5    city school district of the city of New York to support a portion of the

6    costs of the work force education program. Such moneys shall be credited

7    to  the elementary and secondary education fund-local assistance account

8    and shall not  exceed  eleven  million  five  hundred  thousand  dollars

9    ($11,500,000).

10   § 29. Section 6 of chapter 756 of the laws of 1992, relating to fund-

11   ing a program for work force education conducted by the  consortium  for

12   worker education in New York city, as amended by section 22 of part A of

13   chapter 56 of the laws of 2023, is amended to read as follows:

14   § 6.  This  act  shall  take effect July 1, 1992, and shall be deemed

15   repealed June 30, [2024] 2025.

16   § 30. Paragraph (d) of subdivision 1 of section 2856 of the  education

17   law,  as  amended by section 36-c of part A of chapter 56 of the laws of

18   2021, is amended to read as follows:

19   (d) School districts shall be eligible  for  an  annual  apportionment

20   equal  to  the  amount of the supplemental basic tuition for the charter

21   school in the base year for the expenses incurred in  the  two  thousand

22   fourteen--two  thousand  fifteen,  two  thousand  fifteen--two  thousand

23   sixteen, two thousand sixteen--two thousand seventeen school  years  and

24   thereafter.  Provided  that  for  expenses  incurred in the two thousand

25   twenty--two thousand twenty-one school year, for a city school  district

26   in  a city having a population of one million or more, the annual appor-

27   tionment shall be reduced by thirty-five million  dollars  ($35,000,000)

28   upon  certification by the director of the budget of the availability of

1  a grant in the same amount from  the  elementary  and  secondary  school

2  emergency  relief funds provided through the American rescue plan act of

3  2021 (P.L. 117-2).  Provided further that for expenses incurred  in  the

4  two  thousand  twenty-three--two thousand twenty-four school year, for a

5  city school district in a city having a population  of  one  million  or

6  more,  the  annual apportionment shall be reduced by thirty-five million

7  dollars ($35,000,000) upon certification by the director of  the  budget

8  of  the  availability  of a grant in the same amount from the elementary

9  and secondary school emergency relief funds provided through the  Ameri-

10  can rescue plan act of 2021 (P.L.  117-2).

11    § 31. Paragraph (c) of subdivision 1 of section 2856 of the education

12  law, as amended by section 36-d of part A of chapter 56 of the  laws  of

13  2021, is amended to read as follows:

14    (c)  School  districts  shall  be eligible for an annual apportionment

15  equal to the amount of the supplemental basic tuition for  the  charter

16  school  in  the  base year for the expenses incurred in the two thousand

17  fourteen--two  thousand  fifteen,  two  thousand  fifteen--two  thousand

18  sixteen,  two  thousand sixteen--two thousand seventeen school years and

19  thereafter. Provided that for expenses  incurred  in  the  two  thousand

20  twenty--two  thousand twenty-one school year, for a city school district

21  in a city having a population of one million or more, the annual  appor-

22  tionment  shall  be reduced by thirty-five million dollars ($35,000,000)

23  upon certification by the director of the budget of the availability  of

24  a  grant  in  the  same  amount from the elementary and secondary school

25  emergency relief funds provided through the American rescue plan act  of

26  2021  (P.L. 117-2).  Provided further that for expenses incurred in the

27  two thousand twenty-three--two thousand twenty-four school year,  for  a

28  city  school  district  in  a city having a population of one million or

1   <u>more, the annual apportionment shall be reduced by  thirty-five  million</u>

2   <u>dollars  ($35,000,000)  upon certification by the director of the budget</u>

3   <u>of the availability of a grant in the same amount  from  the  elementary</u>

4   <u>and  secondary school emergency relief funds provided through the Ameri-</u>

5   <u>can rescue plan act of 2021 (P.L. 117-2).</u>

6     § 32. Subdivision 3 of section 27 of part A of chapter 56 of the  laws

7   of  2023  directing  the education department to conduct a comprehensive

8   study of alternative tuition  rate-setting  methodologies  for  approved

9   providers  operating  school-age  and preschool programs receiving state

10  funding, is amended to read as follows:

11    3. The state education department shall  present  its  recommendations

12  and  analysis to the governor, the director of the division of the budg-

13  et, the temporary president of the senate, the speaker of the  assembly,

14  the  chairperson of the senate finance committee, and the chairperson of

15  the assembly ways and means committee no later than July 1, [2025] <u>2027</u>.

16  Adoption of any alternative rate-setting methodologies shall be  subject

17  to the approval of the director of the division of the budget.

18    § 33. Subdivision 1 of section 167 of chapter 169 of the laws of 1994,

19  relating  to certain provisions related to the 1994-95 state operations,

20  aid to localities, capital projects and debt service budgets, as amended

21  by section 23 of part A of chapter 56 of the laws of 2022, is amended to

22  read as follows:

23    1. Sections one through seventy of this act shall be  deemed  to  have

24  been  in  full  force  and effect as of April 1, 1994 provided, however,

25  that  sections  one,  two,  twenty-four,  twenty-five and  twenty-seven

26  through seventy of this act shall expire and be deemed repealed on March

27  31, 2000; provided, however, that section twenty of this act shall apply

28  only  to  hearings  commenced  prior  to September 1, 1994, and provided

1  further that section twenty-six of this act shall expire and  be  deemed

2  repealed  on  March  31,  1997;  and provided further that sections four

3  through fourteen, sixteen, and eighteen, nineteen and twenty-one through

4  twenty-one-a  of  this  act shall expire and be deemed repealed on March

5  31, 1997; and provided further that sections three, fifteen,  seventeen,

6  twenty,  twenty-two  and  twenty-three  of  this act shall expire and be

7  deemed repealed on March 31, [2024] 2029.

8    § 34. Section 26 of subpart F of part C of chapter 97 of the  laws  of

9  2011 amending the education law relating to census reporting, as amended

10  by  section 46 of part YYY of chapter 59 of the laws of 2019, is amended

11  to read as follows:

12    § 26. This act shall take effect immediately provided,  however,  that

13  the provisions of section three of this act shall expire June 30, [2024]

14  2029  when upon such date the provisions of such section shall be deemed

15  repealed; provided, further that the provisions of sections eight, elev-

16  en, twelve, thirteen and twenty of this act shall expire  July  1,  2014

17  when  upon  such  date  the  provisions of such sections shall be deemed

18  repealed.

19    § 35. Special apportionment for salary  expenses.  1.  Notwithstanding

20  any  other  provision  of  law,  upon application to the commissioner of

21  education, not sooner than the first day of  the  second  full  business

22  week  of  June  2025  and  not later than the last day of the third full

23  business week of June 2025, a school district eligible for an apportion-

24  ment pursuant to section 3602 of the education law shall be eligible  to

25  receive  an  apportionment pursuant to this section, for the school year

26  ending June 30, 2025, for salary expenses incurred between April  1  and

27  June 30, 2024 and such apportionment shall not exceed the sum of (a) the

28  deficit  reduction assessment of 1990--1991 as determined by the commis-

1  sioner of education, pursuant to paragraph f of subdivision 1 of section

2  3602 of the education law, as in effect through June 30, 1993, plus (b)

3  186 percent of such amount for a city school district in a city with a

4  population in excess of 1,000,000 inhabitants, plus (c) 209 percent of

5  such amount for a city school district in a city with a population of

6  more than 195,000 inhabitants and less than 219,000 inhabitants accord-

7  ing to the latest federal census, plus (d) the net gap elimination

8  adjustment for 2010--2011, as determined by the commissioner of educa-

9  tion pursuant to chapter 53 of the laws of 2010, plus (e) the gap elimi-

10 nation adjustment for 2011--2012 as determined by the commissioner of

11 education pursuant to subdivision 17 of section 3602 of the education

12 law, and provided further that such apportionment shall not exceed such

13 salary expenses. Such application shall be made by a school district,

14 after the board of education or trustees have adopted a resolution to do

15 so and in the case of a city school district in a city with a population

16 in excess of 125,000 inhabitants, with the approval of the mayor of such

17 city.

18  2. The claim for an apportionment to be paid to a school district

19 pursuant to subdivision one of this section shall be submitted to the

20 commissioner of education on a form prescribed for such purpose, and

21 shall be payable upon determination by such commissioner that the form

22 has been submitted as prescribed. Such approved amounts shall be payable

23 on the same day in September of the school year following the year in

24 which application was made as funds provided pursuant to subparagraph

25 (4) of paragraph b of subdivision 4 of section 92-c of the state finance

26 law, on the audit and warrant of the state comptroller on vouchers

27 certified or approved by the commissioner of education in the manner

28 prescribed by law from moneys in the state lottery fund and from the

1  general  fund  to  the  extent  that the amount paid to a school district

2  pursuant to this section exceeds the amount, if  any,  due  such  school

3  district pursuant to subparagraph (2) of paragraph a of subdivision 1 of

4  section  3609-a  of  the  education law in the school year following the

5  year in which application was made.

6    3. Notwithstanding the provisions of section 3609-a of  the  education

7  law, an amount equal to the amount paid to a school district pursuant to

8  subdivisions  one  and  two of this section shall first be deducted from

9  the following payments due the school district during  the  school  year

10 following  the  year  in which application was made pursuant to subpara-

11 graphs (1), (2), (3), (4) and (5) of paragraph a  of  subdivision  1  of

12 section  3609-a of the education law in the following order: the lottery

13 apportionment payable pursuant to subparagraph  (2)  of  such  paragraph

14 followed by the fixed fall payments payable pursuant to subparagraph (4)

15 of  such  paragraph  and then followed by the district's payments to the

16 teachers' retirement system pursuant to subparagraph (1) of  such  para-

17 graph, and any remainder to be deducted from the individualized payments

18 due  the  district  pursuant to paragraph b of such subdivision shall be

19 deducted on a chronological basis starting with the earliest payment due

20 the district.

21   § 36. Special apportionment for public pension accruals. 1.  Notwith-

22 standing any other provision of law, upon application to the commission-

23 er  of education, not later than June 30, 2025, a school district eligi-

24 ble for an apportionment pursuant to section 3602 of the  education  law

25 shall  be eligible to receive an apportionment pursuant to this section,

26 for the school year ending June 30, 2025 and  such  apportionment  shall

27 not  exceed  the  additional  accruals  required  to  be made by school

28 districts in the 2004--2005 and 2005--2006 school years associated  with

1  changes  for  such  public pension liabilities. The amount of such addi-

2  tional accrual shall be certified to the commissioner  of  education  by

3  the  president of the board of education or the trustees or, in the case

4  of  a  city  school  district  in  a city with a population in excess of

5  125,000 inhabitants, the mayor of such city. Such application  shall  be

6  made by a school district, after the board of education or trustees have

7  adopted  a resolution to do so and in the case of a city school district

8  in a city with a population in excess of 125,000 inhabitants,  with  the

9  approval of the mayor of such city.

10   2.  The  claim  for  an  apportionment to be paid to a school district

11  pursuant to subdivision one of this section shall be  submitted  to  the

12  commissioner  of  education  on  a form prescribed for such purpose, and

13  shall be payable upon determination by such commissioner that  the  form

14  has been submitted as prescribed. Such approved amounts shall be payable

15  on  the  same  day in September of the school year following the year in

16  which application was made as funds provided  pursuant  to  subparagraph

17  (4) of paragraph b of subdivision 4 of section 92-c of the state finance

18  law,  on  the  audit  and  warrant  of the state comptroller on vouchers

19  certified or approved by the commissioner of  education  in  the  manner

20  prescribed  by  law  from  moneys in the state lottery fund and from the

21  general fund to the extent that the amount paid  to  a  school  district

22  pursuant  to  this  section  exceeds the amount, if any, due such school

23  district pursuant to subparagraph (2) of paragraph a of subdivision 1 of

24  section 3609-a of the education law in the  school  year  following  the

25  year in which application was made.

26   3.  Notwithstanding  the provisions of section 3609-a of the education

27  law, an amount equal to the amount paid to a school district pursuant to

28  subdivisions one and two of this section shall first  be  deducted  from

1  the  following  payments  due the school district during the school year

2  following the year in which application was made  pursuant  to  subpara-

3  graphs  (1),  (2),  (3),  (4) and (5) of paragraph a of subdivision 1 of

4  section  3609-a of the education law in the following order: the lottery

5  apportionment payable pursuant to subparagraph  (2)  of  such  paragraph

6  followed by the fixed fall payments payable pursuant to subparagraph (4)

7  of  such  paragraph  and then followed by the district's payments to the

8  teachers' retirement system pursuant to subparagraph (1) of  such  para-

9  graph, and any remainder to be deducted from the individualized payments

10  due  the  district  pursuant to paragraph b of such subdivision shall be

11  deducted on a chronological basis starting with the earliest payment due

12  the district.

13    § 37. The amounts specified in this section shall be a set-aside  from

14  the  state  funds  which  each such district is receiving from the total

15  foundation aid:

16    1. for the development, maintenance or expansion of magnet schools  or

17  magnet  school  programs  for  the  2024--2025 school year. For the city

18  school district of the city of New York there shall be  a  set-aside  of

19  foundation  aid  equal  to  forty-eight million one hundred seventy-five

20  thousand dollars ($48,175,000) including five hundred  thousand  dollars

21  ($500,000)  for  the  Andrew  Jackson  High School; for the Buffalo city

22  school  district,  twenty-one  million  twenty-five   thousand   dollars

23  ($21,025,000);  for  the Rochester city school district, fifteen million

24  dollars ($15,000,000); for the Syracuse city school  district,  thirteen

25  million  dollars  ($13,000,000);  for  the Yonkers city school district,

26  forty-nine million five hundred thousand dollars ($49,500,000); for  the

27  Newburgh city school district, four million six hundred forty-five thou-

28  sand  dollars  ($4,645,000);  for the Poughkeepsie city school district,

1  two million four hundred seventy-five thousand dollars ($2,475,000); for

2  the Mount Vernon city school district, two million dollars ($2,000,000);

3  for the New Rochelle city school district, one million four hundred  ten

4  thousand dollars ($1,410,000); for the Schenectady city school district,

5  one  million  eight  hundred thousand dollars ($1,800,000); for the Port

6  Chester city school district, one million  one  hundred  fifty  thousand

7  dollars  ($1,150,000);  for  the White Plains city school district, nine

8  hundred thousand dollars ($900,000); for the Niagara Falls  city  school

9  district,  six  hundred thousand dollars ($600,000); for the Albany city

10 school district, three  million  five  hundred  fifty  thousand  dollars

11 ($3,550,000);  for  the  Utica city school district, two million dollars

12 ($2,000,000); for the Beacon city school district, five  hundred  sixty-

13 six  thousand  dollars  ($566,000);  for  the  Middletown  city  school

14 district, four hundred thousand dollars ($400,000);  for  the  Freeport

15 union  free  school  district, four hundred thousand dollars ($400,000);

16 for the Greenburgh  central  school  district,  three  hundred  thousand

17 dollars  ($300,000);  for  the  Amsterdam  city  school  district, eight

18 hundred thousand dollars ($800,000);  for  the  Peekskill  city  school

19 district,  two  hundred  thousand dollars ($200,000); and for the Hudson

20 city school district, four hundred thousand dollars ($400,000).

21   2. Notwithstanding any inconsistent provision of law to the  contrary,

22 a  school  district  setting  aside such foundation aid pursuant to this

23 section may use such set-aside  funds  for:  (a)  any  instructional  or

24 instructional  support  costs  associated with the operation of a magnet

25 school; or (b) any instructional or instructional support costs  associ-

26 ated with implementation of an alternative approach to promote diversity

27 and/or enhancement of the instructional program and raising of standards

1  in  elementary and secondary schools of school districts having substan-

2  tial concentrations of minority students.

3    3.  The  commissioner of education shall not be authorized to withhold

4  foundation aid from a school district that used such funds in accordance

5  with this paragraph, notwithstanding any inconsistency with  a  request

6  for  proposals issued by such commissioner for the purpose of attendance

7  improvement and dropout prevention for the 2024--2025 school  year,  and

8  for  any city school district in a city having a population of more than

9  one million,  the  set-aside  for  attendance  improvement  and  dropout

10 prevention  shall  equal  the amount set aside in the base year. For the

11 2024--2025 school year, it is further  provided  that  any  city  school

12 district  in  a  city having a population of more than one million shall

13 allocate at least one-third of any increase from  base  year  levels  in

14 funds set aside pursuant to the requirements of this section to communi-

15 ty-based  organizations.  Any increase required pursuant to this section

16 to community-based organizations must  be  in  addition  to  allocations

17 provided to community-based organizations in the base year.

18   4.  For the purpose of teacher support for the 2024--2025 school year:

19 for the city school district of the city of New York, sixty-two  million

20 seven hundred seven thousand dollars ($62,707,000); for the Buffalo city

21 school  district,  one  million seven hundred forty-one thousand dollars

22 ($1,741,000); for the Rochester city school district, one million seven-

23 ty-six thousand  dollars  ($1,076,000);  for  the  Yonkers  city  school

24 district,  one  million  one  hundred  forty-seven  thousand  dollars

25 ($1,147,000); and for the Syracuse city school district,  eight  hundred

26 nine  thousand  dollars  ($809,000). All funds made available to a school

27 district pursuant to this section shall be  distributed  among  teachers

28 including  prekindergarten teachers and teachers of adult vocational and

1  academic subjects in accordance with this section and shall be in  addi-

2  tion  to  salaries heretofore or hereafter negotiated or made available;

3  provided, however, that all funds distributed pursuant to  this  section

4  for  the  current year shall be deemed to incorporate all funds distrib-

5  uted pursuant to former subdivision 27 of section 3602 of the  education

6  law  for prior years. In school districts where the teachers are repres-

7  ented by certified or  recognized  employee  organizations,  all  salary

8  increases  funded  pursuant to this section shall be determined by sepa-

9  rate collective negotiations conducted pursuant to  the  provisions  and

10  procedures  of  article 14 of the civil service law, notwithstanding the

11  existence of a negotiated agreement between  a  school  district  and  a

12  certified or recognized employee organization.

13    § 38.  Support  of  public libraries. The moneys appropriated for the

14  support of public libraries by a chapter of the laws  of  2024  enacting

15  the  aid  to  localities  budget shall be apportioned for the 2024--2025

16  state fiscal year in accordance with the  provisions  of  sections  271,

17  272,  273,  282,  284,  and  285  of the education law as amended by the

18  provisions of such chapter and the provisions of this section,  provided

19  that library construction aid pursuant to section 273-a of the education

20  law  shall  not  be  payable  from the appropriations for the support of

21  public libraries and provided further that no library, library system or

22  program, as defined by the commissioner of education, shall receive less

23  total system or program aid than it received  for  the  year  2001--2002

24  except as a result of a reduction adjustment necessary to conform to the

25  appropriations for support of public libraries.

26    Notwithstanding  any other provision of law to the contrary the moneys

27  appropriated for the support of public libraries for the year 2024--2025

28  by a chapter of the laws of 2024 enacting the aid to  localities  budget

1  shall  fulfill  the state's obligation to provide such aid and, pursuant

2  to a plan developed by the commissioner of education and approved by the

3  director of the budget, the aid payable to libraries and library systems

4  pursuant  to  such  appropriations  shall  be reduced proportionately to

5  assure that the total amount of aid payable does not  exceed  the  total

6  appropriations for such purpose.

7     § 39. Severability. The provisions of this act shall be severable, and

8  if  the  application  of  any  clause, sentence, paragraph, subdivision,

9  section or part of this act to  any  person  or  circumstance  shall  be

10 adjudged  by  any  court  of  competent jurisdiction to be invalid, such

11 judgment shall not necessarily affect, impair or invalidate the applica-

12 tion of any such clause, sentence, paragraph, subdivision, section, part

13 of this act or remainder thereof, as the  case  may  be,  to  any  other

14 person  or  circumstance,  but shall be confined in its operation to the

15 clause,  sentence,  paragraph,  subdivision,  section  or  part  thereof

16 directly  involved  in the controversy in which such judgment shall have

17 been rendered.

18    § 40. This act shall take effect immediately, and shall be  deemed  to

19 have been in full force and effect on and after April 1, 2024, provided,

20 however, that:

21    1.  sections  one,  two,  three,  four, five, six, eight, ten, twelve,

22 thirteen, fourteen, fifteen, sixteen, seventeen, eighteen, twenty-three,

23 twenty-four, twenty-five, twenty-nine and thirty-seven of this act shall

24 take effect July 1, 2024;

25    2. section seven of this act shall take effect July 1, 2025;

26    3. the amendments to chapter 756 of the  laws  of  1992,  relating  to

27 funding a program for work force education conducted by a consortium for

28 worker  education  in  New  York  City made by sections twenty-seven and

1  twenty-eight of this act shall not affect the repeal of such chapter and

2  shall be deemed repealed therewith; and

3    4. the amendments to paragraph (d) of subdivision 1 of section 2856 of

4  the education law made by section thirty of this act shall be subject to

5  the expiration and reversion of such subdivision pursuant to subdivision

6  d  of  section  27  of chapter 378 of the laws of 2007, as amended, when

7  upon such date the provisions of section thirty-one of  this  act  shall

8  take effect.


9                              PART B


10   Section 1. The education law is amended by adding a new section 818 to

11  read as follows:

12   § 818. Evidence-based and scientifically based reading instruction. 1.

13  (a)  On or before July first, two thousand twenty-four, the commissioner

14  shall provide school districts with the instructional best practices for

15  the teaching of reading to students  in  prekindergarten  through  grade

16  three.   Instructional best practices for the teaching of reading shall

17  be evidence-based and scientifically based, focusing on  reading  compe-

18  tency  in  the areas of phonemic awareness, phonics, vocabulary develop-

19  ment, reading fluency, comprehension,  including  background  knowledge,

20  oral  language  and  writing, oral skill development, and align with the

21  culturally responsive-sustaining (CR-S) framework.   Such  instructional

22  best  practices  shall be periodically updated by the commissioner where

23  appropriate.

24   (b) All school districts in the  state  shall  annually  review  their

25  curriculum  and  instructional  practices  in the subject of reading for

26  students in prekindergarten through grade  three  to  ensure  that  they

1   align with the reading instructional best practices issued by the

2   commissioner, and that all early reading instructional practices and

3   interventions are part of an aligned plan designed to improve student

4   reading outcomes in prekindergarten through grade three.

5       2. For purposes of this section, the following terms shall have the

6   following meanings:

7       (a) "Culturally responsive-sustaining (CR-S) framework" means a frame-

8   work that promotes learning environments that affirm racial, linguistic,

9   and cultural identities; engages students with rigorous, supportive

10  instruction; develops their abilities to connect across lines of differ-

11  ence; elevates historically marginalized voices; and empowers students

12  as agents of social change.

13      (b) "Evidence-based and scientifically based" means an interdiscipli-

14  nary body of research that describes how reading and writing skills and

15  competencies develop from prekindergarten through secondary education

16  and provides evidence-based guidance to inform curriculum and pedagogy.

17      (c) "Phonemic awareness" means the ability to notice, think about and

18  manipulate individual sounds in spoken syllables and words.

19      (d) "Comprehension" means a function of word recognition skills and

20  language comprehension skills and shall include having sufficient back-

21  ground information and vocabulary for the reader to understand the words

22  in front of them. It also includes the active process that requires

23  intentional thinking, during which meaning is constructed through inter-

24  actions between the text and the reader. Comprehension skills are taught

25  explicitly by demonstrating, explaining, modeling and implementing

26  specific cognitive strategies to help beginning readers derive meaning

27  through intentional, problem-solving thinking processes.

1    (e) "Reading fluency" means the ability to read words, phrases, and

2    sentences accurately, at an appropriate speed, and with expression.

3    (f) "Vocabulary development" means the process of acquiring new words

4    and includes improving all areas of communication, including listening,

5    speaking, reading, and writing, which is directly related to school

6    achievement and is a strong predictor for reading success.

7    3. On or before September first, two thousand twenty-five, and on or

8    before September first of each year thereafter, all school districts in

9    the state shall certify to the commissioner that their curriculum and

10   instructional strategies and teacher professional development in the

11   subject of reading in prekindergarten through grade three align with all

12   of the elements of the instructional best practices issued by the

13   commissioner pursuant to this section.

14   4. Compliance with this section shall be subject to review by the

15   commissioner pursuant to section three hundred ten of this title and by

16   article seventy-eight of the civil practice law and rules.

17   § 2. This act shall take effect immediately.


18                                PART C


19   Section 1. Section 305 of the education law is amended by adding a new

20   subdivision 61 to read as follows:

21   61. a. Notwithstanding any provision of law to the contrary, the

22   commissioner shall require each school district to obtain documentation

23   reflecting one of the following from the parent or guardian of each

24   student or, if the student is eighteen years of age or older or legally

25   emancipated, such student, during the school year in which the student

26   is a senior enrolled in such school district: (1) certification of

1   completion  and  submission  of  either the free application for federal

2   student aid (FAFSA) for such student or, if applicable, the Jose Peralta

3   New York State DREAM Act application; or (2) completion of a waiver form

4   promulgated  by  the  department,  to be filed with the student's school

5   district indicating that the parent or guardian or, if  the  student  is

6   eighteen  years  of  age  or  older or legally emancipated, the student,

7   understands what the FAFSA is and has chosen not to file an  application

8   pursuant  to  the  provisions of subparagraph one of this paragraph. For

9   purposes of subparagraph one of this  paragraph,  the  required  certif-

10  ication  shall  not designate which type of application was submitted by

11  the parent, guardian, or student.

12    b. On and after July first,  two  thousand  twenty-five,  each  school

13  district  shall annually report to the department the following data for

14  all seniors enrolled in such school district, aggregated by high school:

15  (1) the total number of students certified to have submitted either  the

16  free  application for federal student aid (FAFSA) or, if applicable, the

17  Jose Peralta New York State DREAM Act application;  (2)  the  number  of

18  students who completed a waiver pursuant to paragraph a of this subdivi-

19  sion; and (3) the total number of seniors enrolled.

20    c.  The  commissioner shall promulgate rules and regulations necessary

21  to implement this subdivision, including requiring each school  district

22  to give notice, no less than four times during each school year, with an

23  explanation  to  each high school senior of the state-sponsored scholar-

24  ships, financial aid and  assistance  available  to  students  attending

25  college or post-secondary education, and to provide access and/or refer-

26  rals to support or assistance necessary for completion of the FAFSA.

27    §  2. This act shall take effect on the first of July  next  succeeding

28  the date on which it shall have become a law. Effective immediately, the

1  addition,  amendment  and/or  repeal of any rule or regulation necessary

2  for the implementation of this act on its effective date are  authorized

3  to be made and completed on or before such effective date.


4                                    PART D


5      Section  1. The opening paragraph of paragraph (a) of subdivision 2 of

6  section 6401 of the education law, as amended by chapter 717 of the laws

7  of 1981, is amended to read as follows:

8      Notwithstanding the provisions of any other law, in order  to  qualify

9  for  state  aid apportionments pursuant to this section, any institution

10  of higher education must meet  either  the  requirements  set  forth  in

11  subparagraphs (i) through [(v)] (vi) of this paragraph or, in the alter-

12  native, the requirements set forth in paragraph (b) of this subdivision:

13    § 2.  Paragraph (a) of subdivision 2 of section 6401 of the education

14  law is amended by adding a new subparagraph (vi) to read as follows:

15    (vi) The institution must have total endowment  assets  of  less  than

16  seven  hundred  fifty  million dollars ($750,000,000), based on the most

17  recent academic year data  collected  in  the  Integrated  Postsecondary

18  Education  Data  System, as required under Title IV of the Higher Educa-

19  tion Act of 1965, as amended, and reported by the Department  of

20  Education's National Center for Education Statistics.

21    § 3.  Paragraph (b) of subdivision 2 of section 6401 of the education

22  law is amended by adding a new subparagraph (vi) to read as follows:

23    (vi) The sponsoring college must have total endowment assets  of  less

24  than  seven  hundred  fifty million dollars ($750,000,000), based on the

25  most recent academic year data collected in the Integrated Postsecondary

26  Education Data System, as required under Title IV of the  Higher  Educa-

1  tion Act of 1965, as amended, and reported by the Department of

2  Education's National Center for Education Statistics.

3    § 4. Subdivision 3 of section 6401 of the education law, as amended by

4  chapter 361 of the laws of 2014, is amended to read as follows:

5    3. Degree awards. The amount of such annual apportionment to each

6  institution meeting the requirements of subdivision two of this  section

7  shall  be  computed  by multiplying by not to exceed six hundred dollars

8  the number of earned associate degrees, by not to  exceed  one  thousand

9  five  hundred dollars the number of earned bachelor's degrees, by not to

10  exceed nine hundred fifty dollars the number of earned master's degrees,

11  and by not to exceed four thousand five hundred fifty dollars the number

12  of earned doctorate degrees, conferred by such  institution  during  the

13  twelve-month  period  next  preceding  the  annual period for which such

14  apportionment is made, provided that there shall be  excluded  from  any

15  such  computation  the number of degrees earned by students with respect

16  to whom state aid other than that established by this section or section

17  sixty-four hundred one-a of this article  is  granted  directly  to  the

18  institution,  and provided further that, except as otherwise provided in

19  this subdivision, the amount apportioned for an associate  degree  shall

20  be  awarded  only  to two year institutions qualifying under subdivision

21  two of this section. The regents shall  promulgate  rules  defining  and

22  classifying  professional  degrees  for  the  purposes  of this section.

23  Institutions qualifying for state aid  pursuant  to  the  provisions  of

24  paragraph  (b) of subdivision two of this section shall, for purposes of

25  this subdivision, be deemed to be the institutions which confer degrees.

26  For purposes of this  subdivision,  a  two-year  institution  which  has

27  received  authority  to  confer  bachelor  degrees  shall continue to be

28  considered a two-year institution until such time  as  it  has  actually

1  begun  to  confer the bachelor's degree. Thereafter, notwithstanding any

2  other provision of law to the contrary, an institution which was former-

3  ly a two-year institution for the purposes of this section and which was

4  granted  authority  by  the regents to confer bachelor degrees, (a) such

5  authority having been granted after the  first  day  of  June,  nineteen

6  hundred ninety-three, but before the first day of July, nineteen hundred

7  ninety-three, (b) such authority having been granted after the first day

8  of  May,  two thousand five, but before the first day of June, two thou-

9  sand five, (c) such authority having been granted after the first day of

10  April, two thousand nine, but before the first day of May, two  thousand

11  nine,  or  (d) such authority having been granted after the first day of

12  December, two thousand nine, but before the first day  of  January,  two

13  thousand ten, may elect to continue to receive awards for earned associ-

14  ate  degrees. Should such institution so elect, it shall not be eligible

15  during the time of such election to receive awards for earned bachelor's

16  degrees. <u>Notwithstanding the preceding provisions of  this  subdivision,</u>

17  <u>in  the event that the total amount of such annual apportionments to all</u>

18  <u>institutions meeting the requirements of subdivision two of this section</u>

19  <u>would otherwise exceed the total amount  appropriated  for  unrestricted</u>

20  <u>aid  to  independent colleges and universities, the annual apportionment</u>

21  <u>to each such institution shall be reduced proportionally.</u>

22    § 5. This act shall take effect July 1, 2024.


23                              PART E


24    Section 1. Paragraph d of subdivision 7 of section 2-d of  the  educa-

25  tion law, as added by section 1 of subpart L of part AA of chapter 56 of

26  the laws of 2014, is amended to read as follows:

1    d.  Nothing  in  this  section  shall  limit the administrative use of

2   student data or teacher or principal data by a person acting exclusively

3   in the person's capacity as an employee of an educational agency  or  of

4   the state or any of its political subdivisions, any court or the federal

5   government  that  is  otherwise required by law. Nothing in this section

6   shall limit the sharing of student data with the New York  state  higher

7   education services corporation, the state university of New York, or the

8   city  university  of  New  York for educational purposes pursuant to the

9   provisions of the family educational rights and privacy act,  20  U.S.C.

10  section 1232g.

11    §  2.  Section  655  of  the  education law is amended by adding a new

12  subdivision 9-a to read as follows:

13    9-a. To provide to any state educational authority such assistance and

14  data as the president deems necessary  for  purposes  of  financial  aid

15  program evaluation.

16    § 3. This act shall take effect immediately.


17                                 PART F


18    Section  1. Section 16 of chapter 260 of the laws of 2011 amending the

19  education law and the New York state urban development  corporation  act

20  relating  to establishing components of the NY-SUNY 2020 challenge grant

21  program, as amended by section 4 of part DD of chapter 56 of the laws of

22  2021, is amended to read as follows:

23    § 16. This act shall take effect July 1, 2011; provided [that sections

24  one, two, three, four, five, six, eight, nine, ten, eleven,  twelve  and

25  thirteen  of  this  act  shall expire 13 years after such effective date

26  when upon such date the provisions of this act shall be deemed repealed;

1  and provided further] that sections fourteen and  fifteen  of  this  act

2  shall expire 5 years after such effective date when upon such date [the]

3  such provisions [of this act] shall be deemed repealed.

4    § 2. This act shall take effect immediately.


5                              PART G


6    Section  1.  Section  3  of  part N of chapter 56 of the laws of 2020,

7  amending the social services law relating to restructuring financing for

8  residential school placements, as amended by section  1  of  part  V  of

9  chapter 56 of the laws of 2023, is amended to read as follows:

10   § 3.  This act shall take effect immediately [and shall expire and be

11  deemed repealed April 1, 2024]; provided however that the amendments  to

12  subdivision 10 of section 153 of the social services law made by section

13  one of this act, shall not affect the expiration of such subdivision and

14  shall be deemed to expire therewith.

15   § 2.  This  act  shall take effect immediately and shall be deemed to

16  have been in full force and effect on and after April 1, 2024.


17                              PART H


18   Section 1. Paragraphs (a), (b),  (c)  and  (d)  of  subdivision  1  of

19  section  131-o  of  the  social services law, as amended by section 1 of

20  part Z of chapter 56 of the  laws  of  2023,  are  amended  to  read  as

21  follows:

22   (a)  in  the  case of each individual receiving family care, an amount

23  equal to at least [$175.00] $181.00 for each month beginning on or after

24  January first, two thousand [twenty-three] twenty-four.

1    (b) in the case of each  individual  receiving  residential  care,  an

2   amount  equal  to at least [$202.00] $208.00 for each month beginning on

3   or after January first, two thousand [twenty-three] twenty-four.

4    (c) in  the  case  of  each individual receiving enhanced residential

5   care, an amount equal to at  least   [$241.00]   $249.00  for  each  month

6   beginning  on  or after January first, two thousand [twenty-three] twen-

7   ty-four.

8    (d) for the period commencing January  first,  two  thousand  [twenty-

9   four]  twenty-five,  the  monthly  personal  needs allowance shall be an

10   amount equal to the sum of the amounts set forth  in  subparagraphs  one

11   and two of this paragraph:

12    (1)  the  amounts  specified  in  paragraphs  (a), (b) and (c) of this

13   subdivision; and

14    (2) the amount in subparagraph one of this  paragraph,  multiplied  by

15   the  percentage  of  any  federal  supplemental  security income cost of

16   living adjustment which becomes effective on or after January first, two

17   thousand [twenty-four] twenty-five, but prior  to  June  thirtieth,  two

18   thousand [twenty-four] twenty-five, rounded to the nearest whole dollar.

19    § 2. Paragraphs  (a),  (b),  (c),  (d),  (e) and (f) of subdivision 2 of

20   section 209 of the social services law, as amended by section 2 of  part

21   Z of chapter 56 of the laws of 2023, are amended to read as follows:

22    (a) On  and  after January first, two thousand [twenty-three] twenty-

23   four, for an eligible individual living  alone,  [$1,001.00]  $1,030.00;

24   and for an eligible couple living alone, [$1,475.00] $1,519.00.

25    (b) On  and  after January first, two thousand [twenty-three] twenty-

26   four, for an eligible individual living  with  others  with  or  without

27   in-kind  income,  [$937.00]  $966.00;  and for an eligible couple living

28   with others with or without in-kind income, [$1,417.00] $1,461.00.

1   (c) On and after January first, two thousand [twenty-three] <u>twenty-</u>

2 <u>four</u>, (i) for an eligible individual receiving family care, [$1,180.48]

3 <u>$1,209.48</u> if he or she is receiving such care in the city of New York or

4 the county of Nassau, Suffolk, Westchester or Rockland; and (ii) for an

5 eligible couple receiving family care in the city of New York or the

6 county of Nassau, Suffolk, Westchester or Rockland, two times the amount

7 set forth in subparagraph (i) of this paragraph; or (iii) for an eligi-

8 ble individual receiving such care in any other county in the state,

9 [$1,142.48] <u>$1,171.48</u>; and (iv) for an eligible couple receiving such

10 care in any other county in the state, two times the amount set forth in

11 subparagraph (iii) of this paragraph.

12   (d) On and after January first, two thousand [twenty-three] <u>twenty-</u>

13 <u>four</u>, (i) for an eligible individual receiving residential care,

14 [$1,349.00] <u>$1,378.00</u> if he or she is receiving such care in the city of

15 New York or the county of Nassau, Suffolk, Westchester or Rockland; and

16 (ii) for an eligible couple receiving residential care in the city of

17 New York or the county of Nassau, Suffolk, Westchester or Rockland, two

18 times the amount set forth in subparagraph (i) of this paragraph; or

19 (iii) for an eligible individual receiving such care in any other county

20 in the state, [$1,319.00] <u>$1,348.00</u>; and (iv) for an eligible couple

21 receiving such care in any other county in the state, two times the

22 amount set forth in subparagraph (iii) of this paragraph.

23   (e) On and after January first, two thousand [twenty-three] <u>twenty-</u>

24 <u>four</u>, (i) for an eligible individual receiving enhanced residential

25 care, [$1,608.00] <u>$1,637.00</u>; and (ii) for an eligible couple receiving

26 enhanced residential care, two times the amount set forth in subpara-

27 graph (i) of this paragraph.

1    (f) The amounts set forth in paragraphs (a) through (e) of this subdi-

2   vision  shall  be  increased to reflect any increases in federal supple-

3   mental security income benefits for individuals or couples which  become

4   effective  on or after January first, two thousand [twenty-four] <u>twenty-</u>

5   <u>five</u>  but  prior  to  June  thirtieth,  two  thousand  [twenty-four]

6   <u>twenty-five</u>.

7    § 3. This act shall take effect December 31, 2024.


8                                    PART I


9    Section 1. Clause (iv) of subparagraph 5 of paragraph (b) of  subdivi-

10   sion 1 of section 413 of the family court act, as amended by chapter 567

11   of the laws of 1989, is amended to read as follows:

12    (iv) at the discretion of the court, the court may attribute or impute

13   income  from[,]  such other resources as may be available to the parent,

14   including, but not limited to:

15   (A) non-income producing assets,

16    (B) meals, lodging, memberships, automobiles or other perquisites that

17   are provided as part of compensation for employment to the  extent  that

18   such  perquisites  constitute  expenditures  for  personal use, or which

19   expenditures directly or [indirecly] <u>indirectly</u> confer personal economic

20   benefits,

21    (C) fringe benefits provided as part of compensation  for  employment,

22   and

23    (D) money, goods, or services provided by relatives and friends;

24    <u>In determining the amount of income that may be attributed or imputed,</u>

25   <u>the  court  shall  consider the specific circumstances of the parent, to</u>

26   <u>the extent known, including such factors as the parent's  assets,  resi-</u>

1   dence,  employment  and earning history, job skills, educational attain-

2   ment, literacy, age, health, criminal record and other employment barri-

3   ers, record of seeking work, the local job market, the  availability  of

4   employers  willing  to hire the parent, prevailing earnings level in the

5   local community, and other relevant background factors such as the  age,

6   number,  needs,  and  care  of the children covered by the child support

7   order. Attribution or imputation  of  income  shall  be  accompanied  by

8   specific written findings identifying the basis or bases for such deter-

9   mination utilizing factors required or permitted to be considered pursu-

10  ant to this clause;

11     § 2. Clause (iv) of subparagraph 5 of paragraph (b) of subdivision 1-b

12  of section 240 of the domestic relations law, as added by chapter 567 of

13  the laws of 1989, is amended to read as follows:

14     (iv) at the discretion of the court, the court may attribute or impute

15  income  from[,]  such other resources as may be available to the parent,

16  including, but not limited to:

17     (A) non-income producing assets,

18     (B) meals, lodging, memberships, automobiles or other perquisites that

19  are provided as part of compensation for employment to the  extent  that

20  such  perquisites  constitute  expenditures  for  personal use, or which

21  expenditures directly or [indirecly] indirectly confer personal economic

22  benefits,

23     (C) fringe benefits provided as part of compensation  for  employment,

24  and

25     (D) money, goods, or services provided by relatives and friends;

26     In determining the amount of income that may be attributed or imputed,

27  the  court  shall  consider the specific circumstances of the parent, to

28  the extent known, including such factors as the parent's  assets,  resi-

1  dence,  employment  and earning history, job skills, educational attain-

2  ment, literacy, age, health, criminal record and other employment barri-

3  ers, record of seeking work, the local job market,  the  availability  of

4  employers  willing  to hire the parent, prevailing earnings level in the

5  local community, and other relevant background factors such as the  age,

6  number,  needs,  and  care  of the children covered by the child support

7  order. Attribution or imputation  of  income  shall  be  accompanied  by

8  specific written findings identifying the basis or bases for such deter-

9  mination utilizing factors required or permitted to be considered pursu-

10  ant to this clause;

11    § 3. Paragraph (k) of subdivision 1 of section 413 of the family court

12  act,  as  amended by chapter 567 of the laws of 1989, is amended to read

13  as follows:

14    (k) When a party has defaulted and/or the court is otherwise presented

15  with insufficient evidence to determine gross income, [the  court  shall

16  order  child  support  based upon the needs or standard of living of the

17  child, whichever is greater] the support obligation shall  be  based  on

18  available information about the specific circumstances of the parent, in

19  accordance  with  clause  (iv)  of subparagraph five of paragraph (b) of

20  this subdivision. Such order may be retroactively modified upward, with-

21  out a showing of change in circumstances.

22    § 4. Paragraph (k) of subdivision 1-b of section 240 of  the  domestic

23  relations  law,  as added by chapter 567 of the laws of 1989, is amended

24  to read as follows:

25    (k) When a party has defaulted and/or the court is otherwise presented

26  with insufficient evidence to determine gross income, [the  court  shall

27  order  child  support  based upon the needs or standard of living of the

28  child, whichever is greater] the support obligation shall  be  based  on

1  <u>available information about the specific circumstances of the parent, in</u>

2  <u>accordance  with  clause  (iv)  of subparagraph five of paragraph (b) of</u>

3  <u>this subdivision.</u> Such order may be retroactively modified upward, with-

4  out a showing of change in circumstances.

5    § 5. Clause (v) of subparagraph 5 of paragraph (b) of subdivision 1 of

6  section  413  of  the family court act, as amended by chapter 313 of the

7  laws of 2019, is amended to read as follows:

8    (v) an amount  imputed  as  income  based  upon  the  parent's  former

9  resources  or  income, if the court determines that a parent has reduced

10  resources or income in order to reduce or avoid the parent's  obligation

11  for  child  support; provided that incarceration shall not be considered

12  voluntary unemployment[, unless such  incarceration  is  the  result  of

13  non-payment  of  a child support order, or an offense against the custo-

14  dial parent or child who is the subject of the order or judgment];

15    § 6. Clause (v) of subparagraph 5 of paragraph (b) of subdivision  1-b

16  of  section 240 of the domestic relations law, as amended by chapter 313

17  of the laws of 2019, is amended to read as follows:

18    (v) an amount  imputed  as  income  based  upon  the  parent's  former

19  resources  or  income, if the court determines that a parent has reduced

20  resources or income in order to reduce or avoid the parent's  obligation

21  for  child  support; provided that incarceration shall not be considered

22  voluntary unemployment[, unless such  incarceration  is  the  result  of

23  non-payment  of  a child support order, or an offense against the custo-

24  dial parent or child who is the subject of the order or judgment];

25    § 7. Paragraph (a) of subdivision 3 of section 451 of the family court

26  act, as amended by chapter 313 of the laws of 2019, is amended  to  read

27  as follows:

1    (a) The court may modify an order of child support, including an order

2   incorporating   without   merging   an   agreement   or   stipulation   of   the

3   parties, upon a  showing  of  a  substantial  change  in  circumstances.

4   Incarceration  shall  not be considered voluntary unemployment and shall

5   not  be a bar to finding a substantial change in circumstances [provided

6   such incarceration is not the result of non-payment of a  child  support

7   order,  or  an  offense against the custodial parent or child who is the

8   subject of the order or judgment].

9    § 8. Clause (i) of subparagraph 2 of paragraph b of subdivision  9  of

10  part B of section 236 of the domestic relations law, as amended by chap-

11  ter 313 of the laws of 2019, is amended to read as follows:

12   (i) The court may modify an order of child support, including an order

13  incorporating   without   merging   an   agreement   or   stipulation   of   the

14  parties, upon a  showing  of  a  substantial  change  in  circumstances.

15  Incarceration  shall  not be considered voluntary unemployment and shall

16  not be a bar to finding a substantial change in circumstances  [provided

17  such  incarceration  is not the result of non-payment of a child support

18  order, or an offense against the custodial parent or child  who  is  the

19  subject of the order or judgment].

20   § 9.  This  act shall take effect immediately, and shall apply to any

21  action or proceeding pending upon or commenced on or after  such  effec-

22  tive date.


23                              PART J


24   Section 1. Subdivision 1 of section 206-c of the labor law, as amended

25  by chapter 672 of the laws of 2022, is amended to read as follows:

1    1.  An employer shall provide [reasonable unpaid] <u>paid</u> break time [or]

2   <u>for up to twenty minutes, and</u> permit an employee to  use   <u>existing</u>  paid

3   break  time or meal time <u>for time in excess of twenty minutes,</u>  to allow

4   an employee to express breast milk for her nursing child each time  such

5   employee has  reasonable  need  to  express breast milk for up to three

6   years following child birth. No employer shall discriminate in  any  way

7   against  an  employee  who  chooses  to  express breast milk in the work

8   place.

9    § 2. This act shall take effect on the sixtieth  day  after  it  shall

10  have become a law.


11                               PART K


12   Section 1. Subdivision 1-a of section 198 of the labor law, as amended

13  by chapter 362 of the laws of 2015, is amended to read as follows:

14   1-a.  On behalf of any employee paid less than the wage to which he or

15  she is entitled under the provisions of this article,  the  commissioner

16  may  bring  any legal action necessary, including administrative action,

17  to collect such claim and as part of such legal action, in  addition  to

18  any other remedies and penalties otherwise available under this article,

19  the  commissioner  shall  assess against the employer the full amount of

20  any such underpayment, and an additional amount as  liquidated  damages,

21  unless  the  employer  proves  a good faith basis for believing that its

22  underpayment of wages was in compliance with the law. Liquidated damages

23  shall be calculated by the commissioner as  no  more  than  one  hundred

24  percent of the total amount of wages found to be due, except such liqui-

25  dated  damages may be up to three hundred percent of the total amount of

26  the wages found to be due for a willful violation of section one hundred

1  ninety-four of this article. In any action instituted in the courts upon

2  a wage claim by an employee or the commissioner in  which  the  employee

3  prevails, the court shall allow such employee to recover the full amount

4  of  any underpayment, all reasonable attorney's fees, prejudgment inter-

5  est as required under the civil practice law and rules, and, unless  the

6  employer  proves  a good faith basis to believe that its underpayment of

7  wages was in compliance with the law, an additional amount as liquidated

8  damages equal to one hundred percent of the total amount  of  the  wages

9  found  to  be  due,  except  such  liquidated damages may be up to three

10 hundred percent of the total amount of the wages found to be due  for  a

11 willful  violation  of  section one hundred ninety-four of this article.

12 <u>Notwithstanding the provisions of this subdivision,  liquidated  damages</u>

13 <u>shall  not be applicable to violations of paragraph a of subdivision one</u>

14 <u>of section one hundred ninety-one of this article where the employee was</u>

15 <u>paid in accordance with the agreed terms of  employment,  but  not  less</u>

16 <u>frequently than semi-monthly.</u>

17   § 2.  This  act  shall take effect on the sixtieth day after it shall

18 have become  a law.


19                              PART L


20   Section 1. Subdivision 3 of section 218 of the labor law,  as  amended

21 by chapter 2 of the laws of 2015, is amended to read as follows:

22   3. <u>(a)</u> Provided  that  no  proceeding for administrative or judicial

23 review as provided in this chapter shall then be pending  and  the  time

24 for  initiation  of such proceeding shall have expired, the commissioner

25 may file with the county clerk of the county where the employer  resides

26 or  has  a place of business the order of the commissioner, or the deci-

1   sion of the industrial board of appeals containing the amount  found  to

2   be  due  including  the civil penalty, if any, and at the commissioner's

3   discretion, an additional fifteen percent damages upon  any  outstanding

4   monies  owed.  [At]  Notwithstanding  any  provision to the contrary, in

5   execution of any order or decision filed by the commissioner pursuant to

6   this section, the commissioner shall have all the powers conferred  upon

7   sheriffs by article twenty-five of the civil practice law and rules, but

8   they shall be entitled to no fee or compensation in excess of the actual

9   expenses  paid  in  the  performance  of such duty. Additionally, at the

10  request of an employee, the commissioner shall assign, without consider-

11  ation or liability, that portion of the  filed  order  that  constitutes

12  wages,  wage  supplements,  interest  on  wages  or wage supplements, or

13  liquidated damages due that employee, to that employee and may  file  an

14  assignment or order in that amount in the name of that employee with the

15  county  clerk of the county where the employer resides or has a place of

16  business. The filing of such assignment, order or  decision  shall  have

17  the  full  force and effect of a judgment duly docketed in the office of

18  such clerk. The assignment[, order or decision] may be enforced [by  and

19  in  the  name  of  the  commissioner, or] by the employee[,] in the same

20  manner, and with like effect, as that prescribed by the  civil  practice

21  law and rules for the enforcement of a money judgment.

22      (b)  In addition and as an alternative to any other remedy provided by

23  this section and provided that no proceeding for administrative or judi-

24  cial review as provided in this chapter shall then be  pending  and  the

25  time  for  initiation of such proceeding shall have expired, the commis-

26  sioner may issue a warrant under their official seal,  directed  to  the

27  sheriff  of  any  county, commanding them to levy upon and sell the real

28  and personal property which may be  found  within  their  county  of  an

1   employer who has defaulted in the payment of any sum determined to be

2   due from such employer for the payment of such sum together with inter-

3   est, penalties, and the cost of executing the warrant, and to return

4   such warrant to the commissioner and to pay into the fund the money

5   collected by virtue thereof within sixty days after the receipt of such

6   warrant.  The sheriff shall, within five days after the receipt of the

7   warrant, file with the clerk of the county a copy thereof, and thereupon

8   such clerk shall enter in the judgment docket the name of the employer

9   mentioned in the warrant and the amount of the contribution, interest,

10  and penalties for which the warrant is issued and the date when such

11  copy is filed.  Thereupon the amount of such warrant so docketed shall

12  become a lien upon the title to and interest in real property and chat-

13  tels of the employer against whom the warrant is issued in the same

14  manner as a judgment duly docketed in the office of such clerk.  The

15  sheriff shall then proceed upon the warrant in the same manner, and with

16  like effect, as that provided by law in respect to executions issued

17  against property upon judgments of a court of record, and for their

18  services in executing the warrant they shall be entitled to the same

19  fees, which they may collect in the same manner.

20   (c) In the discretion of the commissioner, a warrant of like terms,

21  force, and effect may be issued and directed to any officer or employee

22  of the department of labor who may file a copy of such warrant with the

23  clerk of any county in the state, and thereupon each such clerk shall

24  docket it and it shall become a lien in the same manner and with the

25  same force and effect as hereinbefore provided with respect to a warrant

26  issued and directed to and filed by a sheriff; and in the execution

27  thereof such officer or employee shall have all the powers conferred by

28  law upon sheriffs, but they shall be entitled to no fee or compensation

1   in excess of the actual expenses paid in the performance of  such  duty.

2   If  a  warrant is returned not satisfied in full, the commissioner shall

3   have the same remedies to enforce the amount thereof as if  the  commis-

4   sioner had recovered judgment for the same.

5     § 2.  Subdivision  3  of  section 219 of the labor law, as amended by

6   chapter 2 of the laws of 2015, is amended to read as follows:

7     3. (a) Provided that no  proceeding  for  administrative  or  judicial

8   review  as  provided  in this chapter shall then be pending and the time

9   for initiation of such proceeding shall have expired,  the  commissioner

10   may  file with the county clerk of the county where the employer resides

11   or has a place of business the order of the commissioner or the decision

12   of the industrial board of appeals containing the  amount  found  to  be

13   due,  including, at the commissioner's discretion, an additional fifteen

14   percent damages upon any outstanding monies owed.  [At]  Notwithstanding

15   any  provision  to  the  contrary, in execution of any order or decision

16   filed by the commissioner pursuant to  this  section,  the  commissioner

17   shall have all the powers conferred upon sheriffs by article twenty-five

18   of  the  civil  practice law and rules, but they shall be entitled to no

19   fee or compensation in  excess  of  the  actual  expenses  paid  in  the

20   performance  of  such duty. Additionally, at the request of an employee,

21   the commissioner shall assign, without consideration or liability,  that

22   portion  of  the  filed  order that constitutes wages, wage supplements,

23   interest on wages or wage supplements, or  liquidated  damages  due  the

24   employee,  to  that employee and may file an assignment or order in that

25   amount in the name of such employee with the county clerk of the  county

26   where  the  employer  resides  or has a place of business. The filing of

27   such assignment, order or decision shall have the full force and  effect

28   of  a  judgment  duly  docketed in the office of such clerk. The assign-

1   ment[, order or decision] may be enforced [by and in  the  name  of  the

2   commissioner,  or]  by the employee[,] in the same manner, and with like

3   effect, as that prescribed by the civil practice law and rules  for  the

4   enforcement of a money judgment.

5       (b)  In addition and as an alternative to any other remedy provided by

6   this section and provided that no proceeding for administrative or judi-

7   cial review as provided in this chapter shall then be  pending  and  the

8   time  for  initiation of such proceeding shall have expired, the commis-

9   sioner may issue a warrant under their official seal,  directed  to  the

10  sheriff  of  any  county, commanding them to levy upon and sell the real

11  and personal property which may be  found  within  their  county  of  an

12  employer  who  has  defaulted in the payment of any sum determined to be

13  due from such employer for the payment of such sum together with  inter-

14  est,  penalties,  and  the  cost of executing the warrant, and to return

15  such warrant to the commissioner and to pay  into  the  fund  the  money

16  collected  by virtue thereof within sixty days after the receipt of such

17  warrant. The sheriff shall, within five days after the  receipt  of  the

18  warrant, file with the clerk of the county a copy thereof, and thereupon

19  such  clerk  shall enter in the judgment docket the name of the employer

20  mentioned in the warrant and the amount of the  contribution,  interest,

21  and  penalties  for  which  the warrant is issued and the date when such

22  copy is filed. Thereupon the amount of such warrant  so  docketed  shall

23  become  a lien upon the title to and interest in real property and chat-

24  tels real of the employer against whom the warrant is issued in the same

25  manner as a judgment duly docketed in the  office  of  such  clerk.  The

26  sheriff shall then proceed upon the warrant in the same manner, and with

27  like  effect,  as  that  provided by law in respect to executions issued

28  against property upon judgments of a court  of  record,  and  for  their

1  services  in  executing  the  warrant they shall be entitled to the same

2  fees, which they may collect in the same manner.

3   (c)  In  the  discretion of the commissioner, a warrant of like terms,

4  force, and effect may be issued and directed to any officer  or  employee

5  of  the department of labor who may file a copy of such warrant with the

6  clerk of any county in the state, and thereupon each  such  clerk  shall

7  docket  it  and  it  shall become a lien in the same manner and with the

8  same force and effect as hereinbefore provided with respect to a warrant

9  issued and directed to and filed by a  sheriff;  and  in  the  execution

10 thereof  such officer or employee shall have all the powers conferred by

11 law upon sheriffs, but they shall be entitled to no fee or  compensation

12 in  excess  of the actual expenses paid in the performance of such duty.

13 If a warrant is returned not satisfied in full, the  commissioner  shall

14 have  the  same remedies to enforce the amount thereof as if the commis-

15 sioner had recovered judgment for the same.

16    § 3. This act shall take effect immediately.


17                                PART M


18    Section 1. Section 2 of chapter 25 of the laws of  2020,  relating  to

19 providing  requirements  for  sick  leave  and  the provision of certain

20 employee benefits when such  employee  is  subject  to  a  mandatory  or

21 precautionary  order  of  quarantine  or  isolation  due to COVID-19, is

22 amended to read as follows:

23    § 2. This act shall take effect immediately and shall  expire  and  be

24 deemed repealed July 31, 2024.

25    § 2. This act shall take effect immediately.

1                                  PART N

2    Section  1.  Notwithstanding  any  other provision of law, the housing

3   trust fund corporation may provide, for  purposes  of  the  neighborhood

4   preservation  program,  a  sum  not to exceed $12,830,000 for the fiscal

5   year ending March 31, 2025.  Notwithstanding any other provision of law,

6   and subject to the approval of the New York state director of the  budg-

7   et,  the  board  of  directors  of the state of New York mortgage agency

8   shall authorize the transfer to the housing trust fund corporation,  for

9   the purposes of reimbursing any costs associated with neighborhood pres-

10  ervation  program  contracts authorized by this section, a total sum not

11  to exceed $12,830,000, such transfer to be made  from  (i)  the  special

12  account  of  the  mortgage  insurance  fund  created pursuant to section

13  2429-b of the public authorities law, in an amount  not  to  exceed  the

14  actual  excess  balance in the special account of the mortgage insurance

15  fund, as determined and certified by the  state  of  New  York  mortgage

16  agency  for  the fiscal year 2023-2024 in accordance with section 2429-b

17  of the public authorities law, if any, and/or  (ii)  provided  that  the

18  reserves in the project pool insurance account of the mortgage insurance

19  fund  created  pursuant  to section 2429-b of the public authorities law

20  are sufficient to attain and maintain the credit rating  (as  determined

21  by  the  state  of  New York mortgage agency) required to accomplish the

22  purposes of such account, the project  pool  insurance  account  of  the

23  mortgage insurance fund, such transfer to be made as soon as practicable

24  but no later than June 30, 2024.

25    §  2.  Notwithstanding  any  other provision of law, the housing trust

26  fund corporation may provide, for purposes  of  the  rural  preservation

27  program, a sum not to exceed $5,360,000 for the fiscal year ending March

1   31, 2025. Notwithstanding any other provision of law, and subject to the

2   approval  of  the  New  York  state director of the budget, the board of

3   directors of the state of New York mortgage agency shall  authorize  the

4   transfer  to  the  housing  trust  fund corporation, for the purposes of

5   reimbursing  any  costs  associated  with  rural  preservation   program

6   contracts  authorized  by  this  section,  a  total  sum  not  to exceed

7   $5,360,000, such transfer to be made from (i) the special account of the

8   mortgage insurance fund created pursuant to section 2429-b of the public

9   authorities law, in an amount not to exceed the actual excess balance in

10  the special account of the mortgage insurance fund,  as  determined  and

11  certified  by  the state of New York mortgage agency for the fiscal year

12  2023-2024 in accordance with section 2429-b of  the  public  authorities

13  law,  if any, and/or (ii) provided that the reserves in the project pool

14  insurance account of the mortgage insurance  fund  created  pursuant  to

15  section  2429-b  of  the public authorities law are sufficient to attain

16  and maintain the credit rating (as determined by the state of  New  York

17  mortgage  agency)  required  to accomplish the purposes of such account,

18  the project pool insurance account of the mortgage insurance fund,  such

19  transfer  to  be  made as soon as practicable but no later than June 30,

20  2024.

21    § 3. Notwithstanding any other provision of  law,  the  housing  trust

22  fund  corporation  may provide, for purposes of the rural rental assist-

23  ance program pursuant to article 17-A of  the  private  housing  finance

24  law,  a  sum  not to exceed $23,180,000 for the fiscal year ending March

25  31, 2025.  Notwithstanding any other provision of law,  and  subject  to

26  the  approval of the New York state director of the budget, the board of

27  directors of the state of New York mortgage agency shall  authorize  the

28  transfer  to  the  housing  trust  fund corporation, for the purposes of

1  reimbursing any costs associated with rural rental assistance program

2  contracts authorized by this section, a total sum not to exceed

3  $23,180,000, such transfer to be made from (i) the special account of

4  the mortgage insurance fund created pursuant to section 2429-b of the

5  public authorities law, in an amount not to exceed the actual excess

6  balance in the special account of the mortgage insurance fund, as deter-

7  mined and certified by the state of New York mortgage agency for the

8  fiscal year 2023-2024 in accordance with section 2429-b of the public

9  authorities law, if any, and/or (ii) provided that the reserves in the

10 project pool insurance account of the mortgage insurance fund created

11 pursuant to section 2429-b of the public authorities law are sufficient

12 to attain and maintain the credit rating, as determined by the state of

13 New York mortgage agency, required to accomplish the purposes of such

14 account, the project pool insurance account of the mortgage insurance

15 fund, such transfer shall be made as soon as practicable but no later

16 than June 30, 2024.

17   § 4. Notwithstanding any other provision of law, the homeless housing

18 and assistance corporation may provide, for purposes of the New York

19 state supportive housing program, the solutions to end homelessness

20 program or the operational support for AIDS housing program, or to qual-

21 ified grantees under such programs, in accordance with the requirements

22 of such programs, a sum not to exceed $53,580,000 for the fiscal year

23 ending March 31, 2025. The homeless housing and assistance corporation

24 may enter into an agreement with the office of temporary and disability

25 assistance to administer such sum in accordance with the requirements of

26 such programs. Notwithstanding any other provision of law, and subject

27 to the approval of the New York state director of the budget, the board

28 of directors of the state of New York mortgage agency shall authorize

1  the transfer to the homeless housing and assistance corporation, a total

2  sum not to exceed $53,580,000, such transfer to be  made  from  (i)  the

3  special  account  of  the  mortgage  insurance  fund created pursuant to

4  section 2429-b of the public authorities law, in an amount not to exceed

5  the  actual excess balance in the special account of the mortgage insur-

6  ance fund, as determined and certified by the state of New York mortgage

7  agency for the fiscal year 2023-2024 in accordance with  section  2429-b

8  of  the  public  authorities  law, if any, and/or (ii) provided that the

9  reserves in the project pool insurance account of the mortgage insurance

10  fund created pursuant to section 2429-b of the  public  authorities  law

11  are sufficient to attain and maintain the credit rating as determined by

12  the  state  of  New  York  mortgage  agency,  required to accomplish the

13  purposes of such account, the project  pool  insurance  account  of  the

14  mortgage  insurance fund, such transfer shall be made as soon as practi-

15  cable but no later than March 31, 2025.

16     § 5. This act shall take effect immediately.


17                                PART O


18     Section 1. Short title. This act shall be known and may  be  cited  as

19  the "heirs property protection and deed theft prevention act of 2024".

20     §  2.  Subdivision 3 of section 30.10 of the criminal procedure law is

21  amended by adding a new paragraph (h) to read as follows:

22     (h) A prosecution for any felony related to  a  deed  theft  or  where

23  there  is fraud in connection with a transaction involving real property

24  must be commenced within eight years after the commission of the crime.

25     § 3. The penal law is amended by adding a new article 162 to  read  as

26  follows:

1                              <u>ARTICLE 162</u>

2                  <u>RESIDENTIAL AND COMMERCIAL DEED THEFT</u>

3    <u>Section 162.00 Definitions.</u>

4            <u>162.05 Deed theft in the third degree.</u>

5            <u>162.10 Deed theft in the second degree.</u>

6            <u>162.15 Deed theft in the first degree.</u>

7            <u>162.20 Aggravated deed theft.</u>

8    <u>§ 162.00 Definitions.</u>

9     <u>For  the  purposes of this article, the following terms shall have the</u>

10   <u>following meanings:</u>

11   <u>(1) "Deed theft" is committed by a person who:</u>

12   <u>(a) intentionally alters, falsifies, forges, or misrepresents property</u>

13   <u>documents such as a residential or commercial deed or  title,  with  the</u>

14   <u>intent to deceive, defraud or unlawfully transfer or encumber the owner-</u>

15   <u>ship rights of a residential or commercial property; or</u>

16   <u>(b)  with  intent to defraud, misrepresents themselves as the owner or</u>

17   <u>authorized representative of residential or commercial real property  to</u>

18   <u>induce  others  to  rely  on  such  false information in order to obtain</u>

19   <u>ownership or possession of such real property; or</u>

20   <u>(c) with intent to defraud, takes, obtains, steals, or transfers title</u>

21   <u>or ownership of real property by fraud, forgery, larceny, or  any  other</u>

22   <u>fraudulent or deceptive practice.</u>

23   <u>(2)  "Residential  real property" or any derivative word thereof shall</u>

24   <u>have the same meaning as defined in subdivision three of section  187.00</u>

25   <u>of this part.</u>

26   <u>(3)  "Commercial  real  property" or any derivative word thereof shall</u>

27   <u>have the same meaning as defined in paragraph (a) of subdivision six  of</u>

28   <u>section four hundred eighty-nine-aaaa of the real property tax law.</u>

1    (4)  "Mixed-use  property"  shall  have the same meaning as defined in

2   subdivision twenty-two of section four hundred eighty-nine-aaaa  of  the

3   real property tax law.

4    (5)  "Incompetent"  shall  have the same meaning as defined in section

5   1-2.9 of the estates, powers and trusts law.

6    (6) "Incapacitated person" shall mean a person who, because of  mental

7   disability as defined in subdivision three of section 1.03 of the mental

8   hygiene  law or mental deficiency, is unable to care for their own prop-

9   erty and/or personal needs, and is likely to suffer  harm  because  such

10  person  is  unable  to  understand  and appreciate the nature and conse-

11  quences of not being able to care for  their  property  and/or  personal

12  needs.

13  § 162.05 Deed theft in the third degree.

14   A  person is guilty of deed theft in the third degree when such person

15  commits deed theft of one commercial real property.

16   Deed theft in the third degree is a class D felony.

17  § 162.10 Deed theft in the second degree.

18   A person is guilty of deed theft in the second degree when such person

19  commits deed theft of: (1) one residential real  property;  or  (2)  one

20  commercial mixed-use property with at least one residential unit; or (3)

21  three or more commercial properties.

22   Deed theft in the second degree is a class C felony.

23  § 162.15 Deed theft in the first degree.

24   A person is guilty of deed theft in the first degree when such person:

25   (1) commits deed theft of a residential property that is occupied as a

26  home  by at least one person; or (2) commits deed theft of a residential

27  property that involves a home that is owned or occupied  by  an  elderly

1  person or an incompetent, or an incapacitated person, or physically

2  disabled person.

3   Deed theft in the first degree is a class B felony.

4  § 162.20 Aggravated deed theft.

5   A person is guilty of aggravated deed theft when such person commits

6  deed theft of three or more residential properties.

7   Aggravated deed theft is a class B felony.

8   § 4. Subdivision 3 of section 187.00 of the penal law, as amended by

9  chapter 507 of the laws of 2009, is amended to read as follows:

10   3. "Residential real property" means real property that is used or

11  occupied, or intended to be used or occupied, wholly or partly, as the

12  home or residence of one or more persons, including real property that

13  is improved by a one-to-four family dwelling, or a residential unit in a

14  building including units owned as condominiums or on a cooperative

15  basis, used or occupied, or intended to be used or occupied, wholly or

16  partly, as the home or residence of one or more persons, but shall not

17  refer to unimproved real property upon which such dwellings are to be

18  constructed.

19   § 5. Section 993 of the real property actions and proceedings law is

20  amended by adding a new subdivision 12 to read as follows:

21   12. Prohibition on initiation of a partition action. No partition

22  action related to an heirs property may be initiated by a co-tenant who

23  did not inherit their share or shares from a relative or by a co-tenant

24  who is not a relative of a co-tenant who inherited their share or shares

25  of the heirs property from a relative.

26   § 6. Section 993 of the real property actions and proceedings law is

27  amended by adding a new subdivision 13 to read as follows:

1    13.  Right of first refusal. (a) When a co-tenant receives a bona fide

2   offer to purchase a share or shares of an heirs property and the co-ten-

3   ant intends to accept or respond with a counteroffer, the co-tenants who

4   inherited their share or shares of the property, or the  co-tenants  who

5   are relatives to those co-tenants who inherited their share or shares of

6   the  property shall have the right to purchase such shares for the iden-

7   tical price, terms, and conditions of the offer or counteroffer.

8    (b) It shall be the duty of the non-co-tenant  who  made  the  initial

9   offer  for  the share or shares of the property as well as the co-tenant

10   who received the offer to exercise all due diligence to identify all  of

11   the  other  co-tenants to the property and notify such co-tenants of the

12   pending offer. Notice shall be made in the same manner as set  forth  in

13   section  three  hundred  eight  of the civil practice law and rules. The

14   other co-tenants shall have ninety days from the date they are  notified

15   of the offer to match such offer.

16    (c)  In  the  event  that the other co-tenants are not notified of the

17   offer and the sale is completed, and the offeror did  not  exercise  the

18   required due diligence to notify the other co-tenants of the heirs prop-

19   erty,  the  other co-tenants shall have the right to purchase the shares

20   from the non-relative co-tenant for the price paid by such  non-relative

21   co-tenant,  plus  any  applicable  interest at a rate of two percent per

22   annum. Such right shall expire ninety days after the other co-tenants to

23   the heirs property are made aware of the sale.

24    § 7. The real property law is amended by adding a new section  424  to

25   read as follows:

26    § 424.    Transfer on death deed. 1. Definitions. For the purposes of

27   this section the following terms shall have the following meanings:

1    (a) "Beneficiary" means a person who receives property in  a  transfer

2   on death deed.

3    (b) "Designated beneficiary" means  a  person designated to receive

4   property in a transfer on death deed.

5    (c)  "Joint owner" means an individual who owns property  concurrently

6   with  one  or  more other individuals with a right of survivorship.  The

7   term includes a joint tenant, owner of community property with  a  right

8   of  survivorship and tenant by the entirety. The term does not include a

9   tenant in common or owner of  community  property  without  a  right  of

10   survivorship.

11    (d)  "Person"  includes  a  natural person, an association, board, any

12   corporation, whether municipal, stock or non-stock, court,  governmental

13   agency,  authority  or  subdivision,  partnership  or other firm and the

14   state.

15    (e) "Property" means an interest in  real  property  located  in  this

16   state which is transferable on the death of the owner.

17    (f)  "Transfer  on  death  deed"  means  a  deed authorized under this

18   section.

19    (g) "Transferor" means an individual who makes  a  transfer  on  death

20   deed.

21    2.  Nonexclusivity.  This section does not affect any method of trans-

22   ferring property otherwise permitted under the law of this state.

23    3. Transfer on death deed authorized. An individual may transfer prop-

24   erty to one or more beneficiaries effective at the transferor's death by

25   a transfer on death deed.

26    4. Transfer on death deed revocable. A transfer on death deed is revo-

27   cable even if  the  deed  or  another  instrument  contains  a  contrary

28   provision.

1    5. Transfer on death deed nontestamentary. A transfer on death deed is

2    nontestamentary.

3    6. Capacity of transferor. The capacity required to make or revoke a

4    transfer on death deed is the same as the capacity required to make a

5    will.

6    7. Requirements. A transfer on death deed:

7    (a) except as otherwise provided in this subdivision, shall contain

8    the essential elements and formalities of a properly recordable inter

9    vivos deed;

10   (b) shall state that the transfer to the designated beneficiary is to

11   occur at the transferor's death;

12   (c) shall be signed by two witnesses who were present at the same time

13   and who witnessed the signing of the transfer on death deed;

14   (d) shall be acknowledged before a notary public; and

15   (e) shall be recorded before the transferor's death in the public

16   records in the county clerk's office of the county where the property is

17   located in the same manner as any other type of deed.

18   8. Notice, delivery, acceptance, consideration not required. A trans-

19   fer on death deed shall be effective without:

20   (a) notice or delivery to or acceptance by the designated beneficiary

21   during the transferor's life; or

22   (b) consideration.

23   9. Revocation by instrument authorized; revocation by act not permit-

24   ted.

25   (a) Subject to paragraph (b) of this subdivision, an instrument shall

26   be effective to revoke a recorded transfer on death deed, or any part of

27   it, only if the instrument:

28   (1) is one of the following:

1   (A) a transfer on death deed that revokes the deed or part of the deed

2   expressly or by inconsistency;

3   (B)   an  instrument of revocation that expressly revokes the deed or

4   part of the deed; or

5   (C) an inter vivos deed that expressly revokes the transfer  on  death

6   deed or part of the deed; and

7   (2)  is acknowledged by the transferor after the acknowledgment of the

8   deed  being  revoked  and  recorded before the transferor's death in the

9   public records in the county clerk's office of the county where the deed

10  is recorded.

11  (b) If a transfer on death deed is made by more than one transferor:

12  (1)  revocation by a transferor shall not affect the deed  as  to  the

13  interest of another transferor; and

14  (2)  a  deed of joint owners shall only be revoked if it is revoked by

15  all of the living joint owners.

16  (c)  After a transfer on death deed  is  recorded,  it  shall  not  be

17  revoked by a revocatory act on the deed.

18  (d) This section shall not limit the effect of an inter vivos transfer

19  of the property.

20  10.  Effect of transfer on death deed during transferor's life. During

21  a transferor's life, a transfer on death deed shall not:

22  (a) affect an interest or right of the transferor or any other  owner,

23  including the right to transfer or encumber the property;

24  (b) affect an interest or right of a transferee, even if the transfer-

25  ee has actual or constructive notice of the deed;

26  (c)  affect an interest or right of a secured or unsecured creditor or

27  future creditor of the transferor, even if the creditor  has  actual  or

28  constructive notice of the deed;

1    (d)  affect  the  transferor's or designated beneficiary's eligibility

2    for any form of public assistance;

3    (e)  create  a  legal or equitable interest in favor of the designated

4    beneficiary; or

5    (f) subject the property to claims or process of  a  creditor  of  the

6    designated beneficiary.

7    11. Effect of transfer on death deed at transferor's death. (a) Except

8    as  otherwise provided in the transfer on death deed, in this section or

9    in any other section of law which effects nonprobate transfers,  on  the

10   death  of  the transferor, the following rules apply to property that is

11   the subject of a transfer on death deed and owned by the  transferor  at

12   death:

13   (1) Subject to subparagraph two of this paragraph, the interest in the

14   property  shall  be transferred to the designated beneficiary in accord-

15   ance with the deed.

16   (2) The interest of a designated  beneficiary  is  contingent  on  the

17   designated  beneficiary  surviving  the  transferor.  The  interest of a

18   designated beneficiary that fails to survive the transferor lapses.

19   (3) Subject to subparagraph four of this paragraph, concurrent  inter-

20   ests  shall  be  transferred to the beneficiaries in equal and undivided

21   shares with no right of survivorship.

22   (4) If the transferor has identified two or more designated  benefici-

23   aries  to receive concurrent interests in the property, the share of one

24   which lapses or fails for any reason shall be transferred to the  other,

25   or  to the others in proportion to the interest of each in the remaining

26   part of the property held concurrently.

27   (b) Subject to this chapter, a beneficiary takes the property  subject

28   to  all  conveyances,  encumbrances,  assignments, contracts, mortgages,

1  liens, and other interests to which the property is subject at the

2  transferor's death. For purposes of this paragraph and this chapter, the

3  recording of the transfer on death deed shall be deemed to have occurred

4  at the transferor's death.

5  (c) If a transferor is a joint owner and is survived by one or more

6  other joint owners, the property that is the subject of a transfer on

7  death deed shall belong to the surviving joint owner or owners with

8  right of survivorship.

9  (d) If a transferor is a joint owner and is the last surviving joint

10 owner, the transfer on death deed shall be effective.

11 (e) A transfer on death deed transfers property without covenant or

12 warranty of title even if the deed contains a contrary provision.

13 12. Applicability of invalidating and revocatory principles. (a) Noth-

14 ing in this section shall limit the application of principles of fraud,

15 undue influence, duress, mistake, or other invalidating cause to a

16 transfer of property.

17 (b) Divorce, annulment or declaration of nullity, or dissolution of

18 marriage, shall have the same effect on a transfer on death deed as

19 outlined in section 5-1.4 of the estates, powers and trusts law.

20 13. Renunciation. A beneficiary may renounce all or part of the bene-

21 ficiary's interest in the same manner as if the interest was transferred

22 in a will.

23 14. Liability for creditor claims and statutory allowances. (a) To the

24 extent the transferor's probate estate is insufficient to satisfy an

25 allowed claim against the estate or a statutory allowance to a surviving

26 spouse or child, the estate may enforce the liability against property

27 transferred at the transferor's death by a transfer on death deed.

1    (b)  If  more than one property is transferred by one or more transfer

2  on death deeds, the liability under paragraph (a) of this subdivision is

3  apportioned among the properties in proportion to their  net  values  at

4  the transferor's death.

5    (c)  A  proceeding to enforce the liability under this section must be

6  commenced no later than eighteen months after the transferor's death.

7    15. Form of transfer on death deed. The following form may be used  to

8  create  a transfer on death deed. The other subdivisions of this section

9  shall govern the effect of this, or any other instrument used to  create

10  a transfer on death deed:


11  (front of form)


12  REVOCABLE TRANSFER ON DEATH DEED


13  NOTICE TO OWNER

14  You  should  carefully  read  all  information on the other side of this

15  form.  You may want to consult a lawyer before using this form.

16  This form must be recorded before your death, or it will not  be  effec-

17  tive.


18  IDENTIFYING INFORMATION

19  Owner or Owners Making This Deed:

1 _____

2 <u>Printed name                Mailing address</u>

3 _____

4 <u>Printed name              Mailing address</u>

5 <u>Legal description of the property:</u>

6 _____

7 <u>PRIMARY BENEFICIARY</u>

8 <u>I designate the following beneficiary if the beneficiary survives me.</u>

9 _____

10 <u>Printed name                Mailing address, if available</u>

11 <u>ALTERNATE BENEFICIARY - Optional</u>

12 <u>If my primary beneficiary does not survive me, I designate the following</u>

13 <u>alternate beneficiary if that beneficiary survives me.</u>

1 _____

2 Printed name            Mailing address, if available


3 TRANSFER ON DEATH

4 At  my  death,  I  transfer my interest in the described property to the

5 beneficiaries as designated above. Before my death, I have the right  to

6 revoke this deed.


7 SIGNATURE OF OWNER OR OWNERS MAKING THIS DEED




8 _____

9 Signature            Date




10 _____

11 Signature            Date


12 SIGNATURE OF WITNESSES




13 _____

1  <u>Signature           Date</u>


2  _____

3  <u>Signature           Date</u>


4  _____


5  <u>NOTARY ACKNOWLEDGMENT</u>

6  <u>(insert notary acknowledgment for deed here)</u>


7  <u>(back of form)</u>

8  <u>COMMON QUESTIONS ABOUT THE USE OF THIS FORM</u>


9  <u>What does the Transfer on Death (TOD) deed do?</u>


10 <u>When you die, this deed transfers the described property, subject to any</u>

11 <u>liens or mortgages (or other encumbrances) on the property at your</u>

12 <u>death. Probate is not required. The TOD deed has no effect until you</u>

13 <u>die. You can revoke it at any time. You are also free to transfer the</u>

14 <u>property to someone else during your lifetime. If you do not own any</u>

15 <u>interest in the property when you die, this deed will have no effect.</u>

1   How do I make a TOD deed?


2   Complete  this form. Have it acknowledged before a notary public. Record

3   the form in each county where any part of the property is  located.  The

4   form  has  no  effect unless it is acknowledged and recorded before your

5   death.


6   Is the "legal description" of the property necessary?


7   Yes.


8   How do I find the "legal description" of the property?


9   This information may be on the deed you  received  when  you  became  an

10  owner  of  the  property.  This information may also be available in the

11  county clerk's office of the county where the property  is  located.  If

12  you are not absolutely sure, consult a lawyer.


13  Can I change my mind before I record the TOD deed?


14  Yes. If you have not yet recorded the deed and want to change your mind,

15  simply tear up or otherwise destroy the deed.


16  How do I "record" the TOD deed?


17  Take the completed and acknowledged form to the county clerk's office of

18  the  county where the property is located. Follow the instructions given

19  by the county clerk to make the  form  part  of  the  official  property

1   records.  If  the property is in more than one county, you should record

2   the deed in each county.


3   Can I later revoke the TOD deed if I change my mind?


4   Yes.  You  can revoke the TOD deed. No one, including the beneficiaries,

5   can prevent you from revoking the deed.


6   How do I revoke the TOD deed after it is recorded?


7   There are three ways to revoke a recorded TOD deed:


8   (1) Complete and acknowledge a revocation form and  record  it  in  each

9   county where the property is located.


10  (2)  Complete  and  acknowledge a new TOD deed that disposes of the same

11  property and record it in each county where the property is located.


12  (3) Transfer the property to someone else  during  your  lifetime  by  a

13  recorded  deed  that  expressly revokes the TOD deed. You may not revoke

14  the TOD deed by will.


15  I am being pressured to complete this form. What should I do?


16  Do not complete this form under pressure.   Seek  help  from  a  trusted

17  family member, friend, or lawyer.


18  Do I need to tell the beneficiaries about the TOD deed?

1  No, but it is recommended. Secrecy can cause later complications and

2  might make it easier for others to commit fraud.


3  I have other questions about this form. What should I do?


4  This form is designed to fit some but not all situations. If you have

5  other questions, you are encouraged to consult a lawyer.


6   16. Form of revocation. The following form may be used to create an

7  instrument of revocation under this section. The other subdivisions of

8  this section shall govern the effect of this, or any other instrument

9  used to revoke a transfer on death deed.


10  (front of form)

11  REVOCATION OF TRANSFER ON DEATH DEED


12  NOTICE TO OWNER

13  This revocation must be recorded before you die, or it will not be

14  effective.  This revocation is effective only as to the interests in the

15  property of owners who sign this revocation.


16  IDENTIFYING INFORMATION

17  Owner or Owners of Property Making This Revocation:

1  _____

2  Printed name              Mailing address




3  _____

4  Printed name              Mailing address


5  Legal description of the property:




6  _____


7  REVOCATION

8  I revoke all my previous transfers of this property by transfer on death

9  deed.


10  SIGNATURE OF OWNER OR OWNERS MAKING THIS REVOCATION




11  _____

12  Signature            Date

1    _____

2    Signature           Date


3    SIGNATURE OF WITNESSES




4    _____

5    Signature           Date




6    _____

7    Signature           Date


8    NOTARY ACKNOWLEDGMENT

9    (insert notary acknowledgment here)


10   (back of form)


11   COMMON QUESTIONS ABOUT THE USE OF THIS FORM


12   How do I use this form to revoke a Transfer on Death (TOD) deed?


13   Complete  this form. Have it acknowledged before a notary public. Record

14   the form in the public records in the county clerk's office of the coun-

1  ty where the property is located. The  form  must  be  acknowledged  and

2  recorded before your death, or it has no effect.


3  How do I find the "legal description" of the property?


4  This information may be on the TOD deed. It may also be available in the

5  county  clerk's  office  of the county where the property is located. If

6  you are not absolutely sure, consult a lawyer.


7  How do I "record" the form?


8  Take the completed and acknowledged form to the county clerk's office of

9  the county where the property is located. Follow the instructions  given

10  by  the  county  clerk  to  make  the form part of the official property

11  records. If the property is located in more than one county, you  should

12  record the form in each of those counties.


13  I am being pressured to complete this form. What should I do?


14  Do not complete this form under pressure. Seek help from a trusted fami-

15  ly member, friend, or lawyer.


16  I have other questions about this form. What should I do?

17  This  form  is  designed to fit some but not all situations. If you have

18  other questions, consult a lawyer.

19    § 8. This act shall take effect on the ninetieth day  after  it  shall

20  have  become  a law, provided that section 424 of the real property law,

21  as added by section seven of this act, shall apply to any  transfer  on

1   death deed made before, on, or after the effective date of this act by a

2   transferor dying on or after the effective date of this act.


3                               PART P


4     Section  1. This Part enacts into law components of legislation relat-

5   ing to the conveyance and use of real property owned and  maintained  by

6   the  state  university  of New York and the New York state department of

7   transportation. Each component is  wholly  contained  within  a  Subpart

8   identified  as Subparts A through C. The effective date for each partic-

9   ular provision contained within such Subpart is set forth  in  the  last

10  section of such Subpart. Any provision in any section contained within a

11  Subpart, including the effective date of the Subpart, which makes refer-

12  ence  to  a  section  "of  this  act", when used in connection with that

13  particular component, shall be deemed to mean and refer  to  the  corre-

14  sponding  section  of the Subpart in which it is found. Section three of

15  this Part sets forth the general effective date of this Part.


16                              SUBPART A


17    Section 1. Legislative findings. The legislature finds that the  state

18  university  of  New  York  at  Farmingdale  ("Farmingdale") seeks to use

19  approximately 8.7 acres of vacant land on Farmingdale's campus to  build

20  multi-purpose  facilities  to support housing needs and supporting amen-

21  ities, fulfilling a necessary and vital public purpose. The  legislature

22  further  finds  that granting the trustees of the State University of New

23  York ("Trustees") the  authority  and  power  to  lease  and  otherwise

24  contract  to  make  available  grounds and facilities of the Farmingdale

1  campus will ensure such land is utilized for the benefit of Farmingdale,

2  the surrounding community, and the general public.

3    § 2.  Notwithstanding any other law to the contrary, the Trustees are

4  authorized and empowered, without  any  public  bidding,  to  lease  and

5  otherwise  contract  to  make available to Farmingdale state development

6  corporation, a  not-for-profit  corporation  (the  "ground  lessee"),  a

7  portion  of the lands of Farmingdale generally described in this act for

8  the purpose of  developing,  constructing,  maintaining  and  operating

9  multi-purpose  facilities  to support housing needs and supporting amen-

10 ities. Such lease or contract shall be for a period not exceeding  nine-

11 ty-nine years without any fee simple conveyance and otherwise upon terms

12 and  conditions  determined by such trustees, subject to the approval of

13 the director of the division of the budget, the attorney general and the

14 state comptroller. In the event that  the  real  property  that  is  the

15 subject of such lease or contract shall cease to be used for the purpose

16 described  in  this act, such lease or contract shall immediately termi-

17 nate and the real property and any improvements thereon shall revert  to

18 the  state  university  of  New York. Any lease or contract entered into

19 pursuant to this act shall provide that the real property  that  is  the

20 subject  of  such  lease  or contract and any improvements thereon shall

21 revert to the state university of New York on  the  expiration  of  such

22 contract  or lease.   Any and all proceeds related to the leases author-

23 ized by this act shall be used for the benefit of the Farmingdale campus

24 and the allocation of such proceeds shall be subject to approval by  the

25 Trustees.

26   § 3. Any contract or lease entered into pursuant to this act shall be

27 deemed to be a state contract for purposes of article 15-A of the execu-

28 tive law, and any contractor, subcontractor, lessee or sublessee  enter-

1  ing into such contract or lease for the construction, demolition, recon-

2  struction, excavation, rehabilitation, repair, renovation, alteration or

3  improvement  authorized  pursuant  to  this  act  shall  be  deemed  a  state

4  agency for the purposes of article 15-A of the executive law and subject

5  to the provisions of such article.

6    § 4.  Notwithstanding  any  general, special or local law or judicial

7  decision to the contrary, all work performed on a project authorized  by

8  this  act where all or any portion thereof involves a lease or agreement

9  for  construction,  demolition,  reconstruction,  excavation,  rehabili-

10  tation,  repair,  renovation, alteration or improvement shall be subject

11  to and performed in accordance with the provisions of article 8  of  the

12  labor law to the same extent and in the same manner as a contract of the

13  state.

14    § 5. Without limiting the determination of the terms and conditions of

15  such  contracts  or  leases,  such  terms and conditions may provide for

16  leasing,  subleasing,  construction,   reconstruction,   rehabilitation,

17  improvement,  operation  and management of and provision of services and

18  assistance and the granting of licenses, easements  and  other  arrange-

19  ments  with  regard  to such grounds and facilities by Farmingdale state

20  development corporation, and parties contracting with Farmingdale  state

21  development  corporation,  and  in  connection with such activities, the

22  obtaining of funding or financing, whether public or private,  unsecured

23  or  secured,  including,  but not limited to, secured by leasehold mort-

24  gages and assignments of rents and leases, by Farmingdale state develop-

25  ment corporation and parties contracting with Farmingdale state develop-

26  ment corporation for the purposes of completing the project described in

27  this act.

1  § 6. Such lease shall include an indemnity provision whereby the

2  lessee or sublessee promises to indemnify, hold harmless and defend the

3  lessor against all claims, suits, actions, and liability to all  persons

4  on the leased premises, including tenant, tenant's agents, contractors,

5  subcontractors, employees, customers, guests, licensees, invitees and

6  members of the public, for damage to any such person's property, whether

7  real or personal, or for personal injuries arising out of  tenant's  use

8  or occupation of the demised premises.

9  § 7. Any contracts entered into pursuant to this act between the

10 ground lessee and parties contracting with the ground  lessee  shall  be

11 awarded by a competitive process.

12 § 8. The property authorized by this act to be leased to Farmingdale

13 state development corporation is generally described as that  parcel  of

14 real  property  with  improvements  thereon consisting of a total of 8.7

15 acres situated on the campus of the State  University  of  New  York  at

16 Farmingdale,  subject  to  all  existing  easements  and restrictions of

17 record. The description in this section of the parcel to be made  avail-

18 able pursuant to this act is not meant to be a legal description, but is

19 intended only to identify the parcel:

20 The  property is situated at the southwest corner of NYS Route 110 and

21 Melville Road. The eastern boundary runs north/south along  the  western

22 side  of  NYS  Route  110  with  approximately 450 feet of frontage. The

23 northern boundary runs along Melville Road for just over 1,000 feet.

24 § 9. The state university of New York shall not lease lands  described

25 in  this  act  unless any such lease shall be executed within 5 years of

26 the effective date of this act.

1     § 10. Insofar as the provisions of this act are inconsistent with  the

2     provisions of any law, general, special or local, the provisions of this

3     act shall be controlling.

4     § 11. This act shall take effect immediately.


5                                  SUBPART B


6     Section  1. Legislative findings. The legislature finds that the state

7     university of New York at Stony  Brook  ("Stony  Brook")  seeks  to  use

8     approximately  10 acres of underutilized land on Stony Brook's Southamp-

9     ton campus to build multi-purpose facilities to  support  housing  needs

10    and  supporting  amenities,  fulfilling  a  necessary  and  vital public

11    purpose.  The legislature further finds that granting  the  trustees  of

12    the State University of New York ("Trustees") the authority and power to

13    lease and otherwise contract to make available grounds and facilities of

14    Stony  Brook's  campus will ensure such land is utilized for the benefit

15    of Stony Brook, the surrounding community, and the general public.

16    § 2. Notwithstanding any other law to the contrary, the  Trustees  are

17    authorized  and  empowered,  without  any  public  bidding, to lease and

18    otherwise contract to make available to a ground lessee a portion of the

19    lands of Stony Brook generally described in this act for the purpose  of

20    developing, constructing, maintaining and operating multi-purpose facil-

21    ities  to  support housing needs and supporting amenities. Such lease or

22    contract shall be for a period not exceeding ninety-nine  years  without

23    any fee simple conveyance and otherwise upon terms and conditions deter-

24    mined  by  such trustees, subject to the approval of the director of the

25    division of the budget, the attorney general and the state  comptroller.

26    In the event that the real property that is the subject of such lease or

1   contract  shall  cease to be used for the purpose described in this act,

2   such lease or contract shall immediately terminate and the real property

3   and any improvements thereon shall revert to the state university of New

4   York. Any  lease  or  contract  entered into pursuant to this act shall

5   provide that the real property that is the  subject  of  such  lease  or

6   contract  and any improvements thereon shall revert to the state univer-

7   sity of New York on the expiration of such contract or  lease.  Any  and

8   all  proceeds related to the leases authorized by this act shall be used

9   for the benefit of the Stony Brook campus and  the  allocation  of  such

10  proceeds shall be subject to approval by the Trustees.

11     §  3. Any contract or lease entered into pursuant to this act shall be

12  deemed to be a state contract for purposes of article 15-A of the execu-

13  tive law, and any contractor, subcontractor, lessee or sublessee  enter-

14  ing into such contract or lease for the construction, demolition, recon-

15  struction, excavation, rehabilitation, repair, renovation, alteration or

16  improvement  authorized  pursuant  to  this  act shall be deemed a state

17  agency for the purposes of article 15-A of the executive law and subject

18  to the provisions of such article.

19     § 4. Notwithstanding any general, special or  local  law  or  judicial

20  decision  to the contrary, all work performed on a project authorized by

21  this act where all or any portion thereof involves a lease or  agreement

22  for  construction,  demolition,  reconstruction,  excavation,  rehabili-

23  tation, repair, renovation, alteration or improvement shall  be  subject

24  to  and  performed in accordance with the provisions of article 8 of the

25  labor law to the same extent and in the same manner as a contract of the

26  state.

27     § 5. Without limiting the determination of the terms and conditions of

28  such contracts or leases, such terms  and  conditions  may  provide  for

1  leasing,   subleasing,   construction,   reconstruction,   rehabilitation,
2  improvement, operation and management of and provision of  services  and
3  assistance  and  the  granting of licenses, easements and other arrange-
4  ments  with  regard to such grounds and facilities by the ground lessee,
5  and parties contracting with the ground lessee, and in  connection  with
6  such  activities,  the obtaining of funding or financing, whether public
7  or private, unsecured or secured, including, but not limited to, secured
8  by leasehold mortgages and assignments  of  rents  and  leases,  by  the
9  ground  lessee  and  parties  contracting with the ground lessee for the
10  purposes of completing the project described in this act.

11    § 6. Such lease shall  include  an  indemnity  provision  whereby  the
12  lessee  or sublessee promises to indemnify, hold harmless and defend the
13  lessor against all claims, suits, actions, and liability to all  persons
14  on  the leased premises, including tenant, tenant's agents, contractors,
15  subcontractors, employees, customers, guests,  licensees,  invitees  and
16  members of the public, for damage to any such person's property, whether
17  real  or  personal, or for personal injuries arising out of tenant's use
18  or occupation of the demised premises.

19    § 7. Any contracts entered into  pursuant  to  this  act  between  the
20  ground  lessee  and  parties contracting with the ground lessee shall be
21  awarded by a competitive process.

22    § 8. The property authorized by this act to be leased  to  the  ground
23  lessee is generally described as approximately 10 acres of land situated
24  on  the  Southampton campus of the state university of New York at Stony
25  Brook, subject to all existing easements and restrictions of record.

26    § 9. The state university of New York shall not lease lands  described
27  in  this  act  unless any such lease shall be executed within 5 years of
28  the effective date of this act.

1    § 10. Insofar as the provisions of this act are inconsistent with  the

2   provisions of any law, general, special or local, the provisions of this

3   act shall be controlling.

4    § 11. This act shall take effect immediately.


5                              SUBPART C


6    Section 1. Notwithstanding the provisions of section 400 of the trans-

7   portation  law,  or  any  other  provision  of  law to the contrary, the

8   commissioner of transportation is hereby  authorized  and  empowered  to

9   transfer  and  convey certain state-owned real property, as described in

10   section two of this act, upon such terms and conditions as  the  commis-

11   sioner may deem appropriate.

12    §  2.  The  lands authorized by this act to be conveyed consist of two

13   parcels of land in the town of Babylon, Suffolk county, constituting tax

14   map numbers 0100-050.00-01.00-003.000 and 0100-050.00-01.00-002.000, and

15   generally described as approximately twelve and one-half acres  of  land

16   located north of Conklin Street and east of Route 110.

17    §  3.  The  description  in section two of this act of the lands to be

18   conveyed is not intended to be a legal description and is intended  only

19   to identify the premises to be conveyed.

20    § 4. This act shall take effect immediately.

21    § 2. Severability clause. If any clause, sentence, paragraph, subdivi-

22   sion, section, or subpart of this part shall be adjudged by any court of

23   competent  jurisdiction  to  be invalid, such judgment shall not affect,

24   impair, or invalidate the remainder of that subpart or  this  part,  but

25   shall  be  confined in its operation to the clause, sentence, paragraph,

26   subdivision, section, or subpart directly involved in the controversy in

1  which such judgment shall have been rendered. It is hereby  declared  to

2  be  the intent of the legislature that this part and each subpart herein

3  would have been enacted even if such invalid  provisions  had  not  been

4  included herein.

5    § 3. This act shall take effect immediately; provided, however, that

6  the applicable effective date of Subparts A through C of this act  shall

7  be as specifically set forth in the last section of such Subparts.


8                                  PART Q


9    Section  1.  Subdivision 3 of section 26 of the multiple dwelling law,

10  as amended by chapter 748 of the laws of 1961, is  amended  to  read  as

11  follows:

12   3.  Floor  area ratio (FAR). [The] Except as otherwise provided in and

13  determined under a zoning law, ordinance, or resolution of a city with a

14  population of one million or more,  or  after  consultation  with  local

15  officials,  as  provided in a general project plan of the New York state

16  urban  development  corporation, the floor area ratio (FAR) of any dwell-

17  ing or dwellings on a lot shall not exceed 12.0, except that a fireproof

18  class B dwelling in which six or more passenger elevators are maintained

19  and operated in any city having a local zoning law, ordinance or  resol-

20  ution  restricting  districts  in  such  city to residential use, may be

21  erected in accordance with the provisions of such zoning law,  ordinance

22  or resolution, if such class B dwelling is erected in a district no part

23  of  which  is  restricted by such zoning law, ordinance or resolution to

24  residential uses.

25    § 2. This act shall take effect immediately.

1                               PART R


2    Section 1. Paragraphs c and d of subdivision 2 of section 224-a of the

3  labor  law,  as added by section 1 of part FFF of chapter 58 of the laws

4  of 2020, are amended and a new paragraph e is added to read as follows:

5    c. Money loaned by the public entity that is to be repaid on a contin-

6  gent basis; [or]

7    d. Credits that are applied by the public entity against repayment  of

8  obligations to the public entity[.]; or

9    e. Benefits under section four hundred sixty-seven-m of the real prop-

10  erty tax law.

11    § 2.  The  real  property  tax law is amended by adding a new section

12  467-m to read as follows:

13    § 467-m. Exemption from local real property taxation of certain multi-

14  ple dwellings in a city having a population of one million or more.   1.

15  Definitions.  For  purposes  of  this section, the following terms shall

16  have the following meanings:

17    a. "Affordable housing from commercial conversions tax incentive bene-

18  fits" hereinafter referred to as "AHCC program benefits", shall mean the

19  exemption from  real  property  taxation  authorized  pursuant  to  this

20  section.

21    b.  "Affordability  requirement"  shall  mean that within any eligible

22  multiple dwelling: (i) not less than  twenty  percent  of  the  dwelling

23  units  are  affordable housing units; (ii) not less than five percent of

24  the dwelling units are affordable housing forty percent units; (iii) the

25  weighted average of all income bands for all of the  affordable  housing

26  units does not exceed eighty percent of the area median income, adjusted

27  for  family size; (iv) there are no more than three income bands for all

1   of the affordable housing units; and (v) no income band  for  affordable

2   housing  units  exceeds  one  hundred percent of the area median income,

3   adjusted for family size.

4     c.  "Affordable housing forty percent unit" shall mean a dwelling unit

5   that: (i) is situated within the eligible multiple  dwelling  for  which

6   AHCC program benefits are granted; and (ii) upon initial rental and upon

7   each  subsequent rental following a vacancy during the restriction peri-

8   od, is affordable to and restricted to occupancy by individuals or fami-

9   lies whose household income does not exceed forty percent  of  the  area

10  median income, adjusted for family size, at the time that such household

11  initially occupies such dwelling unit.

12    d.  "Affordable housing unit" shall mean, collectively and individual-

13  ly: (i) an affordable housing forty percent unit;  and  (ii)  any  other

14  unit  that  meets  the affordability requirement upon initial rental and

15  upon each subsequent rental following a vacancy during  the  restriction

16  period,  and is affordable to and restricted to occupancy by individuals

17  or families whose household income does  not  exceed  the  income  bands

18  established in conjunction with such affordability requirement.

19    e. "Agency" shall mean the New York city department of housing preser-

20  vation and development.

21    f. "Application" shall mean an application for AHCC program benefits.

22    g.  "Building service employee" shall mean any person who is regularly

23  employed at, and performs work in connection with the  care  or  mainte-

24  nance  of, an eligible multiple dwelling, including, but not limited to,

25  a watchman, guard, doorman, building cleaner, porter, handyman, janitor,

26  gardener, groundskeeper,  elevator  operator  and  starter,  and  window

27  cleaner,  but  not  including  persons regularly scheduled to work fewer

28  than eight hours per week at such eligible multiple dwelling.

1    h. "Commencement date" shall mean the date upon which the actual

2    construction of the eligible conversion lawfully begins in good faith.

3    i.  "Completion date" shall mean the date upon which the local depart-

4    ment of buildings issues the first temporary or permanent certificate of

5    occupancy covering all residential areas of an eligible multiple dwell-

6    ing.

7    j. "Construction period" shall mean, with respect to any eligible

8    multiple dwelling, a period: (i) beginning on the later of the commence-

9    ment date or three years before the completion date; and (ii) ending on

10   the day preceding the completion date.

11   k.  "Dwelling" or "dwellings" shall have the same meaning as set forth

12   in subdivision four of section four of the multiple dwelling law.

13   l. "Eligible conversion" shall mean the conversion of a non-residen-

14   tial building, except a hotel or other class B multiple dwelling, to an

15   eligible multiple dwelling.

16   m. "Eligible multiple dwelling" shall mean a multiple dwelling which

17   was subject to an eligible conversion in which: (i) all dwelling units

18   included in any application are operated as rental housing; (ii) six or

19   more dwelling units have been created through an eligible conversion;

20   (iii) the commencement date is after December thirty-first, two thousand

21   twenty-two and on or before December thirty-first, two thousand thirty-

22   three; and (iv) the completion date is on or before December thirty-

23   first, two thousand thirty-nine.

24   n. "Fiscal officer" shall mean the comptroller or other analogous

25   officer in a city having a population of one million or more.

26   o. "Floor area" shall mean the horizontal areas of the several floors,

27   or any portion thereof, of a dwelling or dwellings, and accessory struc-

1  tures  on  a  lot measured from the exterior faces of exterior walls, or

2  from the center line of party walls.

3   p.  "Income  band"  shall mean a percentage of the area median income,

4  adjusted for family size, that is a multiple of ten percent.

5   q. "Manhattan prime development area"  shall  mean  any  tax  lot  now

6  existing  or  hereafter  created which is located entirely south of 96th

7  street in the borough of Manhattan.

8   r. "Market unit" shall mean a dwelling unit in  an  eligible  multiple

9  dwelling other than an affordable housing unit.

10  s. "Marketing band" shall mean maximum rent amounts ranging from twen-

11  ty  percent  to thirty percent of the area median income or income band,

12  respectively, that is applicable to a specific affordable housing unit.

13  t. "Multiple dwelling" shall have the same meaning  as  set  forth  in

14  subdivision seven of section four of the multiple dwelling law.

15  u.  "Non-residential  building" shall mean a structure or portion of a

16  structure, except a hotel or other class B multiple dwelling, having  at

17  least  one  floor, a roof and at least three walls enclosing all or most

18  of the space used in connection with the structure  or  portion  of  the

19  structure, which has a certificate of occupancy for commercial, manufac-

20  turing  or other non-residential use for not less than ninety percent of

21  the aggregate floor area of such structure or portion of such structure,

22  or other proof of such non-residential use as is acceptable to the agen-

23  cy.

24  v. "Non-residential tax lot" shall  mean  a  tax  lot  that  does  not

25  contain any dwelling units.

26  w.  "Rent stabilization" shall mean, collectively, the rent stabiliza-

27  tion law of nineteen hundred sixty-nine, the rent  stabilization  code,

28  and the emergency tenant protection act of nineteen seventy-four, all as

1    in  effect as of the effective date of this section or as amended there-

2    after, together with any successor statutes  or  regulations  addressing

3    substantially the same subject matter.

4     x.  "Residential  tax lot" shall mean a tax lot that contains dwelling

5    units.

6     y. "Restriction period" shall  mean  a  period  commencing  on  the

7    completion date and extending in perpetuity, notwithstanding any earlier

8    termination or revocation of AHCC program benefits.

9     2.  Benefit.  In  cities  having  a population of one million or more,

10   notwithstanding the provisions of any other general,  special  or  local

11   law  to  the contrary, a new eligible multiple dwelling, except a hotel,

12   that complies with the provisions of this section shall be  exempt  from

13   real  property  taxation, other than assessments for local improvements,

14   in the amounts and for the periods which shall be  set  forth  in  regu-

15   lations promulgated by the division of housing and community renewal, in

16   consultation  with  the  agency,  provided  that  such eligible multiple

17   dwelling is used or held out for use for dwelling purposes.

18    3. Tax payments. In addition to any other amounts payable pursuant  to

19   this section, the owner of any eligible multiple dwelling receiving AHCC

20   program  benefits shall pay, in each tax year in which such AHCC program

21   benefits are in effect, all assessments for local improvements.

22    4. Limitation on benefits for non-residential space. If the  aggregate

23   floor  area of commercial, community facility and accessory use space in

24   an eligible multiple dwelling exceeds twelve percent  of  the  aggregate

25   floor area in such eligible multiple dwelling, any AHCC program benefits

26   shall  be  reduced  by a percentage equal to such excess. If an eligible

27   multiple dwelling contains multiple tax lots, the  tax  arising  out  of

28   such  reduction  in AHCC program benefits shall first be apportioned pro

1   rata among any non-residential tax lots. After any such  non-residential

2   tax lots are fully taxable, the remainder of the tax arising out of such

3   reduction  in  AHCC  program  benefits, if any, shall be apportioned pro

4   rata  among the remaining residential tax lots. For the purposes of this

5   section, accessory use space shall not include home occupation space  or

6   accessory  parking  space  located not more than twenty-three feet above

7   the curb level.

8     5. Application of benefit. Based on the certification  of  the  agency

9   certifying  eligibility  for  AHCC  program  benefits, the department of

10  finance shall determine the amount of the exemption pursuant to subdivi-

11  sions two and four of this section and shall apply the exemption to  the

12  assessed value of the eligible multiple dwelling.

13    6.  Affordability  requirements.  An  eligible multiple dwelling shall

14  comply with the affordability requirement  defined  in  paragraph  b  of

15  subdivision one of this section during the restriction period. An eligi-

16  ble  multiple dwelling shall also comply with the following requirements

17  during the restriction period:

18    a. All affordable housing units in an eligible multiple dwelling shall

19  share the same common entrances and common areas as rental  market  rate

20  units  in such eligible multiple dwelling and shall not be isolated to a

21  specific  floor  or  area  of  an  eligible  multiple  dwelling.  Common

22  entrances  shall  mean  any means of ingress or egress regularly used by

23  any resident of a rental dwelling unit in the eligible  multiple  dwell-

24  ing.

25    b.  Unless  preempted by the requirements of a federal, state or local

26  housing program, either: (i) the affordable housing units in an eligible

27  multiple dwelling shall have a  unit  mix  proportional  to  the  rental

28  market  units;  or (ii) at least fifty percent of the affordable housing

1  units in an eligible multiple dwelling shall have two or  more  bedrooms

2  and  no  more  than  twenty-five percent of the affordable housing units

3  shall have less than one bedroom.

4     c.  Notwithstanding any provision of rent stabilization to the contra-

5  ry: (i) all affordable housing units shall remain fully subject to  rent

6  stabilization  during  the  restriction  period; and (ii) any affordable

7  housing unit occupied by a tenant that has been approved by  the  agency

8  prior to the agency's denial of an eligible multiple dwelling's applica-

9  tion  for  AHCC program benefits shall remain subject to rent stabiliza-

10  tion until such tenant vacates such affordable housing unit.

11     d. All rent stabilization registrations required  to  be  filed  shall

12  contain  a  designation  that specifically identifies affordable housing

13  units created pursuant to this section as "AHCC program affordable hous-

14  ing units" and shall contain an explanation  of  the  requirements  that

15  apply to all such affordable housing units.

16     e.  Failure  to  comply  with  the provisions of this subdivision that

17  require the creation, maintenance, rent  stabilization  compliance,  and

18  occupancy of affordable housing units shall result in revocation of AHCC

19  program benefits.

20     f.  Nothing  in  this  section shall: (i) prohibit the occupancy of an

21  affordable housing unit by individuals or families whose income  at  any

22  time  is  less  than the maximum percentage of the area median income or

23  income band, as applicable, adjusted for family size, specified for such

24  affordable housing unit pursuant to this section; or (ii)  prohibit  the

25  owner  of  an  eligible  multiple  dwelling from requiring, upon initial

26  rental or upon any rental following a  vacancy,  the  occupancy  of  any

27  affordable housing unit by such lower income individuals or families.

1    g. Following issuance of a temporary certificate of occupancy and upon

2   each vacancy thereafter, an affordable housing unit shall promptly be

3   offered for rental by individuals or families whose income does not

4   exceed the maximum percentage of the area median income or income band,

5   as applicable, adjusted for family size, specified for such affordable

6   housing unit pursuant to this section and who intend to occupy such

7   affordable housing unit as their primary residence. An affordable hous-

8   ing unit shall not be: (i) rented to a corporation, partnership or other

9   entity; or (ii) held off the market for a period longer than is reason-

10   ably necessary to perform repairs needed to make such affordable housing

11   unit available for occupancy.

12    h. An affordable housing unit shall not be rented on a temporary,

13   transient or short-term basis. Every lease and renewal thereof for an

14   affordable housing unit shall be for a term of one or two years, at the

15   option of the tenant.

16    i. An affordable housing unit shall not be converted to cooperative or

17   condominium ownership.

18    j. The agency may establish by rule such requirements as the agency

19   deems necessary or appropriate for: (i) the marketing of affordable

20   housing units, both upon initial occupancy and upon any vacancy; (ii)

21   monitoring compliance with the provisions of this subdivision; (iii) the

22   establishment of marketing bands for affordable housing units; and (iv)

23   specifying the legal instrument by which the marketing, affordability,

24   rent stabilization, permitted rent, and any other requirement associated

25   with this benefit will be recorded and enforced. Such requirements may

26   include, but need not be limited to, retaining a monitor approved by the

27   agency and paid for by the owner of the eligible multiple dwelling.

1   k. Notwithstanding any provision of this section to  the  contrary,  a

2   market  unit  shall  not be subject to rent stabilization unless, in the

3   absence of AHCC program benefits, the unit  would  be  subject  to  rent

4   stabilization.

5   7.  Building  service  employees. a. For the purposes of this subdivi-

6   sion, "applicant" shall mean an applicant for AHCC program benefits, any

7   successor to such applicant, or any employer of building service employ-

8   ees for such applicant including, but not limited to, a property manage-

9   ment company or contractor.

10   b. All building service employees employed by  the  applicant  at  the

11   eligible  multiple dwelling shall receive the applicable prevailing wage

12   for the duration of the benefit period, regardless of whether such bene-

13   fits provided pursuant to this section are revoked or terminated.

14   c. The fiscal officer shall have the power to enforce  the  provisions

15   of  this  subdivision.  In enforcing such provisions, the fiscal officer

16   shall have the power: (i) to investigate or cause an investigation to be

17   made to determine the prevailing wages for building  service  employees,

18   and  in  making  such investigation, the fiscal officer may utilize wage

19   and fringe benefit data from various sources, including, but not limited

20   to, data and determinations of  federal,  state  or  other  governmental

21   agencies; provided, however, that the provision of a dwelling unit shall

22   not  be  considered  wages  or  a  fringe benefit; (ii) to institute and

23   conduct inspections at the site of the work or elsewhere; (iii) to exam-

24   ine the books, documents and records pertaining to the  wages  paid  to,

25   and  the hours of work performed by, building service employees; (iv) to

26   hold hearings and, in connection  therewith,  to  issue  subpoenas,  the

27   enforcement  of  which  shall be regulated by the civil practice law and

28   rules, administer oaths and examine witnesses; (v) to make a classifica-

1   tion by craft, trade or other generally recognized occupational category

2   of the building service employees and to determine whether such work has

3   been performed by the building service employees in such classification;

4   (vi)  to  require the applicant to file with the fiscal officer a record

5   of the wages actually paid by such applicant  to  the  building  service

6   employees and of their hours of work; (vii) to delegate any of the fore-

7   going  powers  to his or her deputy or other authorized representative;

8   (viii) to promulgate rules as he or she shall consider necessary for the

9   proper execution of the duties, responsibilities  and  powers  conferred

10  upon  him  or  her  by  the  provisions of this subdivision; and (ix) to

11  prescribe  appropriate  sanctions  for  failure  to  comply   with   the

12  provisions  of  this  subdivision.  For each violation of paragraph b of

13  this subdivision, the fiscal officer may require the payment of (A) back

14  wages and fringe benefits; (B) liquidated damages up to three times  the

15  amount  of  the  back  wages and fringe benefits for willful violations;

16  and/or (C) reasonable attorneys' fees. If the fiscal officer finds  that

17  the  applicant has failed to comply with the provisions of this subdivi-

18  sion, he or she shall present evidence of  such  non-compliance  to  the

19  agency.

20  d. Paragraph b of this subdivision shall not be applicable to:  (i) an

21  eligible  multiple  dwelling containing less than thirty dwelling units;

22  or (ii) an eligible  multiple  dwelling  whose  eligible  conversion  is

23  carried  out  with the substantial assistance of grants, loans or subsi-

24  dies provided by a  federal,  state  or  local  governmental  agency  or

25  instrumentality  pursuant to a program for the development of affordable

26  housing.

27  e. The applicant shall submit a sworn affidavit with  its  application

28  certifying  that  it shall comply with the requirements of this subdivi-

1    sion or is exempt in accordance with paragraph d  of  this  subdivision.

2    Upon the agency's approval of such application, the applicant who is not

3    exempt  in  accordance with paragraph d of this subdivision shall submit

4    annually  a  sworn  affidavit  to  the fiscal officer certifying that it

5    shall comply with the requirements of this subdivision.

6      8. Concurrent exemptions or abatements. An eligible multiple  dwelling

7    receiving  AHCC program benefits shall not receive any exemption from or

8    abatement of real property taxation under any other law.

9      9.  Voluntary  renunciation  or  termination.  Notwithstanding    the

10   provisions  of  any  general,  special  or local law to the contrary, an

11   owner shall not be entitled to voluntarily renounce  or  terminate  AHCC

12   program  benefits  unless  the  agency  authorizes  such renunciation or

13   termination in connection with  the  commencement  of  a  tax  exemption

14   pursuant  to  the  private  housing  finance law or section four hundred

15   twenty-c of this title.

16     10. Termination or revocation. The agency may terminate or revoke AHCC

17   program benefits for noncompliance with this section. All of the afford-

18   able housing units shall remain subject to rent  stabilization  and  all

19   other  requirements  of this section for the duration of the restriction

20   period, regardless of whether such  benefits  have  been  terminated  or

21   revoked.

22     11.  Powers  cumulative.  The  enforcement  provisions of this section

23   shall not be exclusive, and are in addition to any other  rights,  reme-

24   dies  or  enforcement  powers set forth in any other law or available at

25   law or in equity.

26     12. Multiple tax lots.  If  an  eligible  multiple  dwelling  contains

27   multiple  tax  lots, an application may be submitted with respect to one

28   or more of such tax lots. The agency  shall  determine  eligibility  for

1  AHCC  program benefits based upon the tax lots included in such applica-

2  tion and benefits for each such eligible multiple dwelling shall be

3  based upon the completion date of each such multiple dwelling.

4    13. Applications. a. The application with respect to any eligible

5  multiple dwelling shall be filed with the agency no earlier than the

6  completion date and not later than one year after the completion date of

7  such eligible multiple dwelling.

8    b. Notwithstanding the provisions of any general, special, or local

9  law to the contrary, the agency may require by rule that applications be

10  filed electronically.

11  c. The agency may rely on certification by an architect or engineer

12  submitted by an applicant in connection with the filing of an applica-

13  tion. A false certification by such architect or engineer shall be

14  deemed to be professional misconduct pursuant to section sixty-five

15  hundred nine of the education law. Any architect or engineer found

16  guilty of such misconduct under the procedures prescribed in section

17  sixty-five hundred ten of the education law shall be subject to the

18  penalties prescribed in section sixty-five hundred eleven of the educa-

19  tion law and shall thereafter be ineligible to submit a certification

20  pursuant to this section.

21    d. Such application shall also certify that all taxes, water charges,

22  and sewer rents currently due and owing on the property which is the

23  subject of the application have been paid or are currently being paid in

24  timely installments pursuant to a written agreement with the department

25  of finance or other appropriate agency.

26    14. Filing fee. The agency may require a filing fee of no less than

27  three thousand dollars per dwelling unit in connection with any applica-

28  tion, except that the agency may promulgate rules:

1    a. imposing a lesser fee for an eligible multiple dwelling whose

2    eligible conversion is carried out with the substantial assistance of

3    grants, loans or subsidies provided by a federal, state or local govern-

4    mental agency or instrumentality pursuant to a program for the develop-

5    ment of affordable housing; and

6    b. requiring a portion of the filing fee to be paid upon the

7    submission of the information the agency requires in advance of approv-

8    ing the commencement of the marketing process for such eligible conver-

9    sion.

10   15. Rules. Except as provided in subdivision seven of this section,

11   the agency shall have the sole authority to enforce the provisions of

12   this section and may promulgate rules to carry out the provisions of

13   this section.

14   16. Penalties for violations of affordability requirements. a. On or

15   after the expiration date of the benefit provided pursuant to this

16   section, the agency may impose, after notice and an opportunity to be

17   heard, a penalty for any violation by an eligible multiple dwelling of

18   the affordability requirements of subdivision six of this section.

19   b. A penalty imposed under this subdivision shall be computed as a

20   percentage of the capitalized value of all AHCC program benefits on the

21   eligible multiple dwelling, calculated as of the first year that bene-

22   fits were granted, not to exceed one thousand percent. The agency shall

23   establish a schedule and method of calculation of such penalties pursu-

24   ant to subdivision fifteen of this section.

25   c. A penalty imposed under this subdivision shall be imposed against

26   the owner of the eligible multiple dwelling at the time the violation

27   occurred, even if such owner no longer owns such eligible multiple

28   dwelling at the time of the agency's determination.

1    d.  A  person or entity who fails to pay a penalty imposed pursuant to

2  this subdivision shall be guilty of a misdemeanor punishable  by  impri-

3  sonment not to exceed six months.

4    § 3. This act shall take effect immediately.


5                                 PART S


6    Section  1. The multiple dwelling law is amended by adding a new arti-

7  cle 7-D to read as follows:

8                             ARTICLE 7-D

9    LEGALIZATION AND CONVERSION OF BASEMENT AND CELLAR DWELLING UNITS

10 Section 288. Definitions.

11          289. Basement and cellar local laws and regulations.

12          290. Tenant protections in inhabited basement dwelling units and

13                inhabited cellar dwelling units.

14    § 288. Definitions. As used in this article, the following terms shall

15 have the following meanings:

16    1. The term "inhabited basement dwelling unit" means a basement unlaw-

17 fully occupied as a residence by one or more tenants on or prior to  the

18 effective date of this article;

19    2. The term "inhabited cellar dwelling unit" means a cellar unlawfully

20 occupied as a residence by one or more tenants on or prior to the effec-

21 tive date of this article;

22    3.  The term "rented" means leased, let, or hired out, with or without

23 a written agreement; and

24    4. The term "tenant" means an individual to whom an inhabited basement

25 dwelling unit is rented.

1    § 289. Basement and cellar local laws and regulations.   1.  Notwith-

2    standing any other provision of state or local law to the contrary, in a

3    city  with  a  population  of one million or more, the local legislative

4    body may, by local law, establish a program to  address,  provided  that

5    health  and  safety  are  protected,  (a)  the legalization of specified

6    inhabited basement dwelling units and inhabited cellar dwelling units in

7    existence prior to the effective date of this article through conversion

8    to legal dwelling units, or (b) the conversion of other specified  base-

9    ment  and cellar dwelling units in existence prior to the effective date

10   of this article to legal dwelling units. The  local  law  authorized  by

11   this section, and any rules or regulations promulgated thereunder, shall

12   not  be  subject to environmental review, including environmental review

13   conducted pursuant to article eight of  the  environmental  conservation

14   law and any state and local regulations promulgated thereunder.

15   2.  The  program established by such local law may provide to an owner

16   who converts an inhabited basement dwelling  unit  or  inhabited  cellar

17   dwelling  unit in accordance with a local law authorized by this article

18   or who otherwise abates the illegal occupancy of an  inhabited  basement

19   dwelling  unit  or  inhabited cellar dwelling unit, (a) freedom from any

20   civil or administrative liability, citations,  fines,  penalties,  judg-

21   ments  or  any  other  determinations   of  or  prosecution  for  civil

22   violations of this chapter, other state law or local law or  rules,  and

23   the  zoning resolution of such city, and (b) relief from any outstanding

24   civil judgments issued in connection with any  such  violation  of  such

25   laws,  rules  or  zoning  resolution issued before the effective date of

26   this article.  Provided that such local  law  shall  require  that  all

27   applications  for  conversions  be filed by a date certain subsequent to

1  the effective date of this article, provided further that such date

2  shall not exceed five years after the effective date of this article.

3  3. Such local law may provide that any provision of this chapter or

4  local law, rule or regulation, shall not be applicable to provide for

5  the alterations necessary for the conversion of a specified inhabited

6  basement dwelling unit or inhabited cellar dwelling unit or other speci-

7  fied basement or cellar dwelling unit in existence prior to the effec-

8  tive date into a lawful dwelling unit. Any amendment of the zoning

9  resolution necessary to enact such program shall be subject to a public

10  hearing at the planning commission of such locality, and approval by

11  such commission and the legislative body of such local government,

12  provided, however, that it shall not require environmental review,

13  including environmental review conducted pursuant to article eight of

14  the environmental conservation law and any state and local regulations

15  promulgated thereunder, or any additional land use review.

16  § 290. Tenant protections in inhabited basement dwelling units and

17  inhabited cellar dwelling units.   1. The program authorized by this

18  article shall require an application to make alterations to legalize an

19  inhabited basement dwelling unit or inhabited cellar dwelling unit be

20  accompanied by a certification indicating whether such unit was rented

21  to a tenant on the effective date of this article, notwithstanding

22  whether the occupancy of such unit was authorized by law. A city may not

23  use such certification as the basis for an enforcement action for ille-

24  gal occupancy of such unit, provided that nothing contained in this

25  article shall be construed to limit such city from issuing a vacate

26  order for hazardous or unsafe conditions.

27  2. The local law authorized by this article shall provide that a

28  tenant in occupancy at the time of the effective date of this article,

1  who is evicted or otherwise removed from such unit as a result of an

2  alteration necessary to bring an inhabited basement dwelling unit or

3  inhabited cellar dwelling unit into compliance with the standards estab-

4  lished by the local law authorized by this article, shall have a right

5  of first refusal to return to such unit as a tenant upon its first

6  lawful occupancy as a legal dwelling unit, notwithstanding whether the

7  occupancy at the time of the effective date of this article was author-

8  ized by law. Such local law shall specify how to determine priority when

9  multiple tenants may claim such right.

10    3. A tenant unlawfully denied a right of first refusal to return to a

11  legal dwelling unit, as provided pursuant to the local law authorized by

12  this article, shall have a cause of action in any court of competent

13  jurisdiction for compensatory damages or declaratory and injunctive

14  relief as the court deems necessary in the interests of justice,

15  provided that such compensatory relief shall not exceed the annual

16  rental charges for such legal dwelling unit.

17    § 2. This act shall take effect immediately.


18                              PART T


19    Section 1. Subparagraph (xxviii) of paragraph (a) of subdivision 16 of

20  section 421-a of the real property tax law, as amended by section 3 of

21  part TTT of chapter 59 of the laws of 2017, is amended to read as

22  follows:

23    (xxviii) "Eligible multiple dwelling" shall mean a multiple dwelling

24  or homeownership project containing six or more dwelling units created

25  through new construction or eligible conversion for which the commence-

26  ment date is after December thirty-first, two thousand fifteen and on or

1  before  June  fifteenth,  two  thousand  twenty-two,  and  for which the

2  completion date is on or before June fifteenth,  two  thousand  [twenty-

3  six]  _thirty-one_.

4      § 2.  This act shall take effect immediately.


5                                PART U


6      Section  1.  The  real  property  tax  law  is amended by adding a new

7  section 485-x to read as follows:

8      _§ 485-x. Affordable neighborhoods for New Yorkers tax incentive.    1._

9  _Definitions.  For purposes of this section:_

10     _(a)  "Affordable  neighborhoods for New Yorkers tax incentive benefits_

11  _(hereinafter referred to as "ANNY Program  benefits")"  shall  mean  the_

12  _exemption from real property taxation pursuant to this section._

13     _(b)  "Affordable homeownership program" shall only apply to a homeown-_

14  _ership project, of which a prescribed percent of the units  shall,  upon_

15  _initial sale immediately subsequent to the completion date and upon each_

16  _subsequent sale for forty years immediately subsequent to the completion_

17  _date,  be  affordable  to individuals or families whose household income_

18  _does not exceed a prescribed percent of the area median income, adjusted_

19  _for family size, and where each owner of any such unit shall  agree,  in_

20  _writing,  to  maintain  such unit as their primary residence for no less_

21  _than five years from the acquisition of such unit, and such  project  is_

22  _subject  to  a  regulatory  agreement  with a city or state agency.  The_

23  _prescribed percentage of the units and the prescribed percentage of  the_

24  _area  median income shall be set forth in regulations promulgated by the_

25  _agency in accordance with the goals and factors set forth in subdivision_

26  _eight of this section._

1    (c) "Affordability percentage" shall mean a fraction, the numerator of

2    which is the number of affordable housing units in an eligible site  and

3    the  denominator  of which is the total number of dwelling units in  such

4    eligible site.

5    (d)  "Affordable housing unit" shall mean a dwelling unit that: (i) is

6    situated within the eligible site for which ANNY  Program  benefits  are

7    granted;  and  (ii)  upon initial rental and upon each subsequent rental

8    following a vacancy during the applicable restriction period, is afford-

9    able to and restricted to occupancy by a household whose income does not

10   exceed a prescribed percentage of the area median income,  adjusted  for

11   family  size,  at  the  time that such household initially occupies such

12   dwelling unit. The prescribed area median income  percentages  shall  be

13   set  forth  in  regulations promulgated by the agency in accordance with

14   the goals and factors set forth in subdivision eight of this section.

15   (e) "Agency" shall mean the department  of  housing  preservation  and

16   development.

17   (f) "Application" shall mean an application for ANNY Program benefits.

18   (g) "Average hourly wage" shall mean the amount equal to the aggregate

19   amount  of all wages and all employee benefits paid to, or on behalf of,

20   construction workers for construction  work  divided  by  the  aggregate

21   number of hours of construction work.

22   (h)  "Brooklyn  development  area"  shall mean any tax lots now

23   existing or hereafter created which  are  located  entirely  within  the

24   borough  of Brooklyn and as set forth pursuant to a memorandum of under-

25   standing  entered  into  pursuant  to  subdivision  twenty-two  of  this

26   section.

27   (i) "Building service employee" shall mean any person who is regularly

28   employed  at,  and  performs work in connection with the care or mainte-

1   nance of, an eligible site, including, but not limited to,  a  watchman,

2   guard,  doorman,  building cleaner, porter, handyman, janitor, gardener,

3   groundskeeper, elevator operator and starter, and  window  cleaner,  but

4   not including persons regularly scheduled to work fewer than eight hours

5   per week at the eligible site.

6     (j) "Commencement  date"  shall  mean,  with  respect  to any eligible

7   multiple dwelling, the date upon which excavation  and  construction  of

8   initial  footings  and foundations lawfully begins in good faith or, for

9   an eligible conversion, the date upon which the actual  construction  of

10   the  conversion,  alteration or improvement of the pre-existing building

11   or structure lawfully begins in good faith.

12     (k) "Completion date" shall mean, with respect to any eligible  multi-

13   ple  dwelling,  the  date  upon  which the local department of buildings

14   issues the first temporary or permanent certificate of occupancy  cover-

15   ing all residential areas of an eligible multiple dwelling.

16     (l) "Construction  period"  shall  mean, with respect to any eligible

17   multiple dwelling, a period: (i) beginning on the later of the commence-

18   ment date of such eligible multiple dwelling or three years  before  the

19   completion  date  of such eligible multiple dwelling; and (ii) ending on

20   the day preceding the completion date of such eligible  multiple  dwell-

21   ing.

22     (m) "Construction work" shall mean the provision of labor performed on

23   an  eligible site between the commencement date and the completion date,

24   whereby materials and constituent parts are combined to initially  form,

25   make  or  build an eligible multiple dwelling, including without limita-

26   tion, painting, or providing of material, articles, supplies  or  equip-

27   ment in the eligible multiple dwelling, but excluding security personnel

28   and work related to the fit-out of commercial spaces.

1    (n)  "Construction   workers"   shall   mean   all  persons  performing

2    construction work who (i) are paid on an hourly basis and (ii)  are  not

3    in a management or executive role or position.

4    (o)  "Contractor  certified  payroll  report"  shall  mean an original

5    payroll report submitted by a contractor or sub-contractor to the  inde-

6    pendent  monitor  setting  forth to the best of the contractor's or sub-

7    contractor's knowledge, the total number of hours of  construction  work

8    performed  by construction workers, and the amount of wages and employee

9    benefits paid to construction workers for construction work.

10   (p) "Eligible conversion" shall mean  the  conversion,  alteration  or

11   improvement  of  a  pre-existing  building  or  structure resulting in a

12   multiple dwelling in which no more than forty-nine percent of the  floor

13   area consists of such pre-existing building or structure.

14   (q)  "Eligible  multiple  dwelling"  shall mean a multiple dwelling or

15   homeownership project containing six  or  more  dwelling  units  created

16   through  new construction or eligible conversion for which the commence-

17   ment date is within five years subsequent to the date on which the memo-

18   randum of understanding is entered into pursuant to subdivision  twenty-

19   two  of  this  section, and for which the completion date is within nine

20   years subsequent to the date on which a memorandum of  understanding  is

21   entered into pursuant to subdivision twenty-two of this section.

22   (r)  "Eligible  site"  shall  mean either: (i) a tax lot containing an

23   eligible multiple dwelling; or (ii) a zoning lot containing two or  more

24   eligible multiple dwellings that are part of a single application.

25   (s)  "Employee benefits" shall mean all supplemental compensation paid

26   by the employer, on behalf of construction workers,  other  than  wages,

27   including,  without  limitation, any premiums or contributions made into

28   plans or funds that provide health, welfare, non-occupational disability

1   coverage, retirement, vacation benefits, holiday pay, life insurance and

2   apprenticeship training. The value of any employee benefits received

3   shall be determined based on the prorated hourly cost to the employer of

4   the employee benefits received by construction workers.

5   (t) "Fiscal officer" shall mean the comptroller or other analogous

6   officer in a city having a population of one million or more.

7   (u) "Floor area" shall mean the horizontal areas of the several

8   floors, or any portion thereof, of a dwelling or dwellings, and accesso-

9   ry structures on a lot measured from the exterior faces of exterior

10  walls, or from the center line of party walls.

11  (v) "Four percent tax credits" shall mean federal low-income housing

12  tax credits computed in accordance with clause (ii) of subparagraph (B)

13  of paragraph (1) of subsection (b) of section forty-two of the internal

14  revenue code of nineteen hundred eighty-six, as amended.

15  (w) "Forty-year benefit" shall mean: (i) for the construction period,

16  a one hundred percent exemption from real property taxation, other than

17  assessments for local improvements; and (ii) for the first forty years

18  of the restriction period, a one hundred percent exemption from real

19  property taxation, other than assessments for local improvements.

20  (x) "Homeownership project" shall mean a multiple dwelling operated as

21  condominium or cooperative housing.

22  (y) "Homeownership project restriction period" shall mean a period

23  commencing on the completion date and expiring on the fortieth anniver-

24  sary of the completion date, notwithstanding any earlier termination or

25  revocation of ANNY Program benefits.

26  (z) "Independent monitor" shall mean an accountant licensed and in

27  good standing pursuant to article one hundred forty-nine of the educa-

28  tion law.

1    (aa) "Job action" shall mean any delay, interruption or  interference

2   with  the construction work caused by the actions of any labor organiza-

3   tion or concerted action of any employees at the eligible site,  includ-

4   ing  without limitation, strikes, sympathy strikes, work stoppages, walk

5   outs, slowdowns, picketing, bannering, hand billing, demonstrations,

6   sickouts, refusals to cross a picket line, refusals  to  handle  struck

7   business, and  use  of  the rat or other inflatable balloons or similar

8   displays.

9    (bb) "Large rental project" shall mean an eligible site consisting  of

10  thirty  or  more  residential dwelling units in which all dwelling units

11  included in any application are operated as rental housing.

12   (cc) "Large rental project restriction period"  shall  mean  a  period

13  commencing  on the completion date and extending in perpetuity, notwith-

14  standing any earlier termination or revocation of ANNY Program benefits.

15   (dd) "Manhattan prime development area" shall mean any tax  lots,  now

16  existing  or hereafter created, located  entirely  in  the  borough  of

17  Manhattan  and  as set forth pursuant to the memorandum of understanding

18  entered into pursuant to subdivision twenty-two of this section.

19   (ee) "Market unit" shall mean a dwelling unit in an eligible  multiple

20  dwelling other than an affordable housing unit.

21   (ff)  "Multiple  dwelling"  shall  have  the same meaning set forth in

22  subdivision seven of section four of the multiple dwelling law.

23   (gg) "Non-residential tax lot" shall mean a  tax  lot  that  does  not

24  contain any dwelling units.

25   (hh)  "Prime development area" shall mean the Manhattan prime develop-

26  ment area, the Brooklyn prime development  area  and  the  Queens  prime

27  development area.

1    (ii)  "Project-wide  certified  payroll report" shall mean a certified

2    payroll report submitted by the independent monitor to the fiscal  offi-

3    cer  based  on each contractor certified payroll report which sets forth

4    the total number of hours of construction work performed by construction

5    workers,  the amount of wages and employee benefits paid to construction

6    workers for construction work and the average hourly wage.

7    (jj) "Queens prime development area"  shall  mean  any  tax  lots  now

8    existing  or  hereafter  created  which  are located entirely within the

9    borough of Queens and as set forth pursuant to a  memorandum  of  under-

10   standing  entered  into  pursuant  to  subdivision  twenty-two  of  this

11   section.

12   (kk) "Rent stabilization" shall mean, collectively, the rent  stabili-

13   zation  law of nineteen hundred sixty-nine, the rent stabilization code,

14   and the emergency tenant protection act of nineteen seventy-four, all as

15   in effect as of the effective date of the chapter of  the  laws  of  two

16   thousand  twenty-four  that added this section or as amended thereafter,

17   together with any successor statutes or regulations addressing  substan-

18   tially the same subject matter.

19   (ll)  "Rental  project" shall mean, collectively, large rental project

20   and small rental project.

21   (mm) "Residential tax lot" shall mean a tax lot that contains dwelling

22   units.

23   (nn) "Small rental project" shall mean an eligible site consisting  of

24   less  than thirty residential dwelling units in which all dwelling units

25   included in any application are operated as rental housing.

26   (oo) "Small rental project restriction period"  shall  mean  a  period

27   commencing on the completion date and expiring on the thirty-fifth anni-

1   versary of the completion date, notwithstanding any earlier termination

2   or revocation of ANNY Project benefits.

3    (pp)  "Tax  exempt bond proceeds" shall mean the proceeds of an exempt

4   facility bond, as defined  in  paragraph  seven  of  subsection  (a)  of

5   section  one  hundred forty-two of the internal revenue code of nineteen

6   hundred eighty-six, as amended, the interest upon which is  exempt  from

7   taxation under section one hundred three of the internal revenue code of

8   nineteen hundred eighty-six, as amended.

9    (qq) "Third-party fund administrator" shall be a person or entity that

10  receives  funds  pursuant to subdivision three of this section and over-

11  sees and manages the disbursal of such funds  to  construction  workers.

12  The  third-party fund administrator shall be a person or entity approved

13  by the fiscal officer and recommended by one, or more, representative or

14  representatives of the largest trade  association  of  residential  real

15  estate developers, either for profit or not-for-profit, in New York city

16  and one, or more, representative or representatives of the largest trade

17  labor  association  representing building and construction workers, with

18  membership in New York city. The third-party fund  administrator  shall

19  be  appointed  for  a  term  of three years, provided, however, that the

20  administrator in place at the end of a three-year term shall continue to

21  serve beyond the end of the term until a  replacement  administrator  is

22  appointed.  The fiscal officer, after providing notice and after meeting

23  with  the  third-party fund administrator, may remove such administrator

24  for cause upon a fiscal officer determination that the administrator has

25  been ineffective at overseeing or managing the disbursal of funds to the

26  construction workers. The third-party fund administrator shall,  at  the

27  request of the fiscal officer, submit reports to the fiscal officer.

1    (rr)  "Thirty-five  year benefit" shall mean: (i) for the construction

2   period, a one hundred percent exemption  from  real  property  taxation,

3   other  than assessments for local improvements; (ii) for the first twen-

4   ty-five years of the small rental  project  restriction  period  or  the

5   large  rental  project  restriction period, as applicable, a one hundred

6   percent exemption from real property taxation,  other  than  assessments

7   for  local  improvements; and (iii) for the final ten years of the small

8   rental project restriction period or for the next ten years of the large

9   rental project restriction period, as applicable, an exemption from real

10   property taxation, other than assessments for local improvements,  equal

11   to the affordability percentage.

12    (ss)  "Wages" shall mean all compensation, remuneration or payments of

13   any kind paid to, or on  behalf  of,  construction  workers,  including,

14   without  limitation,  any  hourly  compensation  paid  directly  to  the

15   construction worker, together with employee benefits,  such  as  health,

16   welfare,  non-occupational  disability  coverage,  retirement,  vacation

17   benefits, holiday pay, life insurance and apprenticeship  training,  and

18   payroll  taxes, including, to the extent permissible by law, all amounts

19   paid for New York state unemployment insurance, New York state disabili-

20   ty insurance, metropolitan commuter transportation mobility tax, federal

21   unemployment insurance and pursuant to the  federal  insurance  contrib-

22   utions act or any other payroll tax that is paid by the employer.

23    2.  Benefit.  In  cities  having  a population of one million or more,

24   notwithstanding the provisions of any general, special or local  law  to

25   the  contrary,  new  eligible  multiple  dwellings,  except hotels, that

26   comply with the provisions of this section shall  be  exempt  from  real

27   property taxation, other than assessments for local improvements, in the

28   amounts  and for the periods specified in this section. A rental project

1  that meets all of the requirements of this section shall receive a thir-

2  ty-five year benefit and a homeownership project that meets all  of  the

3  requirements of this section shall receive a forty-year benefit.

4    3. Rental projects. In addition to all other requirements set forth in

5  this  section, rental projects containing more than the number of rental

6  units set forth by the memorandum of understanding entered into pursuant

7  to subdivision twenty-two of this section that are  located  within  the

8  prime  development  area shall comply with the requirements set forth in

9  this subdivision.  For purposes of this subdivision, "contractor"  shall

10 mean  any  entity  which by agreement with another party, including sub-

11 contractors, undertakes to perform construction work at an eligible site

12 and "applicant" shall mean an applicant for ANNY  Program  benefits  and

13 any successor thereto.

14   (a) The minimum average hourly wage paid to construction workers on an

15 eligible  site  within  the Manhattan prime development area shall be no

16 less than the amount set by the memorandum of understanding entered into

17 pursuant to subdivision twenty-two of this section, and  shall  increase

18 pursuant to a schedule set forth by such memorandum.

19   (b) The minimum average hourly wage paid to construction workers on an

20 eligible  site  within the Brooklyn prime development area or the Queens

21 prime development area shall be no less than the amount set by the memo-

22 randum of understanding entered into pursuant to subdivision  twenty-two

23 of  this section, and shall increase pursuant to a schedule set forth by

24 such memorandum.

25   (c) The requirements of paragraphs (a) and  (b)  of  this  subdivision

26 shall not be applicable to:

27   (i)  an  eligible multiple dwelling in which at least fifty percent of

28 the dwelling units upon initial rental and upon each  subsequent  rental

1  following  a vacancy during the large rental project restriction period,

2  are affordable to and restricted to occupancy by individuals or families

3  whose household income does not exceed ninety percent of the area median

4  income,  adjusted  for  family  size,  at  the  time that such household

5  initially occupies such dwelling unit; or

6    (ii) any eligible dwelling that meets exemption criteria set forth  in

7  a memorandum of understanding entered into pursuant to subdivision twen-

8  ty-two of this section.

9    (d)  The  applicant  shall contract with an independent monitor.  Such

10  independent monitor shall submit to the fiscal officer within  one  year

11  of  the completion date, a project-wide certified payroll report. In the

12  event such project-wide certified payroll report is not submitted to the

13  fiscal officer within the requisite time, the applicant shall be subject

14  to a fine of one thousand dollars per  week,  or  any  portion  thereof;

15  provided  that  the maximum fine shall be seventy-five thousand dollars.

16  In the event that the wage paid is less than the average hourly wage set

17  pursuant to paragraph (a) or (b) of this subdivision as applicable,  the

18  project-wide certified payroll report shall also set forth the amount of

19  such deficiency.

20    (e) The contractor certified payroll report shall be submitted by each

21  contractor  and  sub-contractor  no  later  than  ninety days after the

22  completion of construction work by such contractor or sub-contractor. In

23  the event that a contractor or sub-contractor fails or refuses to submit

24  the contractor certified payroll report within the  time  prescribed  in

25  this  paragraph, the independent monitor shall notify the fiscal officer

26  and the fiscal officer shall be authorized to fine  such  contractor  or

27  sub-contractor in an amount set forth by the memorandum of understanding

28  entered  into  pursuant  to  subdivision  twenty-two  of  this  section,

1  provided that the maximum fine shall not exceed an amount set  forth  in

2  such memorandum.

3   (f)  In the event that the project-wide certified payroll report shows

4  that the wage paid as required by paragraph (a) or (b) of this  subdivi-

5  sion,  as  applicable,  was not paid, if the wage paid is within fifteen

6  percent of the average hourly wage required pursuant to paragraph (a) or

7  (b) of this subdivision, as applicable, then no later than  one  hundred

8  twenty  days  from the date of submission of such project-wide certified

9  payroll report, the applicant shall pay to the third-party fund adminis-

10  trator an amount equal to the amount of the deficiency set forth in  the

11  project-wide  certified payroll report. The third-party fund administra-

12  tor shall distribute  such  payment  to  the  construction  workers  who

13  performed  construction work on such eligible site. Prior to making such

14  repayment, the third-party fund administrator shall submit to the fiscal

15  officer a plan subject to the fiscal officer's  approval  setting  forth

16  the  manner  in  which the third-party fund administrator will reach the

17  required average hourly wage within one hundred fifty days of  receiving

18  the  payment  from  the  applicant  and  how any remaining funds will be

19  disbursed in the event that the third-party  fund  administrator  cannot

20  distribute  the  funds  to  the  construction workers within one year of

21  receiving fiscal officer approval. In the event that the applicant fails

22  to make such payment within the time period  prescribed  in  this  para-

23  graph, the applicant shall be subject to a fine not to exceed the amount

24  set by the memorandum of understanding entered into pursuant to subdivi-

25  sion  twenty-two  of  this section, provided that the maximum fine shall

26  not exceed the amount set by the  memorandum  of  understanding  entered

27  into  pursuant  to  subdivision twenty-two of this section.  If the wage

28  paid is more than fifteen percent below the construction  wage  required

1   pursuant to paragraph (a) or (b) of this subdivision, as applicable,

2   then no later than one hundred twenty days from the date of submission

3   of such project-wide certified payroll report, the applicant shall pay

4   to the third-party fund administrator an amount equal to the amount of

5   the deficiency set forth in the project-wide payroll report. The third-

6   party fund administrator shall distribute such payment to the

7   construction workers who performed construction work on such eligible

8   site. Prior to making such repayment, the third-party fund administrator

9   shall submit to the fiscal officer a plan subject to the fiscal offi-

10  cer's approval setting forth the manner in which the third-party fund

11  administrator will reach the required average hourly wage within one

12  hundred fifty days of receiving the payment from the applicant and how

13  any remaining funds will be disbursed in the event that the third-party

14  fund administrator cannot distribute the funds to the construction work-

15  ers within one year of receiving fiscal officer approval. In addition,

16  the fiscal officer shall impose a penalty on the applicant in an amount

17  equal to twenty-five percent of the amount of the deficiency, provided,

18  however, that the fiscal officer shall not impose such penalty where the

19  eligible multiple dwelling has been the subject of a job action which

20  results in a work delay. In the event that the applicant fails to make

21  such payment within the time period prescribed in this paragraph, the

22  applicant shall be subject to a fine not to exceed the amount set by the

23  memorandum of understanding entered into pursuant to subdivision twen-

24  ty-two of this section, provided that the maximum fine shall not exceed

25  the amount set by the memorandum of understanding entered into pursuant

26  subdivision twenty-two of this section. Notwithstanding any provision

27  of this subdivision, the applicant shall not be liable in any respect

28  whatsoever for any payments, fines or penalties related to or resulting

1   from contractor fraud, mistake, or negligence or for fraudulent or inac-

2   curate contractor certified payroll reports or for fraudulent or inaccu-

3   rate project-wide certified payroll reports, provided, however, that

4   payment to the third-party fund administrator in the amount set forth in

5   the project-wide certified payroll report as described in this paragraph

6   shall still be made by the contractor or sub-contractor in the event of

7   underpayment resulting from or caused by the contractor or sub-contrac-

8   tor, and that the applicant will be liable for underpayment to the

9   third-party fund administrator unless the fiscal officer determines, in

10  its sole discretion, that the underpayment was the result of, or caused

11  by, contractor fraud, mistake or negligence and/or for fraudulent or

12  inaccurate contractor certified payroll reports and/or project-wide

13  certified payroll reports. The applicant shall otherwise not be liable

14  in any way whatsoever once the payment to the third-party fund adminis-

15  trator has been made in the amount set forth in the project-wide certi-

16  fied payroll report. Other than the underpayment, which must be paid to

17  the third-party fund administrator, all fines and penalties set forth in

18  this subdivision imposed by the fiscal officer shall be paid to the

19  agency and used by the agency to provide affordable housing.

20   (g) Nothing in this subdivision shall be construed to confer a private

21  right of action to enforce the provisions of this subdivision, provided,

22  however, that this sentence shall not be construed as a waiver of any

23  existing rights of construction workers or their representatives related

24  to wage and benefit collection, wage theft or other labor protections or

25  rights and provided, further, that nothing in this subdivision relieves

26  any obligations pursuant to a collective bargaining agreement.

27   (h) The fiscal officer shall have the sole authority to determine and

28  enforce any liability for underpayment owing to the third-party fund

1   administrator   from   the applicant and/or the contractor, as a result of

2   contractor fraud, mistake or negligence and/or for fraudulent or inaccu-

3   rate contractor certified payroll reports and/or project-wide  certified

4   payroll reports, as set forth in paragraph (e) of this subdivision.  The

5   fiscal  officer shall expeditiously conduct an investigation and hearing

6   at the New York city office of administrative trials and hearings, shall

7   determine the issues raised thereon and shall make and file an order  in

8   his  or her office stating such determination and forthwith serve a copy

9   of such order, either personally or by mail,  together  with  notice  of

10  filing, upon the parties to such proceedings. The fiscal officer in such

11  an investigation shall be deemed to be acting in a judicial capacity and

12  shall  have  the  right to issue subpoenas, administer oaths and examine

13  witnesses. The enforcement of a subpoena  issued  under  this  paragraph

14  shall  be  regulated  by the civil practice law and rules. The filing of

15  such order shall have the full force and effect of a judgment duly dock-

16  eted in the office of the county clerk. The order may be enforced by and

17  in the name of the fiscal officer in the  same  manner,  and  with  like

18  effect,  as  that prescribed by the civil practice law and rules for the

19  enforcement of a money judgment.

20   4. In addition to all other requirements set forth in this section, an

21  eligible site must, over the course of the design  and  construction  of

22  such  eligible  site,  make all reasonable efforts to spend on contracts

23  with minority and women owned business enterprises at least  twenty-five

24  percent of the total applicable costs, as such enterprises and costs are

25  defined  in  rules  of  the  agency. Such rules shall set forth required

26  measures with respect to contracts for design and construction that  are

27  comparable,  to the extent practicable, to the measures used by agencies

28  of the city of New York to enhance minority  and  women  owned  business

1   enterprise participation in agency contracts pursuant to applicable law,

2   including  section  6-129  of the administrative code of the city of New

3   York.

4     5.  Tax payments. In addition to any other amounts payable pursuant to

5   this section, the owner of any  eligible  site  receiving  ANNY  Program

6   benefits shall pay, in each tax year in which such ANNY Program benefits

7   are in effect, real property taxes and assessments as follows:

8     (a)  with  respect  to  each eligible multiple dwelling constructed on

9   such eligible site, real property taxes on  the  assessed  valuation  of

10  such  land  and  improvements thereon in effect during the tax year

11  prior to the commencement date of such eligible multiple dwelling, with-

12  out regard to any exemption from or abatement of real property  taxation

13  in  effect  during  such  tax  year,  which real property taxes shall be

14  calculated using the tax rate in effect at the time such taxes are  due;

15  and

16    (b) all assessments for local improvements.

17    6.  Limitation on benefits for non-residential space. If the aggregate

18  floor area of commercial, community facility and accessory use space  in

19  an  eligible  site,  other  than  parking which is located not more than

20  twenty-three feet above the curb level, exceeds twelve  percent  of  the

21  aggregate  floor  area  in such eligible site, any ANNY Program benefits

22  shall be reduced by a percentage equal to such excess.  If  an  eligible

23  site  contains  multiple tax lots, the tax arising out of such reduction

24  in ANNY Program benefits shall first be apportioned pro rata  among  any

25  non-residential  tax  lots.  After any such non-residential tax lots are

26  fully taxable, the remainder of the tax arising out of such reduction in

27  ANNY Program benefits, if any, shall be apportioned pro rata  among  the

28  remaining residential tax lots.

1   7. Calculation of benefit. Based on the certification of the agency

2   certifying the applicant's eligibility for ANNY Program benefits, the

3   assessors shall certify to the collecting officer the amount of taxes to

4   be exempted.

5   8. Affordability requirements. A rental project shall maintain an

6   affordability percentage at or above the minimum affordability percent-

7   age set forth in regulations promulgated by the agency. The affordable

8   dwelling units within a rental project shall comply with the area median

9   income affordability level or levels set forth pursuant to regulations

10  promulgated by the agency. In setting the affordability percentage and

11  the area median income levels, the agency shall consider the following

12  goals and factors: the production of financially viable, high quality

13  and safe housing, particularly in well-resourced areas with high land

14  acquisition costs, that meet the needs of low and moderate income house-

15  holds and individuals.

16  (a) All rental dwelling units in an eligible multiple dwelling shall

17  share the same common entrances and common areas as market rate units in

18  such eligible multiple dwelling and shall not be isolated to a specific

19  floor or area of an eligible multiple dwelling. Common entrances shall

20  mean any area regularly used by any resident of a rental dwelling unit

21  in the eligible multiple dwelling for ingress and egress from such

22  eligible multiple dwelling.

23  (b) Unless preempted by the requirements of a federal, state or local

24  housing program, either (i) the affordable housing units in an eligible

25  multiple dwelling shall have a unit mix proportional to the market

26  units, or (ii) at least fifty percent of the affordable housing units in

27  an eligible multiple dwelling shall have two or more bedrooms and no

1  more than twenty-five percent of the affordable housing units shall have

2  less than one bedroom.

3   (c) Notwithstanding any provision of rent stabilization to the contra-

4  ry, all affordable housing units shall remain fully subject to rent

5  stabilization both during and subsequent to the small building

6  restriction period or the large building restriction period, as applica-

7  ble.

8   (d) All rent stabilization registrations required to be filed shall

9  contain a designation that specifically identifies affordable housing

10  units created pursuant to this section as "ANNY Program affordable hous-

11  ing units" and shall contain an explanation of the requirements that

12  apply to all such affordable housing units.

13   (e) Failure to comply with the provisions of this subdivision that

14  require the creation, maintenance, rent stabilization compliance and

15  occupancy of affordable housing units or for purposes of a homeownership

16  project the failure to comply with the affordable homeownership project

17  requirements shall result in revocation of any ANNY Program benefits for

18  the period of such non-compliance.

19   (f) Nothing in this section shall (i) prohibit the occupancy of an

20  affordable housing unit by individuals or families whose income at any

21  time is less than the maximum percentage of the area median income,

22  adjusted for family size, specified for such affordable housing unit

23  pursuant to this section, or (ii) prohibit the owner of an eligible site

24  from requiring, upon initial rental or upon any rental following a

25  vacancy, the occupancy of any affordable housing unit by such lower

26  income individuals or families.

27   (g) Following issuance of a temporary certificate of occupancy and

28  upon each vacancy thereafter, an affordable housing unit shall promptly

1   be offered for rental by individuals or families whose income does not

2   exceed the maximum percentage of the area median income, adjusted for

3   family size, specified for such affordable housing unit pursuant to this

4   section and who intend to occupy such affordable housing unit as their

5   primary residence. An affordable housing unit shall not be (i) rented to

6   a corporation, partnership or other entity, or (ii) held off the market

7   for a period longer than is reasonably necessary to perform repairs

8   needed to make such affordable housing unit available for occupancy.

9     (h) An affordable housing unit shall not be rented on a temporary,

10  transient or short-term basis. Every lease and renewal thereof for an

11  affordable housing unit shall be for a term of one or two years, at the

12  option of the tenant.

13    (i) An affordable housing rental unit shall not be converted to coop-

14  erative or condominium ownership.

15    (j) The agency may establish by rule such requirements as the agency

16  deems necessary or appropriate for (i) the marketing of affordable hous-

17  ing units, both upon initial occupancy and upon any vacancy, (ii) moni-

18  toring compliance with the provisions of this subdivision, and (iii) the

19  marketing and monitoring of any homeownership project that is granted an

20  exemption pursuant to this subdivision. Such requirements may include,

21  but need not be limited to, retaining a monitor approved by the agency

22  and paid for by the owner.

23    (k) Notwithstanding any provision of this section to the contrary, a

24  market unit shall not be subject to rent stabilization unless, in the

25  absence of ANNY Program benefits, the unit would be subject to rent

26  stabilization.

27    9. Building service employees. (a) For the purposes of this subdivi-

28  sion, "applicant" shall mean an applicant for ANNY Program benefits, any

1  successor to such applicant, or any employer of building service employ-

2  ees for such applicant, including, but not limited to, a property

3  management company or contractor.

4      (b)  All  building  service employees employed by the applicant at the

5  eligible site shall receive the applicable prevailing wage for the dura-

6  tion of the applicable benefit period, regardless of whether such  bene-

7  fits are revoked or terminated.

8      (c)  The fiscal officer shall have the power to enforce the provisions

9  of this subdivision. In enforcing such provisions, the  fiscal  officer

10  shall have the power:

11     (i)  to  investigate or cause an investigation to be made to determine

12  the prevailing wages for building  service  employees;  in  making  such

13  investigation,  the  fiscal  officer may utilize wage and fringe benefit

14  data from various sources, including,  but  not  limited  to,  data  and

15  determinations  of  federal,  state  or  other  governmental  agencies,

16  provided, however, that the provision of a dwelling unit  shall  not  be

17  considered wages or a fringe benefit;

18     (ii)  to  institute and conduct inspections at the site of the work or

19  elsewhere;

20     (iii) to examine the books, documents and records  pertaining  to  the

21  wages  paid  to,  and  the  hours of work performed by, building service

22  employees;

23     (iv) to hold hearings and, in connection therewith, to  issue  subpoe-

24  nas,  administer  oaths  and  examine  witnesses;  the  enforcement of a

25  subpoena issued under this subdivision shall be regulated by  the  civil

26  practice law and rules;

27     (v) to make a classification by craft, trade or other generally recog-

28  nized  occupational  category  of  the building service employees and to

1    determine whether such work has been performed by the  building  service

2    employees in such classification;

3     (vi) to require the applicant to file with the fiscal officer a record

4    of  the  wages  actually  paid by such applicant to the building service

5    employees and of their hours of work;

6     (vii) to delegate any of the foregoing powers to his or her deputy  or

7    other authorized representative;

8     (viii)  to  promulgate rules as he or she shall consider necessary for

9    the  proper  execution  of  the  duties,  responsibilities  and   powers

10   conferred upon him or her by the provisions of this paragraph; and

11    (ix) to prescribe appropriate sanctions for failure to comply with the

12   provisions  of  this subdivision. For each violation of paragraph (b) of

13   this subdivision, the fiscal officer may require  the  payment  of:  (A)

14   back wages and fringe benefits; (B) liquidated damages up to three times

15   the amount of the back wages and fringe benefits for willful violations;

16   and/or  (C) reasonable attorney's fees. If the fiscal officer finds that

17   the applicant has failed to comply with the provisions of this  subpara-

18   graph,  he  or  she shall present evidence of such non-compliance to the

19   agency.

20    (d) Paragraph (b) of this subdivision shall not be applicable to:

21    (i) an eligible multiple dwelling containing less than thirty dwelling

22   units; or

23    (ii) an eligible multiple dwelling in which all of the dwelling  units

24   are  affordable  housing  units  and not less than fifty percent of such

25   affordable housing units, upon initial rental and upon  each  subsequent

26   rental following a vacancy are affordable to and restricted to occupancy

27   by individuals or families whose household income does not exceed ninety

1  percent of the area median income, adjusted for family size, at the time

2  that such household initially occupies such dwelling unit.

3    (e) The applicant shall submit a sworn affidavit with its application,

4  and  annually  thereafter,  certifying  that  it  shall  comply with the

5  requirements of this subdivision.

6    (f) The agency shall annually publish a list  of  all  eligible  sites

7  subject  to  the  requirements  of  this  paragraph  and  the  affidavits

8  required pursuant to paragraph (e) of this subdivision.

9    10. Replacement ratio. If the  land  on  which  an  eligible  site  is

10  located  contained any dwelling units three years prior to the commence-

11  ment date of the first eligible multiple  dwelling  thereon,  then  such

12  eligible  multiple  dwelling or dwellings built thereon shall contain at

13  least one affordable housing unit for each dwelling unit that existed on

14  such date and was thereafter demolished, removed or reconfigured.

15    11. Concurrent exemptions or abatements. An eligible multiple dwelling

16  receiving ANNY Program benefits shall not receive any exemption from  or

17  abatement of real property taxation under any other law.

18    12.  Voluntary  renunciation  or  termination.  Notwithstanding  the

19  provisions of any general, special or local  law  to  the  contrary,  an

20  owner  shall  not  be entitled to voluntarily renounce or terminate ANNY

21  Program benefits unless  the  agency  authorizes  such  renunciation  or

22  termination  in  connection with the commencement of a new tax exemption

23  pursuant to either the private  housing  finance  law  or  section  four

24  hundred twenty-c of this title.

25    13. Termination or revocation. The agency may terminate or revoke ANNY

26  Program benefits for noncompliance with this section; provided, however,

27  that  the agency shall not terminate or revoke ANNY Program benefits for

28  a failure to comply with subdivision three of this section. If an appli-

1  cant has committed three violations of the requirements of  paragraph  b

2  of subdivision nine of this section within a five-year period, the agen-

3  cy  may  revoke  any  benefits  under this section. For purposes of this

4  subdivision,  a  "violation"  of paragraph b of subdivision nine of this

5  section shall be deemed a finding by the fiscal officer that the  appli-

6  cant  has  failed to comply with paragraph b of subdivision nine of this

7  section and has failed to cure the deficiency  within  three  months  of

8  such  finding.   Provided, however, that after a second such violation,

9  the applicant shall be notified that any further violation may result in

10 the revocation of benefits under this section and that the fiscal  offi-

11 cer  shall  publish  on  its  website  a list of all applicants with two

12 violations as defined in this paragraph. If ANNY  Program  benefits  are

13 terminated  or  revoked  for noncompliance with this section: (a) all of

14 the affordable housing units shall remain subject to rent  stabilization

15 and   all   other   requirements  of  this  section  for  the  applicable

16 restriction period, and any additional period expressly provided in this

17 section, as if the ANNY Program benefits  had  not  been  terminated  or

18 revoked; or (b) for a homeownership project, such project shall continue

19 to  comply with affordability requirements set forth in this section and

20 all other requirements of this section for the  restriction  period  and

21 any additional period expressly provided in this section, as if the ANNY

22 Program benefits had not been terminated or revoked.

23 14.  Powers  cumulative.  The  enforcement  provisions of this section

24 shall not be exclusive, and are in addition to any other  rights,  reme-

25 dies,  or  enforcement powers set forth in any other law or available at

26 law or in equity.

27 15. Multiple tax lots. If an eligible site contains multiple tax lots,

28 an application may be submitted with respect to one or more of such  tax

1   lots.  The  agency shall determine eligibility for ANNY Program benefits

2   based upon the tax lots included in such application  and  benefits  for

3   each  multiple  dwelling shall be based upon the completion date of such

4   multiple dwelling.

5   16. Applications. (a)  The  application with respect to any eligible

6   multiple dwelling shall be filed with the agency not later than one year

7   after the completion date of such eligible multiple dwelling.

8   (b) Notwithstanding the provisions of any general,  special  or  local

9   law to the contrary, the agency may require by rule that applications be

10  filed electronically.

11  (c)  The  agency may rely on certification by an architect or engineer

12  submitted by an applicant in connection with the filing of  an  applica-

13  tion. A  false  certification  by  such  architect or engineer shall be

14  deemed to be professional  misconduct  pursuant  to  section  sixty-five

15  hundred  nine  of  the  education law. Any licensee found guilty of such

16  misconduct under the procedures prescribed in section sixty-five hundred

17  ten of the education law shall be subject to the penalties prescribed in

18  section sixty-five hundred eleven of the education law and shall  there-

19  after be ineligible to submit a certification pursuant to this section.

20  (d)  The  agency  shall  not  require  that  the applicant demonstrate

21  compliance with the requirements of subdivision three of this section as

22  a condition to approval of the application.

23  17. Filing fee. The agency may require a filing fee of three  thousand

24  dollars  per  dwelling unit in connection with any application. However,

25  the agency may promulgate rules imposing a lesser fee for eligible sites

26  containing eligible multiple dwellings constructed with the  substantial

27  assistance of grants, loans or subsidies provided by a federal, state or

1  local  governmental  agency or instrumentality pursuant to a program for

2  the development of affordable housing.

3   18.  Rules.  Except as provided in subdivisions three and nine of this

4  section, the agency  shall  have  the  sole  authority  to  enforce  the

5  provisions  of  this  section  and may promulgate rules to carry out the

6  provisions of this section.

7   19. Election. Notwithstanding anything in this section to the  contra-

8  ry,  a  small  rental  project,  large  rental  project or homeownership

9  project with a commencement date on or before June fifteenth, two  thou-

10  sand  twenty-two that has not received benefits pursuant to section four

11  hundred twenty-one-a of this title prior to the effective  date  of  the

12  chapter  of the laws of two thousand twenty-four that added this section

13  may elect to comply with this section and receive ANNY Program  benefits

14  pursuant to this section.

15   20.  Reporting.  On or before June thirtieth of each year, the commis-

16  sioner of the New York  city  department  of  housing  preservation  and

17  development  shall  issue a report to the governor, the temporary presi-

18  dent of the senate and the speaker of the  assembly  setting  forth  the

19  number  of  total  projects  and  units created by this section by year,

20  level of affordability, and  community  board,  the  cost  of  the  ANNY

21  Program, and other such factors as the commissioner of the New York city

22  department  of  housing  preservation and development deems appropriate.

23  The New York city department of housing preservation and development may

24  request and shall receive cooperation and assistance  from  all  depart-

25  ments,  divisions,  boards,  bureaus, commissions, public benefit corpo-

26  rations or agencies of the state of New York, the city of  New  York  or

27  any  other political subdivisions thereof, or any entity receiving bene-

28  fits pursuant to this section.

1    21. Penalties for violations of large rental project affordability

2  requirements. (a)  On  and after the expiration date of the thirty-five

3  year benefit for a large rental project, the agency may  impose,  after

4  notice  and  an opportunity to be heard, a fine for any violation of the

5  affordability  requirements established pursuant to subdivision eight of

6  this section by such large rental project.  The agency shall establish a

7  schedule and method of calculation of such fines pursuant to subdivision

8  seventeen of this section.

9    (b) A fine under this subdivision may be imposed against the owner  of

10  the  eligible  site containing such large rental project at the time the

11  violation occurred, even if such owner  no  longer  owns  such  eligible

12  site.   A  failure to pay such fine may result in a lien and such other

13  remedies as may be available pursuant to applicable law and regulation.

14    22. The provisions of subdivisions  one  through  twenty-one  of  this

15  section  shall  take  effect  only upon the conditions that on or before

16  January first, two thousand twenty-five: (a) a memorandum of understand-

17  ing is executed by one, or more, representatives of  the  largest  trade

18  association  of residential real estate developers, either for profit or

19  not-for-profit, in New York city as well  as  one,  or  more,  represen-

20  tatives of the largest trade labor association representing building and

21  construction  workers,  with membership in New York city, and (b) notice

22  of such full execution is delivered to  the  legislative  bill  drafting

23  commission.  Such  memorandum  of understanding shall include provisions

24  regarding wages or wage supplements for construction workers  on  build-

25  ings  over fifteen units where such buildings enjoy the benefits of this

26  section; provided, however, that  such  memorandum  shall  also  address

27  issues including those related to the (i) number of units, (ii) applica-

28  tion of a wage schedule to different size projects, (iii) wage schedules

1  for various geographic locations in New York city, and (iv) a schedule

2  of fines for non-compliance with the wage requirements set forth in this

3  section. The terms and conditions of the memorandum of understanding

4  shall apply to all projects with more than fifteen units that receive

5  benefits under this section after the memorandum of understanding is

6  executed. Notwithstanding the foregoing, the addition, amendment and/or

7  repeal of any rule or regulation necessary for the implementation of

8  this act on its effective date are authorized to be made and completed

9  on or before such effective date.

10  § 2. Paragraphs f and g of subdivision 3 of section 224-a of the labor

11  law, as added by section 1 of part FFF of chapter 58 of the laws of

12  2020, are amended and a new paragraph h is added to read as follows:

13  f. funds provided pursuant to subdivision three of section twenty-

14  eight hundred fifty-three of the education law; [and]

15  g. any other public monies, credits, savings or loans, determined by

16  the public subsidy board created in section two hundred twenty-four-c of

17  this article as exempt from this definition[.]; and

18  h. benefits under section four hundred eighty-five-x of the real prop-

19  erty tax law.

20  § 3. Severability clause. If any clause, sentence, paragraph, subdivi-

21  sion, or section of this act shall be adjudged by any court of competent

22  jurisdiction to be invalid, such judgment shall not affect, impair, or

23  invalidate the remainder thereof, but shall be confined in its operation

24  to the clause, sentence, paragraph, subdivision, or section thereof

25  directly involved in the controversy in which such judgment shall have

26  been rendered. It is hereby declared to be the intent of the legislature

27  that this act would have been enacted even if such invalid provisions

28  had not been included herein.

 1     § 4. This act shall take effect immediately; provided, however, that

 2    the department of housing preservation and development shall notify  the

 3    legislative   bill   drafting   commission   upon   the   occurrence   of   the

 4    execution of the memorandum of understanding provided for in subdivision

 5    twenty-two  of  section  485-x  of the real property tax law as added by

 6    section one of this act in order that the  commission  may  maintain  an

 7    accurate and timely effective data base of the official text of the laws

 8    of  the  state of New York in furtherance of effectuating the provisions

 9    of section 44 of the legislative law and  section  70-b  of  the  public

10    officers law.

11     § 2. Severability clause. If any clause, sentence, paragraph, subdivi-

12    sion,  section  or  part  of  this act shall be adjudged by any court of

13    competent jurisdiction to be invalid, such judgment  shall  not  affect,

14    impair,  or  invalidate  the remainder thereof, but shall be confined in

15    its operation to the clause, sentence, paragraph,  subdivision,  section

16    or part thereof directly involved in the controversy in which such judg-

17    ment shall have been rendered. It is hereby declared to be the intent of

18    the  legislature  that  this  act  would  have been enacted even if such

19    invalid provisions had not been included herein.

20     § 3. This act shall take effect immediately  provided,  however,  that

21    the  applicable effective date of Parts A through U of this act shall be

22    as specifically set forth in the last section of such Parts.